# No. 3:23-cv-102 (KAD)

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

HO WAN KWOK,

Debtor – Appellant,

v.

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, L.P. & LUC A. DESPINS,

Appellees.

Appeal of Preliminary Injunction Order from

United States Bankruptcy Court for the District of Connecticut

Bankr. No. 22-50073 (JAM) / Adv. Pro. No. 22-5032

## APPELLANT HO WAN KWOK APPEAL BRIEF

Jeffrey Hellman (Fed. Bar: ct04102)
Law Offices of Jeffrey Hellman, LLC
195 Church Street, 10th Floor
New Haven, CT 06510
(203) 691-8762
jeff@jeffhellmanlaw.com

David S. Wachen (*pro hac vice*)
Wachen LLC
11605 Montague Court
Potomac, MD 20854
(240) 292-9121
david@wachenlaw.com

*Attorneys for Debtor-Appellant Ho Wan Kwok*

July 26, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT REGARDING ORAL ARGUMENT ................................... 1

JURISDICTIONAL STATEMENT .......................................................... 1

ISSUES PRESENTED AND STANDARD OF REVIEW ......................... 2

STATEMENT OF THE CASE ................................................................. 3

SUMMARY OF ARGUMENT ............................................................... 13

ARGUMENT ......................................................................................... 15

  I.  The Bankruptcy Court Lacked Subject-Matter Jurisdiction ........................... 15

  II. The Sweeping, Content-Based Injunction Violates the First Amendment By Impermissibly Restraining Speech ................................................. 19

    A.  The Injunction Does Not Serve Compelling State Interests ................... 22

    B.  The Injunction Is Not Narrowly Tailored ........................................ 28

      1.  Breadth of Locations and People .......................................... 29

      2.  Arbitrary Buffer Zones ....................................................... 29

      3.  Arbitrary Time Restrictions ................................................ 32

      4.  Prohibited Content ............................................................. 33

      5.  Breadth of Activities Prohibited ......................................... 34

    C.  The Enjoined Speech Involves Matters of Public Concern ................... 34

  III. The Injunction Fails as Vague, Ambiguous, and Overly Broad .................... 37

    A.  The Injunction is Impermissibly Vague and Ambiguous ..................... 38

    B.  The Injunction is Impermissibly Overbroad ..................................... 41

    C.  The Injunction Fails to Put this Court on Notice of What it is Reviewing .......................................................................... 43

  IV. The Bankruptcy Court Improperly Relied on Inadmissible Hearsay ............ 43

  V. The Injunction Exceeds the Bankruptcy Court's Powers ......................... 47

VI. The Court Erred in Applying the Preliminary Injunction Standard ...............49

   A.   The Court Misapplied the Likelihood of Success Standard ....................49

   B.   Appellees Failed to Establish Irreparable Harm ......................................50

   C.   The Balance of Harms Tips Decidedly Against Injunctive Relief...........53

   D.   The Public Interest Weighs Heavily Against the Injunction....................55

CONCLUSION .......................................................................................................55

CERTIFICATE OF COMPLIANCE .......................................................................56

CERTIFICATE OF SERVICE ................................................................................57

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ................................28

*BDRN v. UnitedHealthCare,* No. 15-cv-0804 (NSR), 2015 WL
1841210, at \*4 (S.D.N.Y. Mar. 18 2015) ...........................................................52

*Boos v. Barry*, 485 U.S. 312 (1988)...................................................................21, 41

*CBS v. Davis*, 510 U.S. 1315 (1994) ....................................................19, 20, 22, 55

*CBS v. U.S. Dist. Ct.*, 729 F.2d 1174 (9th Cir. 1984) ................................. 19-20, 22

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) ................................................18, 19

*City of New York v. Mickalis Pawn Shop,* 645 F.3d 114
(2d Cir. 2011) ................................................................................................ 41-42

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................54

*Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530
(1980) ...................................................................................................................21

*Corning Inc. v. PicVue Electronics,* 365 F.3d 156 (2d Cir. 2004) .........................40

*Country Fare LLC v. Lucerne Farms,* No. 3:11CV722(VLB), 2011
WL 2222315 (D. Conn. June 7, 2011)..................................................................46

*Cox v. State of Louisiana,* 379 U.S. 559 (1965) ...................... 23, 24, 25, 26, 31, 33

*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967)...........................................................55

*Diapulse Corp. v. Carba,* 626 F.2d 1108 (2d Cir. 1980)........................................37

*Elrod v. Burns,* 417 U.S. 347 (1976) ......................................................................53

*Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110
(2d Cir. 2009) ................................................................................................50, 52

*Fonar Corp. v. Deccaid Svcs.* 983 F.2d 427, 429 (2d Cir. 1993)...............39, 40, 43

*Frisby v. Schultz,* 487 U.S. 474 (1988)........................... 23, 24, 27, 30-34

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)...........................22

*Gertz v. Robert Welch Inc.*, 418 U.S. 323 (1974).......................18, 36, 37

*Illinois Tool Works v. J-B Weld Co.,* 419 F. Supp. 3d 382
    (D. Conn. 2019) ...................................................................45

*In re Ben Cooper, Inc.*, 896 F.2d 1394 (2d Cir. 1990) ...........................16

*In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992) ...................19

*In re Guadalupe*, 365 B.R. 17 (D. Conn. 2007) .......................................2

*In re Homadian*, 646 B.R. 550 (Bankr. E.D.N.Y. 2022).......................52

*In re Indicon*, 499 B.R. 395 (D. Conn. 2013) .........................................15

*In re LightSquared,* 539 B.R. 232 (S.D.N.Y. 2015) ............................38, 41, 42, 43

*In re Lyondell Chem. Co*., 402 B.R. 571 (Bankr. S.D.N.Y. 2009)................... 49-50

*In re New England Nat.,* No. 02-33699(LMW), 2012 WL 3987648,
    (Bankr. D. Conn. Sept. 11, 2012)...........................................................18

*In re Peterson*, No: 10-23429 (AMN), 2018 WL 1172447
    (Bankr. D. Conn. Mar. 2, 2018) .........................................................51

*In re Roman Catholic Diocese*, 628 B.R. 571 (N.D.N.Y. 2021)...........................50

*In re Roman Catholic Diocese*, No. 20-12345 (MG), 2023 WL
    3750442 (Bankr. S.D.N.Y. June 1, 2023)............................................52

*Int'l Longshoremen's Assoc. Local 1291 v. Philadelphia
    Marine Trade Assoc.,* 389 U.S. 64 (1967)....................................38, 41

*Local 553 v. Eastern Air Lines,* 695 F.2d 668 (2d Cir. 1982) ................................52

*Madsen v. Women's Health Center,* 512 U.S. 753 (1994) ....................24-26, 30-33

*Marah Wood Prods. v. Jones*, 534 B.R. 465 (D. Conn. 2015) ................................18

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..................................................28, 31, 32

*Momentum Mfg. Corp. v. Emp. Creditors Comm.*, 25 F.3d 1132
   (2d Cir. 1994)..................................................................................................47

*Mullins v. City of New York,* 626 F.3d 47 (2d Cir. 2010)....................................44

*Near v. Minnesota,* 283 U.S. 697 (1931) ...........................................................18, 19

*Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539 (1976).......................................20, 55

*New England Dairies v. Dairy Mart Conven. Stores,* 351 F.3d 86
   (2d Cir. 2003) .............................................................................................47, 48

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)........................................18, 19, 21

*N.Y. Times Co. v. United States,* 403 U.S. 713 (1971) ...............................19, 20, 55

*N.Y. Progress and Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d
   Cir. 2013). ........................................................................................................55

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................51

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S.
   50 (1982) ..........................................................................................................17

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988) .........................47

*Obsidian Fin. Gp. v. Cox,* 740 F.3d 1284 (9th Cir. 2014)......................................36

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971)......................26, 27

*Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572
   (2d Cir. 2011) ...............................................................................................18, 19

*Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) ..............................21, 22, 25, 26, 33

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................20, 22

*Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020) .....................................53

*Rosen v. Siegel*, 106 F.3d 28 (2d Cir. 1997) ...........................................................41

*Sanders v. Air Line Pilots Ass'n,* 473 F.2d 244 (2d Cir. 1972) ............. 37, 40, 42-43

*Saxe v. State College Area School Dist.,* 240 F.3d 200 (3d Cir. 2001) ..................21

*Schenck v. Pro-Choice Network,* 519 U.S. 357 (1997) .....................................27, 28

*Schmidt v. Lessard,* 414 U.S. 473 (1974) ..............................................37, 38, 39, 43

*SEC v. Musella,* 578 F. Supp. 425 (S.D.N.Y. 1984)...............................................45

*Sheet Metal Contractors Ass'n v. Sheet Metal Workers Intern. Ass'n*,
    157 F.3d 78 (2d Cir. 1998).....................................................................49

*Simon & Schuster v. Members of N.Y. State Crime Victims Bd.,* 502
    U.S. 105 (1991).........................................................................................28

*Snyder v. Phelps,* 562 U.S. 443 (2011) ......................................................... 2, 34-36

*Stephenson v. Dow Chem. Co.*, 346 F.3d 19 (2d Cir. 2003)...................................48

*Sterling Drug v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994).........................................38

*Stern v. Marshall*, 564 U.S. 462 (2011) ............................................................16, 17

*Syngenta Crop Protection v. Henson*, 537 U.S. 28 (2002).....................................48

*Tilton v. MBIA,* 620 B.R. 707 (S.D.N.Y. 2020)........................................................15

*United States v. Blue Ribbon Smoke Fish,* 56 Fed. Appx. 542
    (2d Cir. 2003)............................................................................................43

*United States v. Buddhu,* No. 08-civ-0074, 2008 WL 2355930
    (D. Conn. June 5, 2008) ...........................................................................44

*United State v. Int'l Brotherhood of Teamsters* 266 F.3d 45
    (2d Cir. 2001)........................................................................................ 48-49

*United States v. N.Y. Tel. Co.,* 434 U.S. 159 (1977)................................................48

*United Transp. Union v. State Bar of Mich.*, 401 U.S. 576 (1971) ........................20

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989)...............................................33

*We the Patriots USA v. Hochul,* 17 F.4th 266 (2d Cir. 2021),
    *cert. denied,* 142 S. Ct. 2569 (2022) .....................................................44

*Wellness Intern. Network v. Sharif*, 575 U.S. 665 (2015) .......................................17

*Winter v. Nat'l Resources Defense Council,* 555 U.S. 7 (2008) ........................51, 55

*Young v. American Mini Theatres*, 427 U.S. 50 (1976) .....................................21, 23


**Statutes**

11 U.S.C. § 105(a). ................................................. 5, 14, 15, 38, 47, 48, 49

28 U.S.C. § 157(a) ...............................................................1, 13, 15, 16

28 U.S.C. § 157(b)(2)(A) ......................................................1, 13, 15, 16

28 U.S.C. § 157(b)(2)(O) ......................................................1, 13, 15, 16

28 U.S.C. § 158(a)(3) ........................................................................1

28 U.S.C. § 1334(b) .............................................................1, 13, 15, 16

28 U.S.C. § 1651(a) ..................................................................5, 15, 48


**Rules**

Bankr. Rule 7065 ...........................................................................38

Bankr. Rule 8003 .............................................................................1

Bankr. Rule 8004 .............................................................................1

Fed. R. Civ. P. 65 .......................................................................38, 49

Fed. R. Civ. P. 65(b)(2) .....................................................................8

Fed. R. Civ. P. 65(d) ..............................................38, 39, 40, 41, 43


**Other Authorities**

2 Collier ¶ 102.02[2] at 105-14 ...........................................................53

Merriam Webster Thesaurus ................................................................39

## STATEMENT REGARDING ORAL ARGUMENT

Debtor/Appellant Kwok requests oral argument because he believes it will significantly aid the Court in rendering its decision.

## JURISDICTIONAL STATEMENT

This is an appeal of a preliminary injunction unconstitutionally restraining speech and related conduct that was entered by the bankruptcy court in an adversary proceeding on January 13, 2023. ("Injunction" or "Inj.") The court asserted jurisdiction pursuant to 28 U.S.C. §§ 157(a), 157(b)(2)(A) and 157(b)(2)(O), and 1334(b), and this Court's September 21, 1984 Order of Reference. (A.0419.) Kwok disputes the bankruptcy court's jurisdiction over the adversary proceeding. (A.0320-21.)

Pursuant to 28 U.S.C. §158(a)(3), this Court has jurisdiction over this Appeal.

On January 25, 2023, Kwok filed a notice of appeal and a motion for leave to appeal, pursuant to Bankruptcy Rules 8003 and 8004. (A.0001, A.0074.) On April 12, 2023, this Court granted Kwok leave to appeal. (A.0158.)

## ISSUES PRESENTED AND STANDARD OF REVIEW

1. ***Did the bankruptcy court lack subject-matter jurisdiction to enter the Injunction?***

    *Question of law, de novo. In re Guadalupe*, 365 B.R. 17, 19 (D. Conn. 2007).

2. ***Did the bankruptcy court err in issuing the Injunction unconstitutionally restricting Appellant's First Amendment rights to speech, protest, and association?***

    *De novo. Snyder v. Phelps,* 562 U.S. 443, 453 (2011); *In re Guadalupe*, *supra*.

3. ***Did the bankruptcy court err in issuing the vague, ambiguous, and overly broad Injunction?***

    *Question of law, de novo. In re Guadalupe, supra.*

4. ***Did the bankruptcy court err in relying almost entirely on inadmissible hearsay for its factual findings in support of the Injunction?***

    *Question of law, de novo. Id.*

5. ***Did the bankruptcy court err in restricting Appellant's ability to assert and pursue rights in the underlying proceeding by prohibiting Appellant's "interfering in any way with the integrity of his Chapter 11 case?"***

    *Mixed question of law and fact, de novo. Id.*

## STATEMENT OF THE CASE

Facts

Appellant Ho Wan Kwok is an outspoken Chinese dissident who has attracted a million social-media followers[1] by exposing corruption and repression of the Chinese Communist Party ("CCP") and transgressions of China's political elite. Facing political persecution, Kwok sought asylum in the U.S. in 2014 where he has become an active critic of the CCP, the corrupt Chinese oligarchy, and their aiders and abettors. Kwok is a frequent subject of media coverage.[2]

On February 15, 2022, Kwok filed a Chapter 11 bankruptcy petition in this Court. (A.0166.) The case has attracted widespread, international coverage.[3] His bankruptcy filing followed a dispute with Appellee Pacific Alliance Asia Opportunity Fund, L.P. ("PAX"), an investment fund managed by Pacific Alliance Group ("PAG"), one of the largest private investment firms in Asia. PAG's Chairman is Chinese national Weijian Shan. PAX is represented by 800-lawyer, international firm O'Melveny & Myers[4] ("O'Melveny"), which has three offices in China and represents state-owned, Chinese entities. (A.0443.) The addresses of the firm's offices appear on its website. (*See* omm.com/locations.)

---

[1] (A.0254.)
[2] *See, e.g.,* Forsythe & Weiser, *Fall of Mogul from Empire to Jail Cell,* N.Y. Times, Mar. 30, 2023 (front page); *infra* n.33.
[3] *See infra* n.33.
[4] https://www.omm.com/omm_distribution/omelveny_at_a_glance/6/.

On July 8, 2022, the bankruptcy court appointed Luc A. Despins as Trustee. (A.0180.) Despins is an equity partner in the international firm Paul Hastings, LLP, which has 1,000 attorneys. (A.0625-26.) The addresses of the firm's 21 offices appear on its website. (https://www.paulhastings.com/offices.) Paul Hastings says it's one of the top international law firms in China, with sixty attorneys in three China-based offices.[5] Paul Hastings represents Chinese companies and has represented PAG. (A.0631.)

On July 15, 2022, Kwok sought to disqualify Despins, whose hourly rate is $1,750[6] (A.0181, A.0636), due to Paul Hastings's ties to the Chinese government and Kwok's status as an enemy of China. Both Kwok's disqualification motion and the bankruptcy court's denial of the motion (A.0181, A0208) were reported by the media.[7]

In November 2022, Despins subpoenaed numerous Chinese dissidents who, like Kwok, reside in the U.S. after being threatened, imprisoned, and tortured by the CCP. (A.0432, A.0435, A.0533.) Thereafter, activists, including some who were subpoenaed, organized or participated in protests at the offices and homes of

---

[5] https://www.paulhastings.com/practice-areas/asia.
[6] Although he testified his rate is $1,750, his fee petition indicates a rate of $1,860. (May 30, 2023 Fee App. (A.0245).)
[7] Wolf, *Chinese Exile Guo Says Bankruptcy Trustee is Conflicted*, BloombergLaw, July 12, 2022 (https://news.bloomberglaw.com/bankruptcy-law/chinese-exile-guo-says-bankruptcy-trustee-is-conflicted).

Despins, his counsel, counsel to and employees of PAX, and Despins's ex-wife and adult daughters. (A.0435.) The protesters raised concerns about: the bankruptcy proceedings; ties between Paul Hastings, O'Melveny, PAX, and the CCP; and alleged improprieties by Despins. (A.0435-37.)

The protests were peaceful and in public spaces, such as Grand Central Terminal, Times Square, and public sidewalks outside offices and residences. (A.0441, A.0536, A.0557, A.0574-78, A.0646-47.) No criminal charges or lawsuits were filed against any protester. Kwok never appeared at any protest. (A.0641.) On November 20, 2022, Kwok, in an online video, said he "strongly oppose[s] such protests," "absolutely do[es] not support such protests," and "hope[s] no one will go to such protests."  (A.0434.) He requested that anyone protesting "act within the perimeter of the law" and "observe your state ordinances and respect the local police." (A.0367.)

PAX's Injunction Action

On November 22, 2022, PAX commenced this adversary proceeding with a Complaint containing two counts: (1) "Order pursuant to 28 U.S.C. § 1651(a)"; and (2) "Order pursuant to 11 U.S.C. § 105(a)." (A.0247.) The Complaint was devoid of any substantive cause of action, although it alleged that Kwok published "harassing and defamatory statements" about PAG's chairman and his family, Despins and his family, and Despins's and PAX's counsel. (A.0254.) The Complaint sought to enjoin

5

Kwok and others in concert from: (1) publishing online home addresses and personal information of Despins, Shan, PAX's or PAG's officers and employees, and their relatives; (2) "posting false and harassing online materials" about these individuals as well as Despins's and Pax's counsel, and any of their relatives; and (3) "encouraging, inciting, suggesting, or directly or indirectly funding protests at the[ir] homes." (A.0261-62.) PAX asked the court to order Kwok to remove all social media posts with personal information about these people and that "encourage, incite, or suggest protests, harassment, doxing, or similar conduct." (*Id*.) Accompanying PAX's Complaint were motions for a temporary restraining order and preliminary injunction. (A.0263.)

Despins moved to intervene. (A.0297.) He filed a "statement" in which he said, "To be clear, the Debtor's antics will not influence or sway the Trustee (or PAX)." (A.0220.)

The next day—the day before Thanksgiving—the court held a hearing on the TRO request at which Kwok was neither present nor represented.[8] (A.0307.) At 6:00 p.m., the court issued a TRO restraining Kwok from (1) "posting false and harassing online materials" about Despins, PAX and PAG officers or employees, Despins and PAX's counsel, and "any of their respective relatives"; (2) publishing online their

---

[8] Kwok's bankruptcy counsel were present, but informed the court that they were not representing Kwok in the adversary proceeding. (A.0307.)

home addresses and personal information; and (3) "encouraging, inciting, suggesting, or directly or indirectly funding protests" at their homes or offices. (A.0311-12.) The court also ordered Kwok to remove social media posts. (*Id.*)

### The PI Hearing

On December 5, 2022, the court began a four-day hearing on PAX's preliminary injunction motion. No PAX or PAG representatives or their relatives testified. Nor did PAX, PAG, or Despins's counsel or their relatives.

Three protest participants testified. Their uncontroverted testimony was that Kwok did not order, recommend, fund, support, or suggest that they protest. They testified that Kwok had told people *not* to participate in protests. (A.0578.) YaQin Li testified that she traveled from Ontario to participate in protests, at her expense and not in response to any request from Kwok. (A.0573.) She had never met or spoken with Kwok. (A.0583-84.) Li protested outside Despins's home, "standing there," being "very quiet" and "[v]ery peaceful." (A.0575-76.) She and fellow protesters stood in the cul-de-sac's island across from Despins's house and did not block ingress or egress to Despins's house. (*Id.*) While there, Li never saw Despins. (A.0577.)

Chinese dissident Ziheng Cheng testified that Kwok did not ask him to protest, and he had seen videos of Kwok telling people not to protest; Cheng decided to protest anyway. (A.0560-62.) Cheng protested in Times Square outside

O'Melveny's office. (A.0556.) He was not paid to protest. (A.0560.) He and fellow protesters stood peacefully, holding banners, not blocking building entrances or exits, and following building security instructions. (A.0557-58.) There were no disagreeable interactions or violence. (A.0559.)

Chinese dissident Bing Shang Jiao, who tearfully recounted her experience during the Tiananmen Square protests (A.0533-34), testified that she helped organize protests outside O'Melveny's Washington office. (A.0534-35.) She did not work for Kwok, was not paid by him, and was not asked by him to do this. (A.0535.) She saw Kwok's videos asking people not to protest. (A.0541-43, A.0549.) The protests were "[v]ery peaceful," with no violence. (A.0536.)

Apart from the testimony of Despins, Kwok, and an analyst, PAX relied on inadmissible hearsay evidence consisting of social media posts and videos, in support of its injunction request.

On the third hearing day, with the TRO about to expire and over strong opposition from Kwok (A.0603-06), who submitted proposed revisions to the TRO that reasonably curtailed its breadth (A.0341), the court extended its TRO "until the Court rules on the PI Motion." (A.0344.) On December 12, 2022, the PI hearing concluded. (A.0419.)

On January 11, 2023, with the TRO in place for 49 days,[9] the court issued an

---

[9] Rule 65(b)(2) permits a TRO to remain in place for a maximum of 28 days.

Order granting Appellees' motion for preliminary injunction. (A.0406.) The Order was accompanied by a Memorandum. (A.0346.) On January 13, 2023, the court issued a "corrected" Order ("Injunction" or "Inj.") and Memorandum ("Mem.") (A.0474, A0413), which are the focus of this appeal.

<u>The Injunction</u>

The Injunction imposes sweeping restrictions on not only Kwok, but also ten individuals and numerous entities found to be in active concert with Kwok. (A.0480.) This includes the three testifying witnesses, despite their uncontroverted testimony that they had not acted in concert with Kwok. (*Id*.) The Injunction appears to enjoin all specified speech by anyone on the GETTR social-media platform.[10]

The Injunction imposes confusing, contradictory restrictions on First Amendment rights of speech and protest, including in public places like Grand Central Terminal and Times Square, and on public, city and residential sidewalks. Section 1(d) of the Injunction enjoins Kwok and associates from "protesting, picketing, parading, or displaying or distributing harassing material at any time, within thirty-six feet (36 ft.) of any entrance to the offices or workplaces (which may include universities and schools) of the Chapter 11 Trustee, PAX or its affiliates, PAX's or its affiliates' officers or employees, and counsel to the Chapter 11 Trustee

---

[10] Section 5(b) of the Order finds that "G-Series entities" are "in active concert or participation with the Debtor." (A.0480.) In the Memorandum, the court finds that the G Series entities include GETTR. (A.0422.)

or PAX or its affiliates, and any of their respective relatives (including former spouses)."[11] (A.0476-77.) The Injunction does not identify PAX's "affiliates," or "PAX or its affiliates' officers or employees," or the relatives (including ex-spouses) of *any* of the protected parties.[12] The sweeping Injunction applies to *any* type of "protesting, picketing, parading or displaying or distributing [of] harassing material," regardless of whether it concerns Despins, PAX, or the bankruptcy. It defines "harassing material" as "material that depicts, describes, or accuses" the covered parties as "Communists, agents of the Chinese Communist Party, extortionists, anti-Semites, racists, supporters of genocide, or otherwise makes similarly disparaging allegations regarding such parties' actions or beliefs." (A.0478-79.)

Section 1(e) further enjoins Kwok and associates from these activities within 100 feet of "offices or workplaces (which may include universities and schools)" of the same relatives mentioned in 1(d). (A.0416.) The Injunction does not address what happens if a relative works in the same place as the protected party to whom he/she is related or what degree of relation makes one a "relative," except as to "former spouses."

Section 1(f) further enjoins Kwok and associates from these activities within

---

[11] PAX's affiliate PAG has 300 employees. (https://www.zoominfo.com/c/pacific-alliance-group/348535829.)

[12] The only ex-spouse mentioned in these proceedings was Despins's.

100 feet of workplaces (including universities and schools) of the protected people and relatives between 8:00 a.m. and 10:00 a.m. and 4:00 p.m. and 8:00 p.m., *but* "not within thirty-six feet (36 ft.) of an entrance to the offices or workplaces (wherein subparagraph (d), *supra,* controls)." (A.0477.) This contradictory language makes it unclear whether protest can occur within 36 feet of an entrance regardless of time, or if the time restriction overrides the 36-feet restriction.

Thus, in the case of Paul Hastings's and O'Melveny's offices adjacent to Grand Central Terminal and Times Square respectively, the Injunction prohibits any such activity in these public fora, regardless of whether it concerns a protected party or this proceeding. In the case of O'Melveny's Times Square office and prohibition on "parading," the Injunction precludes participation in Macy's Thanksgiving Parade.

In the case of universities or schools, the Injunction does not indicate whether the prohibition creates a 36-foot or 100-foot buffer around the *entire* campus.

The Injunction provides greater restrictions on activities near residences of the "Trustee, PAX's or its affiliates' officers or employees, counsel to the…Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses)." Section 1(a) precludes activity "before or about the homes or residences" of these individuals, "*at all times,*" without disclosing the applicable addresses. (A.0475-76.) Section 1(b) expands the restriction as to residences of "relatives" to

200 feet from their homes "at any time." (A.0476.) Section 1(c) then contradicts 1(a) and 1(b) by restricting activity between 3:00 p.m. and 10:00 a.m. within 200 feet of residences of all referenced parties and relatives, "but not before or about the homes or residences (wherein subparagraph (a), *supra,* controls)." (*Id.*)

The Injunction enjoins Kwok and associates from "publishing online the home addresses and other [unspecified] personal information (including, with respect to relatives, relatives' employers) of the Chapter 11 Trustee, PAX's or its affiliates' officers or employees, counsel to the Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses)." (A.0478.)

The Injunction enjoins Kwok and associates from "encouraging, inciting, suggesting, or directly or indirectly funding any [enjoined] activity." (A.0478.) The Injunction says restrictions as to Despins or PAX's counsel extend to the 2,000 lawyers and thousands of employees at Paul Hastings, O'Melveny, Robinson & Cole LLP, and Neubert, Pepe & Monteith, P.C. (A.0478-79.) Thus, the Injunction precludes activities around thousands of unspecified residences and workplaces worldwide, and on social media.

The Injunction remains in effect until further Order, dismissal, or closure of the bankruptcy, or one year from entry, unless extended. (A.0480-81.)

12

## SUMMARY OF ARGUMENT

The bankruptcy court lacked subject-matter jurisdiction over this adversary proceeding. The statutes invoked to assert jurisdiction—28 U.S.C. §1334(b), §157(a) and subsections of §157(b)—confer jurisdiction only over matters arising in or related to cases under Title 11 or that concern administration of the estate or liquidation of the estate's assets. This case is none of those. Thus, this Court should vacate the Injunction for lack of jurisdiction.

Moreover, the sweeping, content-based Injunction is a prior restraint that violates the First Amendment. The court purported to apply strict scrutiny, which requires narrowly tailoring the enjoined conduct to serve a compelling government interest. The Supreme Court has consistently struck down prior restraints where the interests at stake (national security and personal liberty) were far more compelling than the interests articulated here (quiet enjoyment of homes and integrity of the judicial process).

Additionally, the Injunction is not narrowly tailored and employs highly restrictive means bearing little relation to the claimed government interests. The fatal deficiencies include: breadth of locations and people covered; arbitrary buffer zones; arbitrary time restrictions; prohibited content; and breadth of activities prohibited. The court cites no authorities upholding a content-based injunction with similar breadth.

The Injunction also fails as vague, ambiguous, and overbroad. The Injunction's prohibitions on "interfering," "harassing," or "disparaging" are too undefined to allow an enjoined party to know precisely what acts are forbidden, as required by law. The Injunction is overbroad for many reasons, including that it purports to protect thousands of law firm employees and their unidentified relatives (and ex-spouses) worldwide.

The evidentiary record is fatally flawed because the court relied on inadmissible hearsay consisting of social media posts and internet videos. None of that "evidence" was sworn testimony and/or subject to cross-examination. The Injunction also exceeds the bankruptcy court's powers. No court has used §105(a), as the court did here, to enjoin alleged defamation and harassment, and §105(a) provides no "independent relief."

Finally, the court erred in applying the preliminary injunction standard, including by failing to establish any irreparable harm, the most important prerequisite for a preliminary injunction. The balance of harms and public interest decisively weigh against any injunction.

## ARGUMENT

### I.   THE BANKRUPTCY COURT LACKED SUBJECT-MATTER JURISDICTION

The Complaint purports to assert causes of action pursuant to 28 U.S.C. §1651(a) and 11 U.S.C. §105(a). (A.0259-61.) Under 1651, the All Writs Act, courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Under 105(a), a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]." Neither provides a private right of action. The bankruptcy court, nonetheless, invoked 28 U.S.C. §1334(b) and §157(a), (b)(2)(A), and (b)(2)(O) (A.0419-20) to assert jurisdiction over an adversary proceeding with no actual claim asserted. Sections 1334(b) and 157(a) confer jurisdiction *only* for cases arising in or related to cases under Title 11. Appellees' "claims" do neither. The court's assertion of jurisdiction and exercise of 105(a) and 1651(a) powers impermissibly extends these provisions beyond their statutory limitations.

An action arises "*under*" Title 11 when "a claim is made under a provision of [T]itle 11." *Tilton v. MBIA,* 620 B.R. 707, 713 (S.D.N.Y. 2020). An action arises "*in*" Title 11 if "the claim can *only* be brought in a bankruptcy action, because it has no existence outside of bankruptcy." *In re Indicon*, 499 B.R. 395, 401 (D. Conn. 2013) (emphasis added). Appellees, under the guise of 105(a) and 1651(a), allege that Kwok defamed and harassed them. They do not allege Kwok violated a

15

bankruptcy statute, and common-law defamation claims and criminal violations do not arise under or in Title 11. Thus, neither §1334(b) nor §157(a) supports jurisdiction.

Section 157(b) allows bankruptcy courts to "hear and determine…all core proceedings arising under title 11, or arising in a case under title 11." The court asserts that the "claims" are "core" under §157(b)(2)(A) ("matters concerning the administration of the estate") and §157(b)(2)(O) ("proceedings affecting the liquidation of the assets of the estate…except personal injury tort [claims]"). Appellees' allegations attacking "defamatory" signs and statements they say are impeding the bankruptcy amount to defamation claims. Thus, §157(b)(2)(O) does not provide a basis of jurisdiction.

Neither does §157(b)(2)(A), as this proceeding does not "concern[] the administration of the estate." The Second Circuit has acknowledged that this subsection "could be construed to include almost any matter relating to bankruptcy, but the structure of the statute as a whole does not permit such a construction." *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d Cir. 1990). Therefore "[m]atters that merely concern the administration of the bankrupt estate tangentially" are not "core" proceedings but "are related, non-core proceedings." *Id*. This adversary proceeding does not concern administration of the estate, even tangentially.

The Supreme Court's holding in *Stern v. Marshall*, 564 U.S. 462 (2011), and

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982) ("*Marathon*"),[13] support this conclusion.

In *Stern*, the Court excluded from bankruptcy court jurisdiction state common-law claims that rely upon private rights. 564 U.S. at 499, 503. The Court expanded upon its ruling in *Marathon*, where it held that non-Article III bankruptcy judges were vested with jurisdiction to decide state-law claims *only* if the claims involved "public rights." 458 U.S. at 67-71. Appellees' claims, like those rejected in *Stern*, rely upon private rights. 564 U.S. at 499, 503. Thus, the court lacked jurisdiction to hear them.

The court's attempt to distinguish *Stern* contradicts its prior rulings and the underlying record. PAX's Complaint alleges that Kwok posted "outrageous baseless and vexatious" "false" statements, displayed "defamatory" signs, and "spread[] falsehoods." (A.0255-56, A.0256-60.) PAX further claimed violations of anti-harassment laws. (A.0260, A.0285-87.) The TRO says that PAX "asserts…that the Defendant has been *defaming*" it and that Appellees have "*sufficiently alleged* and *established*" defamation "for the purposes of a temporary restraining order." (A.0307-08, A0310 (emphasis added).) In support of its TRO, the court even cited

---

[13] Although the Court in *Wellness Intern. Network v. Sharif*, 575 U.S. 665, 669 (2015), found that "Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge," no such consent was given here.

seminal Supreme Court defamation cases and cases *forbidding* prior restraints. (A.0310 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964), *Gertz v. Robert Welch Inc.*, 418 U.S. 323 (1974), *Near v. Minnesota,* 283 U.S. 697 (1931)).)

Two months after acknowledging that the Complaint alleged claims beyond its statutory and constitutional authority, the court reversed course, stating that "the Complaint does not assert a claim for defamation." (A.0420.) To try to get around this problem, the court substituted the synonymous "disparaging" for what it previously termed "defamatory." (A.0478)

Although the court did not claim jurisdiction as a related, non-core proceeding, that argument would also fail. A non-core matter is "related to" the bankruptcy if the outcome of the matter would have "any conceivable effect on the bankrupt estate." *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (internal citation omitted); *In re New England Nat.,* No. 02-33699(LMW), 2012 WL 3987648, at *4 (Bankr. D. Conn. Sept. 11, 2012). "'[R]elated to' jurisdiction cannot be limitless." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995); *Marah Wood Prods. v. Jones*, 534 B.R. 465, 471 (D. Conn. 2015).

Appellees claim that because they may be harmed and they are participants in the bankruptcy, the process may be harmed, albeit indirectly. The claims here are too tenuous to "conceivably" affect the estate. Despins testified he would not be influenced or swayed in carrying out his duties. (A.0624, A.0220.) Further, a finding

that Kwok defamed them[14] or committed criminal harassment will not affect estate administration. As for third parties that allegedly may have been harmed, in the court's words, those parties have "no involvement in these cases." (A.0443.)

The types of claims over which courts have exercised "related to jurisdiction" do not support exercising it here. *See, e.g., Celotex*, 514 U.S. at 308 (execution of bond that would adversely affect reorganization); *Parmalat Cap. Fin. Ltd.*, 639 F.3d at 579 (state-law claims to recover estate assets); *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (settlement agreement re bankruptcy claims).

## II. THE SWEEPING, CONTENT-BASED INJUNCTION VIOLATES THE FIRST AMENDMENT BY IMPERMISSIBLY RESTRAINING SPEECH

As the Supreme Court recognized long ago, "it is the chief purpose of the guaranty [of the First Amendment] to prevent previous restraints upon publication." *Near*, 283 U.S. at 713. There is a "heavy presumption against [the] constitutional validity" of a prior restraint, with the burden on the party seeking the prior restraint to overcome that presumption. *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (internal citation omitted) (dissolving injunction preventing publication of Pentagon Papers). This presumption can be overcome "only in 'exceptional cases.'" *CBS v. Davis*, 510 U.S. 1315, 1317 (1994) ("Davis") (quoting *Near*, 283 U.S. at 716); *CBS v. U.S. Dist. Ct.*, 729 F.2d 1174, 1183 (9th Cir. 1984) ( "prior restraints,

---

[14] Any damages award—the only legal remedy for defamation—would be to the detriment of the estate's creditors. (A.0653.)

if permissible at all, are permissible only in the most extraordinary of circumstances"). Courts must "look at the injunction as we look at a statute, and if upon its face it abridges rights guaranteed by the First Amendment, it should be struck down." *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 581 (1971).

Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights" because they are "an immediate and irreversible sanction," not only "chilling" speech but "freezing" it. *Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539. 559 (1976). The Supreme Court has consistently rejected prior restraints, including where the claimed justifications included: Sixth Amendment rights of criminal defendants, *Stuart*, 427 U.S. at 570; protection of proprietary business information, *Davis*, 510 U.S. at 1318; and protection of military secrets and national security, *N.Y. Times*, 403 U.S. at 713. The so-called compelling government interests for imposing the prior restraint here—not even involving national security or personal liberty—fall far short of the justifications squarely rejected in these landmark cases.

Government-imposed restrictions on the content of speech—as the Injunction imposes by prohibiting distribution of so-called "harassing materials" that make "disparaging allegations regarding [a] parties' actions or beliefs"—is presumptively prohibited by the First Amendment. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "There is no categorical 'harassment exception' to the First Amendment's

free speech clause." *Saxe v. State College Area School Dist.,* 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). Even if a restriction is content neutral—which the Injunction is not as it does not enjoin complimentary speech, for example—it would nonetheless be "impermissible because the 'First Amendment's hostility to content-based regulation extends...to prohibition of public discussion of an entire topic.'" *Boos v. Barry*, 485 U.S. 312, 319 (1988) (quoting *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 537 (1980)).

As the Supreme Court held in *Young v. American Mini Theatres*, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." 427 U.S. 50, 64 (1976). To hold otherwise would undercut a core American value: "To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 64-65 (quoting *Sullivan,* 376 U.S. at 270).

Thus, "[c]ontent-based regulations are 'presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to

serve compelling state interests.'" *Picard v. Magliano*, 42 F.4th 89, 102 (2d Cir. 2022) (quoting *Reed*, 576 U.S. at 163). This is strict scrutiny, which the court acknowledges applies. (A.0456.) "A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (internal citation omitted). The interests identified by the court fall far short.

### A.    <u>The Injunction Does Not Serve Compelling State Interests</u>

Contrary to the bankruptcy court's findings, this is not an "exceptional case," *Davis*, 510 U.S. at 1317, involving the "most extraordinary of circumstances," *CBS*, 729 F.2d at 1183, that requires restrictions not only on conduct, but also on content. Rather, it is like thousands of cases where a claim for damages is the remedy for objections to speech. *Davis*, 510 U.S. at 1318 ( "First Amendment requires that [plaintiff] remedy its harms [such as defamation or economic harms] through a damages proceeding rather than through suppression of protected speech"). Perhaps content-neutral, *reasonable,* and narrowly tailored time, place, and manner restrictions could be imposed (although as explained, the restrictions are not *reasonable*), but the court's targeting of content, including "disparaging allegations" about Despins and others goes far beyond any reasonable restrictions and is not supported by any authority.

The court suggests two "compelling government interests": (1) Protecting the

"Quiet Enjoyment of Private Homes," and (2) Protecting the "Integrity of the Judicial Process." (A.0457, A.0460.) Neither interest, however, justifies content-based regulation, and the Injunction is not narrowly tailored to advance such interests.

First, the court claims that it seeks to protect the "well-being, tranquility and privacy of the home" (A.0457), relying on *Frisby v. Schultz*, which upheld a narrowly drafted ordinance that imposed content-neutral, time, place, and manner restrictions on picketing in front of a residence. But unlike the Injunction, which restricts "harassing" and "disparaging" speech, the *Frisby* ordinance was content neutral, was narrowly tailored, and left "ample alternative channels of communication." 487 U.S. 474, 488 (1988).

The *Frisby* Court noted that the case presented "only a facial challenge to the ordinance." *Id.* at 488. It said, "Particular hypothetical applications of the ordinance—to, for example, a particular resident's use of his or her home as a place of business…may present somewhat different questions." *Id*. Thus, the court's reliance (A.0476) on *Cox v. State of Louisiana,* 379 U.S. 559 (1965), involving a statute prohibiting picketing near a courthouse, to justify its prohibition on protesting in the traditional public forum of a residential street is completely misplaced.

In upholding the *Frisby* ordinance, the Court noted that it banned "only focused picketing taking place solely in front of a particular residence," and not

protesting or marching through neighborhoods, going door-to-door to proselytize, and/or distributing literature. *Id.* at 483-84. By contrast, the Injunction prohibits "protesting, picketing, parading, or displaying or distributing harassing material" within 200 feet of a residence. (A.0475-76.) Thus, the Injunction prohibits the very acts that the *Frisby* ordinance did not prohibit so as to provide ample alternatives to pass constitutional muster. 487 U.S. at 483-84, 487-88. As the Court recognized, "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Id.* at 480.

Another critical distinction is that *Frisby* involved a constitutional challenge to an *ordinance*, not an injunction. As recognized in *Madsen v. Women's Health Center*—relied upon heavily by the bankruptcy court—injunctions should be reviewed more stringently under the First Amendment than statutes, because "[i]njunctions also carry greater risks of censorship and discriminatory application than do general ordinances." 512 U.S. 753, 764 (1994). The analysis in *Madsen,* however, is not applicable here because *Madsen* involved a content-neutral injunction that did not require enhanced scrutiny. *Id.* at 753.

In addition, the bankruptcy court made no findings that the quiet enjoyment of the homes of the protected parties was disturbed by the protesters.

The second alleged compelling interest cited by the bankruptcy court is protecting the judicial system. Citing *Cox*, 379 U.S. 559, the court imposed sweeping

restrictions on speech around law offices, universities, and other businesses worldwide (although, paradoxically, not around courthouses). *Cox* concerned a statute restricting picketing near courthouses; it did not involve and does not support restraining speech away from a courthouse that disparages a litigant, its counsel, its employees, a trustee, or their relatives (and ex-spouses). *Cox* acknowledged legitimate reasons for a legislature's concern about conduct outside a courthouse— reasons not applicable here. As recognized in *Madsen*, an injunction infringing speech must be viewed more stringently than legislation, 512 U.S. at 764. *Cox* does not authorize a judge to restrict speech and conduct away from a courthouse.

*Picard*, relied upon by the bankruptcy court, also involved a statute regulating speech and conduct near courthouses. That statute criminalized speech and conduct within 200 feet of a courthouse that was "concerning the conduct of a trial being held in such courthouse." 42 F.4th at 93-94. While the Second Circuit noted that the statute "promotes the duty of witnesses to tell the truth and of jurors to follow a judge's instructions…and return a verdict based on the evidence…without regard to public opinion or influence," it held the statute unconstitutional as applied to the plaintiff's protest about jury nullification unconnected to any trial at the courthouse. *Id*. at 103-04, 106. Thus, *Picard* undermines the bankruptcy court's rationale for the Injunction, which is not narrowly tailored to serve the interest identified. There have been no protests near a courthouse here and none of the challenged speech was

directed at jurors or witnesses. The Trustee stated that his work would not be impacted by the protests. (A.0624.) Thus, neither *Cox* nor *Picard* supports enjoining speech far from any courthouse because it relates to a judicial proceeding or litigants.

This case is most analogous to *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971), where civil rights activists believing real-estate broker Keefe engaged in improper practices, began distributing leaflets in Keefe's hometown, including to people entering and exiting Keefe's church. Some leaflets included Keefe's home phone number and urged calling Keefe and expressing disapproval. The leafletters would not stop unless Keefe stopped doing what the leafletters condemned. Although the Illinois courts enjoined the leafletting, the Supreme Court reversed on First Amendment grounds. The Court concluded that even if the protesters "intended to exercise a coercive impact on the respondent [that] does not remove [the speech] from the reach of the First Amendment." *Id.* at 419. The Court said, "Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper." *Id.* The Court held that "[d]esignating the conduct as an invasion of privacy…is not sufficient to support an injunction against peaceful distribution of [such] informational literature," when the plaintiff "is not attempting to stop the flow of information into his own household, but to the public." *Id.* at 419-20.

The bankruptcy court attempts to distinguish *Keefe*, claiming it did not

involve targeting one's home and "court proceedings." (A.0458, A.0461.) But the Injunction does not focus only on residences or court proceedings. It prevents protesting in Grand Central Terminal, Times Square, public streets, and on college campuses, if protesters are disseminating information regarding the Trustee, PAX, their counsel, their employees, or their relatives that "disparage[es]" their "actions or beliefs." (A.0478.) That is a classic content-based restriction for which *Frisby* and the other cases cited by the bankruptcy court provide no support. The Injunction also bars social media posts with "disparaging" commentary. The court offers no authority for banning statements on the internet.

Moreover, the protests and leafletting here have been peaceful and while the protesters (like most protesters) may seek to have what the court called "a coercive impact"—*i.e.,* to pushback against Despins's aggressive tactics such as subpoenaing many of them—that does not remove their activities and speech from First Amendment protection. *Keefe*, 402 U.S. at 419. The topic of the protests—connections with the Chinese government involving Despins, PAX, their counsel, employees, and relatives, and income received therefrom—are matters of public concern and constitute lawful commentary about connections promoted by them.[15] There has been no violence, physically abusive conduct, or harassment of the police by protesters. *Cf. Schenck v. Pro-Choice Network,* 519 U.S. 357, 380 (1997)

---

[15] *See supra* p. 3-4.

(upholding 15-foot buffer around doorways, driveways, and driveway entrances to abortion clinic after "physically abusive conduct, harassment of the police that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct").

Further, the information disseminated about Despins and PAX was obtained from the public record—home addresses or places of employment—and easily found in a simple Google search. There has been no disclosure of private, personal information. There is *no* government interest in enjoining republication of widely public information.

### B.   <u>The Injunction Is Not Narrowly Tailored</u>

The Injunction is unconstitutional because it is not narrowly tailored. *Simon & Schuster v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 123 (1991) (striking law not narrowly tailored even though it served compelling state interest). "A regulation is not 'narrowly tailored'...where...a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals." *Id*. at 122 n.[2] (internal citation omitted). Further, "[u]nder strict scrutiny, the government must adopt 'the least restrictive means of achieving a compelling state interest.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2379 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

The Injunction is not narrowly tailored and employs highly restrictive means

bearing little relation to the claimed state interests. Among the fatal deficiencies are: breadth of locations and people protected; arbitrary buffer zones; arbitrary time restrictions; prohibited content; and breadth of activities prohibited.

### 1.    Breadth of Locations and People

The Injunction applies to residences and workplaces (including schools and university campuses) of the Trustee, PAX, its affiliates, their officers or employees, and the thousands of worldwide employees of Paul Hastings, O'Melveny, Neubert, and Robinson, as well as their countless "relatives," whose limitless scope even includes ex-spouses.[16] The Injunction restricts activity near thousands of unidentified homes, offices, and campuses worldwide. *See infra* p. 37. The court fails to offer any justification for protecting such an enormous assortment of locations and people. What possible rationale exists for restricting speech concerning every O'Melveny employee, let alone their relatives and ex-spouses? Although the Injunction affords greater protection for "relatives," it fails to explain why, let alone why relatives are even covered.

### 2.    Arbitrary Buffer Zones

The Injunction's arbitrary buffer zones of 100 feet from workplaces, 36 feet from workplace "entrances," and 200 feet from residences are not narrowly

---

[16] (A.0476-79.)

tailored.[17] By contrast, the *Frisby* ordinance restricted "picketing focused on, *and taking place in front of*, a particular residence." 487 U.S. at 482 (emphasis added). In upholding the ordinance, the Court noted "ample alternative channels," including going door-to-door and picketing throughout the neighborhood, which the Injunction's 200-foot buffer precludes.[18] In *Madsen,* the Court upheld a content-neutral injunction restricting protests near an abortion clinic because of the physical and emotional toll running a "gauntlet" to the clinic and hearing the protests in the clinic during procedures and while recuperating was having on patients. 512 U.S. 753, 758 (1994). Unlike here, the *Madsen* injunction came in response to unlawful conduct. *Id.* at 758. Unlike here, the buffers in *Madsen* were not arbitrarily selected. Because the state court had found that protesters had repeatedly interfered with vehicular access to the clinic and impeded traffic following a less restrictive injunction, the court issued a second injunction requiring protesters to be on the other side of the street, which *resulted* in a 36-foot buffer from the entrance but still allowed protesters within 10-12 feet of cars entering the clinic. *Id.* at 768-69.

Given those circumstances, the Court upheld the 36-foot buffer. *Id.* at 770. Contrary to the bankruptcy court's suggestion, the *Madsen* Court did not condone a 36-foot buffer in all circumstances. (A.0462.) Indeed, the *Madsen* Court *struck* a 36-

---

[17] These buffers could be even greater if protected people live or work near one another.

[18] The 200-foot buffer shields six of Despins's cul-de-sac neighbors.

foot buffer surrounding other areas of the clinic as "burden[ing] more speech than necessary to protect access to the clinic." *Id.* at 755, 771, 776. In *McCullen,* 573 U.S. at 495-96, the Court struck a 35-foot buffer around an abortion clinic for the same reason.

The *Madsen* Court also struck a 300-foot buffer around clinic staff residences, finding it "much larger than the zone provided for in the ordinance which we approved in *Frisby*" and "would ban '[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses." *Id.* at 775 (quoting *Frisby,* 487 U.S. at 483). The Court noted that the *Frisby* ordinance prohibited only "focused picketing taking place solely in front of a particular residence." *Id.*

Thus, the bankruptcy court's reliance on *Madsen* in support of its 200-foot buffer from residences (A.0459 n.12) is not only misplaced, but provides controlling authority for vacating the Injunction.[19]

*Madsen* does not support the bankruptcy court's 100-foot buffer around workplaces for access (A.0462) because *Madsen* reluctantly permitted only a 36-foot entrance buffer, for access and traffic flow. 512 U.S. at 771. Neither does *Cox's*

---

[19] The *Madsen* Court found even the 36-foot buffer around the entrance was "debatable" but said "some deference must be given to the state court's familiarity with the facts and background of the dispute." *Id.* at 769-70, 813.

prohibition on picketing near courthouses, which is inapposite to non-courthouse workplaces. Buffers of 100 feet from New York offices, for example, require picketers to stand blocks away, effectively suppressing protests.

The Injunction's buffers affect public streets and sidewalks—*i.e.,* traditional public fora where government's ability to restrict speech is "very limited." *McCullen,* 573 U.S. at 477. These buffers "burden substantially more speech than necessary to achieve" the alleged interests. *Id.* at 490. And there has been no previous, less restrictive alternative to achieve these interests. *Id.* at 495.

### 3.    Arbitrary Time Restrictions

Quoting *Madsen,* the bankruptcy court says, "a court may issue 'a limitation on the time, duration of picketing, and number of pickets outside a smaller zone.'" (A.0459.) However, the Supreme Court noted this in *dicta,* after rejecting a 300-foot buffer around residences as "*much larger* than the zone" in *Frisby,* which limited picketing directly in front of a residence only. *Madsen,* 512 U.S. at 774-75. Why the bankruptcy court would then arbitrarily conclude that a 200-foot buffer was acceptable is baffling. Moreover, the Court's time/duration/number comment related to the impact of sound amplification equipment. *Id.* The Court suggested a *limited* time/duration/number restriction "could have accomplished the desired result"—*i.e.,*

mitigating sound amplification—rather than the unjustifiable 300-foot buffer.[20] *Id.* at 775. Here, there was no evidence of noise issues.

### 4.    Prohibited Content

Although the court relies on *Madsen, Frisby, Cox,* and *Picard* for its breathtaking prohibitions, those cases, unlike here, involved content-neutral laws or injunctions. The "principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.'" *Madsen,* 512 U.S. at 763 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (upholding noise regulations)). The Injunction restricts "harassing material," which "include[s]" "depicts, describes, or accuses" the protected persons of being "Communists, agents of the Chinese Communist Party, extortionist, anti-Semites, racists, supporters of genocide, or otherwise makes similarly *disparaging allegations regarding such parties' actions or beliefs*." (A.0478 (emphasis added).) It regulates content and came in response to protesters' previous expression. (A.0435-36.) By contrast, the *Madsen* injunction "was issued *not* because of the content of the petitioners' expression," 512 U.S. at 763 n.2, and thus was subject to a lower level of scrutiny than the content-based restrictions here. *Id.* at 761.

---

[20] The Court permitted a restriction on "high noise levels outside the clinic" that were "within earshot of the patients inside the clinic [from] 7:30 a.m. through noon on Mondays through Saturdays." *Id.* at 772.

The court fails to justify its sweeping speech prohibitions and regarding individuals with limited or no connection to this bankruptcy.

### 5.    Breadth of Activities Prohibited

The Injunction prohibits not only protesting and picketing, but also parading and distributing materials. The *Frisby* Court upheld the ordinance restricting "focused picketing" "in front of a particular residence" because of unrestricted alternatives, including neighborhood parading, door-to-door proselytizing, and distributing literature. 487 U.S. at 483-84. Here, the Injunction unconstitutionally prohibits those activities and offers no alternatives. *Id.* As for workplaces (none alleged to be a courthouse), the court fails to justify its sweeping prohibition as advancing the alleged interest of protecting the "integrity of the judicial process," rather than Appellees' real interest in avoiding unpleasant but protected speech.

### C.    The Enjoined Speech Involves Matters of Public Concern

As the Supreme Court recognized, "speech on matters of public concern is at the heart of the First Amendment's protection," "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder,* 562 U.S. at 451-52 (internal quotes omitted). While acknowledging this, the bankruptcy court erroneously concludes that Kwok's bankruptcy is not a matter of public concern. (A.0464.) Not only is that belied by substantial, regular media

coverage,[21] but also the enjoined speech was not limited to Kwok's bankruptcy. Most concerned other topics.

As the court recognized, the speech focused on: an alleged extortion demand and improper actions and threats by Despins; alleged troubling connections between Despins, PAX, and their counsel on the one hand, and the CCP on the other; their targeting of Kwok, an outspoken Chinese dissident and Chinese whistleblower movement leader with one million social-media followers; and alleged anti-Semitism and racism by Despins. (A.0435-39, A0441.) As the court recognized, Despins's law firm has offices in China, as does PAX's, and both firms represent Chinese companies. (A.0442-43.) PAG is based in China.[22] The speech also concerned protester support for the dissident movement and "New Federal State of China," and condemnation of CCP oppression. (A.0437.) Protesters displayed signs and flags and distributed leaflets. (A.0438.)

As the *Snyder* Court held*,* "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community… or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." 562 U.S. at 453 (internal quotes omitted). "The arguably inappropriate or controversial character

---

[21] *See infra* n.24.

[22] https://www.zoominfo.com/c/pacific-alliance-group/348535829.

of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.* (internal quotes omitted). Speech in a public place on a matter of public concern requires special First Amendment protection. *Id.* at 458.

The speech here—concerning alleged criminal activity by the Trustee, CCP oppression, regime change in China, improper connections between U.S. law firms and the CCP, and mistreatment of the Chinese whistleblower movement leader—unquestionably involves matters of public concern, deserving special protection.

Finally, although the court incorrectly concludes that Despins is not a public figure in his role in this high-profile matter,[23] that issue is not central to the First Amendment analysis here. Rather, it relates to the level of proof needed in a defamation action, which the court insists this case is not. (A.0420.) Thus, it is no surprise that every case cited by the court on the public figure issue is a defamation case—not a prior restraint case like this one. (A.0463-64.) Moreover, Despins, who

---

[23] The court's reliance on *Obsidian Fin. Gp. v. Cox,* is misplaced since that case did not consider whether a bankruptcy trustee could be a public figure in a defamation action. 740 F.3d 1284, 1292 n.5 (9th Cir. 2014) (noting public figure issue not raised on appeal). Likewise, the language from *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 352 (1974), deals only with whether someone could be a public figure "for all purposes," as opposed to as trustee in a particular, high-profile case, in which a trustee has been profiled on the front page of The New York Times, among other places.

has garnered regular media coverage,[24] including in this case,[25] certainly would be at least a limited purpose figure were he to challenge protesters' statements in a defamation action. *Gertz,* 418 U.S. at 347 ("[T]hose classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" and "invite attention and comment").

## III.   THE INJUNCTION FAILS AS VAGUE, AMBIGUOUS, AND OVERLY BROAD

Inherent in every injunction is the principle of "basic fairness [which] requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "[T]he party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Ass'n,* 473 F.2d 244, 247 (2d Cir. 1972). Vague, ambiguous, or overly broad orders—like the Injunction—violate the Federal Rules and "will not withstand appellate scrutiny." *Diapulse Corp. v. Carba,* 626 F.2d 1108, 1111 (2d Cir. 1980).

---

[24] *See*, *e.g.*, Leslie Wayne, *At Center of Enron Bankruptcy Dispute Over Big Bank Creditors,* N.Y. Times, Apr. 30, 2022 (quoting Despins comments to reporter), (https://www.nytimes.com/2002/04/30/business/at-center-of-enron-bankruptcy-dispute-over-big-bank-creditors.html); Glater and Morgenson, *A Fight For a Piece of What's Left,* N.Y. Times, Sept. 15, 2008 (quoting Despins re Lehman Bankruptcy), (https://www.nytimes.com/2008/09/16/business/16bankruptcy.html);     Dealbook, *Chrysler Bankruptcy Judge is Used to Big Cases,* N.Y. Times (May 1, 2008) (quoting Despins) (https://www.nytimes.com/2009/05/01/business/01judge.html).
[25] See supra n.2.

### A.    __The Injunction is Impermissibly Vague and Ambiguous__

Orders issued under §105(a) are governed by Rule 65,[26] *In re LightSquared,* 539 B.R. 232, 242 (S.D.N.Y. 2015), which requires that "[e]*very* order granting an injunction and *every* restraining order *must*… state its terms specifically." Fed. R. Civ. P. 65(d)(1)(B) (emphasis added). The rule requires strict compliance. *Int'l Longshoremen's Assoc. Local 1291 v. Philadelphia Marine Trade Assoc.,* 389 U.S. 64, 74-76 (1967).

 "[T]he specificity provisions of Rule 65(d) are no mere technical requirements…The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt*, 414 U.S. at 476; *In re LightSquared*, 539 B.R. at 242-243. The Injunction fails to provide the requisite specificity as to what behavior is prohibited; the law does not permit the court to force someone to "guess—on pain of contempt—" what it intended. *Sterling Drug v. Bayer AG*, 14 F.3d 733, 748 (2d Cir. 1994).

The Injunction's forbidding Kwok from "disparaging" the protected parties' "actions or beliefs" and "harassing" (A.0477-78) is too vague. Both "disparaging" and "harassing" are subjective, general terms susceptible to interpretation. The Injunction's incomprehensibility is apparent in the Memorandum, which

---

[26] As made applicable to this proceeding by Bankruptcy Rule 7065.

circuitously concludes that Despins and PAX allege an undefined category of speech and actions that are disparaging but not defamatory, and only prohibits the former. Kwok cannot know one from the other. Even Merriam-Webster is unable to do so.[27] Likewise impossible is discerning what might be considered "otherwise" or "similarly" disparaging. (A.0478.)

As discussed, the Injunction fails to sufficiently identify the thousands it purports to protect. *See supra* p. 10. Yet the Injunction vaguely and ambiguously enjoins Kwok from speech regarding not only those unspecified persons' association with two political parties and an entire race and religion, but also their *unspecified* actions and belief. (A.0478.) Kwok does not know every action and belief of those unidentified individuals, let alone what might be considered harassing or disparaging, and the Injunction sets no limitations on what speech and behavior they may assert as such, and seek contempt on.

The Supreme Court and Second Circuit have invalidated numerous injunctions like the one here that fail to define key terms. The Court in *Schmidt* vacated an order enjoining enforcement of the "scheme" alleged in the complaint because the failure to define scheme fell "far short" of the Rule 65(d) requirements. 414 U.S. at 474, 476. Likewise, *Fonar Corp. v. Deccaid Svcs.* concerned contempt

---

[27] Mirriam-Webster Thesaurus (listing "disparaging" as synonym for "defamatory" and vice versa).

of an injunction prohibiting certain activities regarding plaintiff's "maintenance software." 983 F.2d 427, 429 (2d Cir. 1993). The injunction loosely defined the protected software as "all software other than the Operational Software," which it defined as software described in the User's Manual. *Id.* The Second Circuit invalidated such language as "impossible" to understand. *Id.; Corning Inc. v. PicVue Electronics,* 365 F.3d 156, 158 (2d Cir. 2004) (vacating in part injunction against misappropriating trade secrets and infringing copyrights that did not identify the trade secrets or copyrighted works, as failing to satisfy Rule 65(d)); *Sanders,* 473 F.2d at 247 (finding order enjoining breach of duty of fair representation "so hopelessly elusive as to violate Rule 65(d)").

It is similarly unclear what the court intended in enjoining Kwok from "interfering" with the bankruptcy proceeding. Despins could view every act contrary to his wishes as "interference." Even this appeal could be viewed as "interfering." The vague, ambiguous Injunction chills Kwok's actions, on fear of being found in contempt.

Thus, courts have vacated injunctions prohibiting parties from "interfering" or otherwise vaguely defining boundaries of participation in proceedings. Addressing a similarly ambiguous injunction, the Supreme Court found that directing a party to "comply with" and "abide by" an arbitration award contained "only an abstract conclusion of law, not an operative command capable of

enforcement," and "too vague to be sustained as a valid exercise of judicial authority." *Int'l Longshoremen's Assoc.,* 389 U.S. at 73-76 (calling order "unintelligible" and a "command that defies comprehension"). Courts in this Circuit have vacated injunctions prohibiting interference. *See*, *e.g.*, *In re LightSquared,* 539 B.R. at 244-45 (vacating bankruptcy court's enjoining "any action which may, *inter alia*, impede or adversely affect'" the bankruptcy plan); *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir. 1997) (finding injunction prohibiting plaintiff from "interfering" with corporation-defendant insufficiently clear, especially as parties were preparing for trial and "interfering" could be interpreted to impair plaintiff's trial preparation, including speaking to witnesses).

The vague, ambiguous Injunction more closely resembles an unconstitutional prior restraint on speech and actions that may offend the Trustee, PAX, and others, rather than a restraint against legitimate, specific harm. *See Boos*, 485 U.S. at 314, 320 (regulating speech that may offend dignity of listeners is content-based, violation of First Amendment). The bankruptcy court cannot circumvent the law by using vague, ambiguous language.

## B.      The Injunction is Impermissibly Overbroad

Rule 65(d)(1)(C) requires every injunction to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Otherwise, it must be vacated. An overbroad injunction "seeks to

restrain [a party] from engaging in legal conduct , or from engaging in illegal conduct that was not fairly the subject of litigation." *City of New York v. Mickalis Pawn Shop*, 645 F.3d 114, 145 (2d Cir. 2011).

First, as discussed, *see supra* p. 29, the Injunction is overbroad as to whom it purports to protect—specifically: Despins; PAX and its (unidentified) affiliates' officers and employees; all worldwide employees of Paul Hastings, O'Melveny, and the Connecticut firms; and all "relatives" (including ex-spouses) of everyone. (A.0474.) The bankruptcy court's injunctive powers do not extend this far. *In re LightSquared,* 539 B.R. at 244 (vacating overbroad injunction extending to heirs, successors, assigns, trustees, executors, administrators, controlled affiliates, officers, directors, agents, representatives, and others because it "may be read to extend to persons and entities that have limited or no involvement in [debtor's] bankruptcy").

Second, the Injunction is overbroad because it restrains "parading…at any time, before or about" residences of thousands of people regardless of subject. (A.0475.) It precludes participation in Macy's Thanksgiving Parade, which passes within 36 feet of O'Melveny's office, or anti-CCP protests because protected people might live or work nearby.

The Injunction restrains lawful, unrelated activities. Courts in this Circuit have rejected injunctions restricting "normal business actions, not even remotely concerned with the [dispute] and having only a limited and tangential effect

thereon." *Sanders,* 473 F.2d at 48 (affirming denial of injunction that may have restricted defendant's unrelated business activities); *United States v. Blue Ribbon Smoke Fish,* 56 Fed. Appx. 542, 544 (2d Cir. 2003) (finding injunction restraining participation in smoked fish business in any context overbroad and "reach[ed] beyond the discretion of the district court" to redress or prevent illegal activity at plant); *In re LightSquared,* 539 B.R. at 245 (injunction "creates a serious risk of chilling ordinary commercial activity by other market participants in countless ways").

### C.   The Injunction Fails to Put this Court on Notice of What it is Reviewing

The Injunction fails the second objective of Rule 65(d)—putting this Court on notice of what it is reviewing. The Supreme Court recognized in *Schmidt* that "[u]nless the trial court carefully frames its orders of injunctive relief, it is impossible for an appellate tribunal to know precisely what it is reviewing," complicating and potentially making impossible "informed and intelligent appellate review." 414 U.S. at 477; *Fonar Corp.*, 983 F.2d at 429. The Injunction's numerous infirmities make it impossible to determine the scope of speech and actions that violates it.

### IV.   THE BANKRUPTCY COURT IMPROPERLY RELIED ON INADMISSIBLE HEARSAY

Although its Memorandum does not mention the word "hearsay," most of the bankruptcy court's critical fact findings were based on normally inadmissible

hearsay. The court, relying on *Mullins v. City of New York,* 626 F.3d 47, 52 (2d Cir. 2010), concluded that it could consider all proffered hearsay in deciding whether to grant a preliminary injunction and "give it whatever weight [it] deem[ed] appropriate." (A.0504-12.)

The court, however, misconstrued *Mullins,* in which 4,300 police sergeants sued the City and Police for systematic violations of overtime rights. 626 F.3d at 48-49. During the preliminary injunction hearing, the district court accepted hearsay *statements* and deposition *testimony* of representative plaintiffs—sworn statements subject to cross-examination. *Id.* at 51.[28]

In *United States v. Buddhu,* No. 08-civ-0074, 2008 WL 2355930, at *1 n.2 (D. Conn. June 5, 2008), referenced by the bankruptcy court (A.0510), a court in this District found that, on a preliminary injunction motion, "the Court may rely on affidavits, depositions, and sworn testimony, even when they include hearsay." Again, the hearsay consisted of sworn statements, some subject to cross-examination. *We the Patriots USA v. Hochul,* 17 F.4th 266, 276 n.3 (2d Cir. 2021) ("[C]ourts may consider hearsay evidence *such as affidavits* when determining whether to grant a preliminary injunction.") (emphasis added), *cert. denied,* 142 S.

---

[28] Although the Second Circuit, in dicta, said "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction," the court held only that "the district court committed no error in considering, and relying on, hearsay *testimony* from the [plaintiffs]." 626 F.3d at 52 (emphasis added).

Ct. 2569 (2022); *Illinois Tool Works v. J-B Weld Co.,* 419 F. Supp. 3d 382, 398-399

(D. Conn. 2019) (refusing to consider online reviews on preliminary injunction

because even though court "may consider hearsay," court "do[es] not find the

reviews probative, let alone persuasive").

By contrast, the hearsay offered by PAX consisted of social media posts and

internet videos (*see, e.g.,* A.0496-514)—not sworn testimony, subject to cross-

examination. Most came from unidentifiable social-media posters, making it

inherently unreliable. *Cf. SEC v. Musella,* 578 F. Supp. 425, 427-28 (S.D.N.Y. 1984)

(could consider hearsay if "inherently trustworthy").[29]

For example, the court determined that Elliott Dordick is a GETTR employee

and thus part of a group "substantially intertwined" with Kwok. (A.0425, A.0472.)

No statement or testimony from Dordick was offered. Instead, the court relied on

social-media postings, including PAX Ex. 94, proffered as Dordick's GETTR page.

(A.0658-59.) PAX pointed to a post allegedly by Dordick that says, "[S]o grateful

to @JasonMiller in DC for the opportunity to join the @GETTR team as the

---

[29] Although the court admitted PAX's hearsay evidence wholesale, regardless of reliability, it did not apply that approach to hearsay offered by Kwok. Despite professing that hearsay is fully admissible in preliminary injunction proceedings (*see, e.g.,* A.0486 ("I'll remind the Court that the rules against hearsay, for example, do not apply in this proceeding….")), Appellees objected on hearsay grounds to testimony offered by Kwok, and the bankruptcy court reflexively sustained those objections even though such testimony was inherently more reliable than PAX's social media material. (*See, e.g.,* A.0536, A.0550, A.0561, A.0675.)

company's trust, and safety analyst," to argue that Dordick "is a GETTR employee as of at least October 24th." (A.0661-62.) The post, on its face, does not establish that, much less as of the December 2022 hearing. (A.0664.)[30] This is not reliable evidence. *See Country Fare LLC v. Lucerne Farms,* No. 3:11CV722(VLB), 2011 WL 2222315, at *9 (D. Conn. June 7, 2011) (finding declaration supporting PI motion "made on unidentified and unsubstantiated information and belief and not…personal knowledge…unpersuasive"). Dordick's role here is, at best, tangential, making it even more concerning that the court would rely on normally inadmissible, untrustworthy hearsay for these findings.

The court also admitted an alleged excerpt from a WhatsApp group chat (PAX Ex. 86) allegedly suggesting that a participant referred in Chinese to witness Li as "a great wise, beautiful sister." (A.0589.) The message followed a message from Li to someone else. (A.0590.) Li did not know if the compliment had come from Kwok or was directed to her. (A.0590, A.0595, A.0598.) She could not recall receiving messages from Kwok. (A.0597.) Nevertheless, the court concluded that Kwok was "commending [Li] for her protest efforts" (A.0423-24), even though it simply reflects someone complimenting someone.

The court erred in its admission and reliance on PAX's hearsay evidence in

---

[30] Dordick's LinkedIn profile indicates he was not associated with GETTR as of the hearing. (https://www.linkedin.com/in/elliot-dordick-esq-3639b5a0/.)

numerous fact-findings supporting the Injunction.

## V.   THE INJUNCTION EXCEEDS THE BANKRUPTCY COURT'S POWERS

In support of its Injunction, the bankruptcy court says "it is common practice in adversary proceedings" to use §105(a). (A.0420.) This case, however, bears no resemblance to the cases cited by the court (*id.*) in which bankruptcy courts used §105(a) to enjoin third-party actions that debtors alleged would interfere with the bankruptcy. The same is true with *Momentum Mfg. Corp. v. Emp. Creditors Comm.*, 25 F.3d 1132, 1136 (2d Cir. 1994), where § 105(a) was used to estop a debtor who filed false financial disclosures from filing more. Those cases do not support using §105(a) to enjoin alleged defamation and harassment, as the Injunction does.

"[S]ection 105(a) does not operate on a stand-alone basis" and does not afford Appellees "independent relief." *New England Dairies v. Dairy Mart Conven. Stores,* 351 F.3d 86, 92 (2d Cir. 2003). Section 105(a) "can only be exercised *within the confines of the Bankruptcy Code*." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988) (emphasis added). A bankruptcy court may not exercise "equitable powers" to "further the purpose of the Code generally, or otherwise to do the right thing"; §105(a) powers must "be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." *New England Dairies,* 351 F.3d at 91-92 (holding bankruptcy courts do not have equitable powers under §105(a) over claims that merely "implicate" Bankruptcy Code but do not invoke

specific provisions). This is precisely the situation here: Appellees alleged, and the court concluded, that "defamation" and "harassment"—in the form of unflattering statements, assembling in public spaces, and publishing publicly available information—are *so harmful* to the estate and integrity of the process that an unprecedented, sweeping injunction infringing core constitutional rights is required. (A.0446.) The court's conclusion that it must "insure [sic] the proper administration of the Estate under the provisions of the bankruptcy code" (A.0447), without basing its action on any Code provision, does not distinguish this proceeding from the limitations enumerated in *New England Dairies*.

The court's secondary reliance on §1651(a) does not fare better. Section 1651(a), a non-bankruptcy statute, grants federal courts authority to issue writs "*in aid*" of their jurisdiction—not to *create* jurisdiction. *Syngenta Crop Protection v. Henson*, 537 U.S. 28, 33 (2002). The court must have jurisdiction from an independent source. *See id.*; *Stephenson v. Dow Chem. Co.*, 346 F.3d 19, 21 (2d Cir. 2003) ("All Writs Act does not relieve a party…from complying with the statutory requirements"). Otherwise, §1651(a) is unavailable.

The cases upon which the court relies fail to support its position. *United States v. N.Y. Tel. Co.,* upholding a §1651(a) order compelling assistance to the FBI, bears no resemblance to the circumstances here. 434 U.S. 159, 174 (1977). And *United States v. Int'l Brotherhood of Teamsters* undermines the court's position. There the

Second Circuit invalidated terms in a §1651 order that risked interfering with First Amendment rights. 266 F.3d 45, 51 (2d Cir. 2001). Indeed, *Int'l Brotherhood* highlights the prohibition on using §1651(a) to deny a party's First Amendment rights. *Id.* (court abused discretion because injunction denied party's "important statutory and First Amendment rights of association") (citing *Sheet Metal Contractors Ass'n v. Sheet Metal Workers Intern. Ass'n*, 157 F.3d 78, 84 (2d Cir. 1998)).

## VI.   THE COURT ERRED IN APPLYING THE PRELIMINARY INJUNCTION STANDARD

The appropriate standard for an injunction—*if* the court had jurisdiction—is Rule 65. *See supra* p. 38. Because the Second Circuit has not established a standard for §105(a) injunctive relief, the bankruptcy court relied on the test proposed by lower courts in New York and the 9th Circuit—an approach not binding on this Court. (*See* A.0448-49.) Appellees do not meet either that standard or the Rule 65 standard.

### A.   The Court Misapplied the Likelihood of Success Standard

The court erroneously considered the likelihood of success of a reorganization rather than the success of the underlying defamation claim. Appellees could not hope to succeed on the latter. *See supra* p. 36. But the court's analysis of the enjoined acts' alleged harm—a breakdown in settlement efforts and the effect on the investigation—does not mean that the acts would "cause" any failed reorganization,

*see In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009), and is nonetheless conflicted by the record. Settlement discussions broke down three days *before* the protests began. (A.0433-34; A.0491, A.0519-21, A.0527, A.0626-27.) There is no evidence that, but for the protests, discussions would have resumed and were likely to succeed. The court further concludes that the alleged protests would "greatly diminish[]" the Trustee's investigation. (A.0452.) The evidence indicates otherwise. (A.0245-46 (showing 24 Paul Hastings attorneys billed more than 7,000 hours, including during the protests); A.0220 ("Debtor's antics will not influence or sway the Trustee (or PAX)"); A.0624 (Trustee stating he will not back down).)

### B.   <u>Appellees Failed to Establish Irreparable Harm</u>

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation omitted); *In re Roman Catholic Diocese*, 628 B.R. 571, 580-81 (N.D.N.Y. 2021). To show irreparable harm, a plaintiff "*must* demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transport*, 559 F.3d at 118-19 (emphasis added) (internal citation omitted); *In re Peterson*, No: 10-23429 (AMN), 2018 WL 1172447, at * 2 (Bankr. D. Conn. Mar. 2, 2018) (applying Second Circuit irreparable harm test to §105(a) injunction).

Showing "some possibility of irreparable injury" is insufficient. *Nken v. Holder*, 556 U.S. 418, 434-35 (2009) (internal citation omitted); *Winter v. Nat'l Resources Defense Council,* 555 U.S. 7, 22 (2008). Irreparable harm "necessitates more than a mere showing that the party seeking relief will see its relative position deteriorate." *In re Peterson*, 2018 WL 1172447 at *2.

The court identifies three allegedly "irreparable" harms: (1) unfunded, unsustainable investigation; (2) chilling effect on potential witnesses and creditors; and (3) risk Despins will have to resign. These are legally insufficient and refuted by the record.

There is no evidence the investigation is "unfunded" or "unsustainable." (A.0453.) Although Despins testified his firm had not billed or been paid (A.0637), there is no evidence this was related to the enjoined activity. Despins has since submitted a fee request for $12 million. (A.0244.) Despins testified to experiencing inconveniences and distractions due to the protests. He tried to "avoid" protesters by leaving his house before protesters arrived; certain co-workers worked remotely. (A.0623, A.0639.) He did not testify that his schedule changed materially due to the protests or that working remotely is outside Paul Hastings's regular practice.[31] He testified that the adversary proceeding, which *PAX initiated,* is a "diversion" and

---

[31] At least six attorneys assisting Despins, including his lead counsel, do not work in the same office as Despins.

"huge distraction." (A.0617-18.) However, "[p]ersonal inconvenience is not the irreparable harm that warrants preliminary injunctive relief." *Local 553 v. Eastern Air Lines,* 695 F.2d 668, 677 (2d Cir. 1982); *BDRN v. UnitedHealthCare,* No. 15-cv-0804 (NSR), 2015 WL 1841210, at *4 (S.D.N.Y. Mar. 18 2015) (inability to use preferred pharmacy not "actual and imminent harm"). Neither are "distractions." *In re Roman Catholic Diocese*, No. 20-12345 (MG), 2023 WL 3750442, at *34-35 (Bankr. S.D.N.Y. June 1, 2023) (distraction from underlying litigation neither imminent nor irreparable). Despite "inconveniences" and "distractions," Despins's team averaged $2 million a month in fees. (A.0245-46.)

The court also said, "there is a very real risk that [Despins] will ultimately be forced to resign." (A.0453.) The only mention of resignation during the hearing came in testimony about Paul Hastings' concerns about unbilled fees. (A.0612.) However, Despins testified that he will not be swayed in his duties. (A.0220, A.0624.)

To the extent the court relied on alleged economic harm, such as Trustee expenses for cybersecurity and meetings, that is not *irreparable* injury. *Faiveley*, 559 F.3d at 118-119; *In re Homadian*, 646 B.R. 550, 602 (Bankr. E.D.N.Y. 2022) (missed financial collections not irreparable injury).

Finally, the court fails to identify any irreparable harm to PAX, which did not present any evidence of irreparable harm. Instead, the court speculated that the

enjoined activities have harmed the settlement process. (A.0455.)

The cases the court cites do not lead to another conclusion. *Cox*, for example, concerned restrictions on courthouse protests. It does not discuss irreparable harm. No evidence was offered that public perception of the judicial process is in danger.

### C.    The Balance of Harms Tips Decidedly Against Injunctive Relief

In assessing the need for §105(a) relief, "the most important element will be the balancing of harms." 2 Collier ¶ 102.02[2] at 105-14. The alleged harms asserted by Appellees are not *irreparable* harm, and are decidedly outweighed by the harm to Kwok because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As discussed, *supra* p. 28, the content-based Injunction is not narrowly tailored to serve a compelling government interest.

In weighing the harms—*i.e.,* Kwok's First Amendment rights against inconvenience and cost to Despins and unpleasant statements and depictions—the court cited (but misconstrued) defamation law, in concluding that Kwok's speech deserved less protection. (A.0463.) It analyzed whether Despins is a public figure, a defamation law concept that does not affect Kwok's exercise of First Amendment

rights here.[32]

These proceedings, which have received significant media coverage,[33] are matters of public concern (another defamation law concept), *see supra* p. 27, despite the court's clearly erroneous finding otherwise. (A.0465.) *See Connick v. Myers*, 461 U.S. 138, 146 (1983)) (matters of public concern "relat[e] to any matter of public, social, or other concern to the community").

---

[32] Nevertheless, as discussed, *supra* p. 36, Despins would be a public figure were he to sue protesters who made "disparaging" comments for defamation.

[33] *See, e.g.,* Thomas, "Paul Hastings Partner Wants Guo Wengui Sanctioned for Smear Campaign," Reuters (Dec. 1, 2022) (https://www.reuters.com/legal/legalindustry/paulhastings-partner-wants-guo-wengui-sanctioned-smear-campaign-2022-12-01/); Archer, "Chinese Billionaire Accused of Harassing Ch. 11 Foes," Law360, Nov. 22, 2022 (https://www.law360.com/articles/1551864/chinese-billionaire-accused-of-harassing-ch-11-foes); Randles, "Judge Strips Control of Bankruptcy from Exiled Chinese Businessman," Wall Street J., June 15, 2022 (https://www.wsj.com/articles/judge-strips-control-of-bankruptcy-from-exiled-chinese-businessman-11655331569); Wolf, "Chinese Exile Guo Says Bankruptcy Trustee is Conflicted," July 12, 2022 (https://news.bloomberglaw.com/bankruptcy-law/chinese-exile-guo-says-bankruptcy-trustee-is-conflicted); Hill, "Chinese Exile's Legal Foe Calls Bankruptcy Filing 'Astonishing,'" Bloomberg, Mar. 1, 2022 (https://www.bloomberg.com/news/articles/2022-03-01/chinese-exile-s-legal-foe-calls-bankruptcy-filing-astonishing?leadSource=uverify%20wall); "Law firm Paul Hastings asks for sanctions in lawsuit tied to Guo Wengui," Reuters Legal, Jan. 19, 2023 (https://www.reuters.com/legal/legalindustry/law-firm-paul-hastings-asks-sanctions-lawsuit-tied-guo-wengui-2023-01-19/); "150-foot luxe superyacht, $134 mn fine & bankruptcy: How a $37 mn wire transfer is keeping an exiled Chinese businessman away from jail," Economic Times, Apr. 25, 2022 (https://economictimes.indiatimes.com/magazines/panache/150-foot-luxe-superyacht-134-mn-fine-bankruptcy-how-a-37-mn-wire-transfer-is-keeping-exiled-chinese-businessman-guo-wenguis-away-from-jail/articleshow/91070161.cms?from=mdr).

**D.**    <u>**The Public Interest Weighs Heavily Against the Injunction**</u>

In determining the public interest, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. The court failed to do so. As evidenced by the Supreme Court's repeated rejection of prior restraints, as in *Stuart*, *Davis*, and *N.Y. Times*, "securing First Amendment rights is in the public interest." *N.Y. Progress and Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Abridging them is not. The First Amendment's "touchstones are that acceptable limitations must neither affect the impartial distribution of news and ideas…nor deprive our free society of the stimulating benefit of varied ideas because their purveyors fear physical or economic retribution solely because of what they choose to think and publish." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 150-151 (1967).

The public interest weighs heavily against silencing Kwok and his supporters.

## CONCLUSION

Accordingly, the Court should vacate the Injunction.

Respectfully submitted,

/s/David S. Wachen

Jeffrey Hellman (Fed. Bar: ct04102)
Law Offices of Jeffrey Hellman, LLC
195 Church Street, 10th Floor
New Haven, CT 06510
(203) 691-8762
jeff@jeffhellmanlaw.com

David S. Wachen (*pro hac vice*)
Wachen LLC
11605 Montague Court
Potomac, MD 20854
(240) 292-9121
david@wachenlaw.com

*Counsel for Debtor-Appellant Ho Wan Kwok*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h)(1), I certify that this brief complies with the requirements of Rule 8015(a)(7)(B)(i) in that the brief contains no more than 13,000 words. Calculating the number of words in accordance with Rule 8015(g) and using the word count feature of Microsoft Word, the brief has 12,045 words.

*/s/David S. Wachen*

David S. Wachen
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that, on July 26, 2023, I caused the foregoing Appellant Ho Wan Kwok Appeal Brief to be filed electronically via the Court's CM/ECF system. Notice of this filing is being sent by email to all parties in the matter by operation of the Court's CM/ECF system. Parties may access this filing through the Court's CM/ECF system.

/s/David S. Wachen
David S. Wachen
*Counsel for Appellant*