# No. 3:23-cv-102 (KAD)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HO WAN KWOK,

Debtor-Appellant,

v.

PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, L.P.
& LUC A. DESPINS, CHAPTER 11 TRUSTEE

Appellees.

Appeal of Preliminary Injunction Order from

United States Bankruptcy Court for the District of Connecticut

Bankr. No. 22-50073 (JAM) / Adv. Pro. No. 22-5032

## MEMORANDUM OF LAW OF APPELLEES PACIFIC ALLIANCE ASIA OPPORTUNITY FUND, L.P. AND LUC A. DESPINS, CHAPTER 11 TRUSTEE

*(Counsel listed on following page)*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
Telephone: (203) 781-2847
E-mail: dskalka@npmlaw.com
plinsey@npmlaw.com

Nicholas A. Bassett (*pro hac vice* forthcoming)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
Telephone: (202) 551-1902
E-mail: nicholasbassett@paulhastings.com

Avram E. Luft (*pro hac vice* forthcoming)
Douglass Barron ((*pro hac vice* forthcoming)
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6079
Email: aviluft@paulhastings.com
douglassbarron@paulhastings.com

Patrick M. Birney (CT No. 19875)
Annecca H. Smith (CT No. 31148)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Telephone: (860) 275-8275
E-mail: pbirney@rc.com
asmith@rc.com

Peter Friedman (*pro hac vice* pending)
Stuart M. Sarnoff (*pro hac vice* pending)
Daniel L. Cantor (*pro hac vice* pending)
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: pfriedman@omm.com
ssarnoff@omm.com
dcantor@omm.com

*Attorneys for Appellees Pacific Alliance Asia Opportunity Fund, L.P.
and Luc A. Despins, Chapter 11 Trustee*

September 25, 2023

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8014(a), Appellee Pacific Alliance Asia Opportunity Fund L.P. ("PAX") states that it is a limited partnership and that it has no partner with a greater than 10% interest who is publicly held or is directly or indirectly owned by a publicly held entity.  PAX will supplement this statement within a reasonable time if there is any change to the above information.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF THE ISSUES.............................................................................. 3

STATEMENT OF THE CASE.................................................................................. 4

SUMMARY OF ARGUMENT ................................................................................ 11

ARGUMENT ............................................................................................................ 12

    I.    THE BANKRUPTCY COURT HAD SUBJECT MATTER JURISDICTION. .......................................................................................... 12

        A.    Federal Subject Matter Jurisdiction Exists under 18 U.S.C. 1334........... 12

        B.    The Bankruptcy Court Had the Authority to Hear the Adversary Proceeding and Issue the Injunction. ....................................................... 13

    II.    THE PRELIMINARY INJUNCTION COMPORTS WITH WELL-ESTABLISHED FIRST AMENDMENT PRINCIPLES. ................................... 17

        A.    The Injunction Is a Viewpoint-Neutral Time, Place, and Manner Restriction Concerning Speech About a Private Matter. ......................... 17

        B.    The State Has Compelling Interests in Protecting the Quiet Enjoyment of Private Homes and Preserving the Integrity of the Judicial Process. ...................................................................................... 21

        C.    The Injunction Is Narrowly Tailored to Serve These Compelling Interests. ................................................................................................. 24

            1.    Breadth of Locations and Individuals. .......................................... 25

            2.    Buffer Zones. ................................................................................. 25

            3.    Time Restrictions. .......................................................................... 28

            4.    Content Prohibited. ........................................................................ 29

            5.    Breadth of Activities. ..................................................................... 29

        D.    The Injunction Does Not Restrict Speech of Public Concern................. 30

    III.    THE INJUNCTION IS NOT VAGUE, AMBIGUOUS, OR OVERLY BROAD.................................................................................................... 32

    IV.    THE BANKRUPTCY COURT PERMISSIBLY RELIED ON AUTHENTICATED HEARSAY EVIDENCE. ................................................. 36

    V.    THE INJUNCTION IS A PROPER EXERCISE OF THE BANKRUPTCY COURT'S POWERS. ............................................................. 39

i

**TABLE OF CONTENTS**
**(continued)**

Page

VI.  THE BANKRUPTCY COURT APPROPRIATELY ANALYZED AND APPLIED THE PRELIMINARY INJUNCTION STANDARD. ...................... 42

    A.  The Bankruptcy Court Appropriately Applied the Likelihood of Success Standard................................................................... 43

    B.  The Bankruptcy Court Correctly Found Irreparable Harm..................... 44

    C.  The Bankruptcy Court Correctly Found That the Balance of Harms Favors Injunctive Relief................................................................ 45

    D.  The Bankruptcy Court Correctly Found That the Public Interest Weighs in Favor of the Injunction. ........................................... 46

CONCLUSION.............................................................................................. 47

## TABLE OF AUTHORITIES

**Page(s)**

### <u>CASES</u>

*Ams. for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021) ............................................................................ 24

*Ayotte v. Planned Parenthood of N. New England*,
    546 U.S. 320 (2006) ............................................................................... 20

*Baker v. Simpson*,
    613 F.3d 346 (2d Cir. 2010) ................................................................... 11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    140 S. Ct. 2335 (2020) ............................................................................ 17

*Beauharnais v. Illinois*,
    343 U.S. 250 (1952) ............................................................................... 31

*Caperton v. A.T. Massey Coal Co.*,
    556 U.S. 868 (2009) ............................................................................... 23

*CBS v. Davis*,
    510 U.S. 1315 (1994) ............................................................................. 20

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995) ........................................................................... 13, 14

*Cent. Vt. Pub. Serv. Corp. v. Herbert*,
    341 F.3d 186 (2d Cir. 2003) ................................................................... 11

*Century Indem. Co. v. Kosnoff (In re Boy Scouts of Am.)*,
    Case No. 20-10343, Adv. P. No. 22-50071 (Bankr. D. Del. Jan. 24, 2022) ........................... 42

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    142 S. Ct. 1464 (2022) ....................................................................... 2, 18, 21

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984) ............................................................................... 18

*Clift v. City of Burlington, Vt.*,
    925 F. Supp. 2d 614 (D. Vt. 2013) ......................................................... 20

*Corning Inc. v. PicVue Elecs., Ltd.*,
    365 F.3d 156 (2d Cir. 2004) ................................................................... 34

*Cox v. Louisiana*,
    379 U.S. 559 (1965) ....................................................................... 23, 24, 26, 27

*Curtis Publ'g Co. v. Butts*,
    388 U.S. 130 (1967) ............................................................................... 46

*Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*,
    2011 WL 5244463 (S.D.N.Y. Nov. 2, 2011) ......................................... 15

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985) ........................................................................... 21, 32

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Fonar Corp. v. Deccaid Servs., Inc.*,
   983 F.2d 427 (2d Cir. 1993) ........................................................................ 34

*Frisby v. Schultz*,
   487 U.S. 474 (1988) .............................................................................. passim

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) .................................................................................... 3

*Gong v. Sarnoff*,
   2023 WL 5372473 (S.D.N.Y. Aug. 22, 2023) ........................................... 32

*Gorenflo v. Penske Logistics*,
   592 F. Supp. 2d 300 (N.D.N.Y. 2009) ....................................................... 16

*Hill v. Colorado*,
   530 U.S. 703 (2000) .................................................................................... 19

*Hodge v. Talkin*,
   799 F.3d 1145 (D.C. Cir. 2015) ................................................................. 29

*Houghtaling v. Eaton*,
   559 F. Supp. 3d 164 (W.D.N.Y. 2021) ....................................................... 42

*In re AroChem Corp.*,
   176 F.3d 610 (2d Cir. 1999) .................................................................... 3, 4

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
   770 F.2d 328 (2d Cir. 1985) ...................................................................... 41

*In re Ctr. Teleproductions, Inc.*,
   112 B.R. 567 (Bankr. S.D.N.Y. 1990) ....................................................... 23

*In re Dairy Mart Convenience Stores, Inc*,
   351 F.3d 86 (2d Cir. 2003) ........................................................................ 40

*In re G.M. Crocetti, Inc.*,
   2008 WL 4601278 (S.D.N.Y. Oct. 15, 2008) ............................................ 14

*In re Kirwan Offs. S.a.r.l.*,
   592 B.R. 489 (S.D.N.Y. 2018) ................................................................... 14

*In re Kirwan Offs. S.a.R.L.*,
   792 F. App'x 99 (2d Cir. 2019) ................................................................. 14

*In re LightSquared, Inc.*,
   539 B.R. 232 (S.D.N.Y. 2015) ................................................................... 35

*In re Monroe Well Serv. Inc.*,
   67 B.R. 746 (Bankr. E.D. Pa. 1986) .......................................................... 44

*In re Peterson*,
   2018 WL 1172447 (Bankr. D. Conn. Mar. 2, 2018) .................................. 44

*In re Purdue Pharms. L.P.*,
   619 B.R. 38 (S.D.N.Y. 2020) ..................................................................... 15

TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Quigley Co.*,
676 F.3d 45 (2d Cir. 2012) ................................................................. 15

*In re Robert Plan Corp.*,
777 F.3d 594 (2d Cir. 2015) ............................................................... 12

*In re Robinson*,
368 B.R. 805 (Bankr. E.D. Ark. 2007) ............................................... 39

*In re Stabile*,
436 F. Supp. 2d 406 (E.D.N.Y. 2006) ................................................. 42

*In re United Health Care Org,*,
210 B.R. 228 (S.D.N.Y. 1997) ........................................................... 43

*In re Vebeliunas*,
332 F.3d 85 (2d Cir. 2003) ................................................................... 4

*In re Wingspread Corp.*,
92 B.R. 87 (Bankr. S.D.N.Y. 1988) .................................................... 14

*Int'l Longshoreman's Ass'n v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) ............................................................................. 35

*Longo v. U.S. Postal Serv.*,
953 F.2d 790 (2d Cir.), *judgment vacated on other grounds*, 506 U.S. 802
(1992) ................................................................................................. 18

*Lyondell Chemical Co. v. CenterPoint Energy Gas Services (In re Lyondell
Chemical Co.)*,
402 B.R. 571 ................................................................................ 43, 44

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ..................................................................... 26, 27

*McCullen v. Coakley*,
573 U.S. 464 (2014) ..................................................................... 19, 28

*Mullins v. City of New York*,
626 F.3d 47 (2d Cir. 2010) ................................................................. 36

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) ............................................................... 46

*N.Y. State Nat'l Org. for Women v. Terry*,
886 F.2d 1339 (2d Cir. 1989) ............................................................. 33

*Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*,
365 B.R. 401 (S.D.N.Y. 2007) ........................................................... 43

*New York v. Griepp*,
991 F.3d 81 (2d Cir. 2021) ................................................................. 37

*Nguyen Huu To v. Rubin*,
99 F.3d 400, 1995 WL 723130 (2d Cir. 1995) ................................... 41

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988) ................................................................................................ 40

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) ................................................................................................ 22

*Patriot Grp. v. Fustolo (In re Fustolo)*,
    2015 WL 411760 (Bankr. D. Mass. Jan. 30, 2015) ................................................ 39

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
    646 F.2d 800 (2d Cir. 1981) ................................................................................... 33

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
    460 U.S. 37 (1983) ................................................................................................. 21

*Picard v. Magliano*,
    42 F.4th 89 (2d Cir. 2022) ...................................................................................... 23

*R.A.V. v. St. Paul*,
    505 U.S. 377 (1992) ................................................................................................ 32

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................................................... 21, 22

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ............................................................................... 38

*Rosen v. Siegel*,
    106 F.3d 28 (2d Cir. 1997) ..................................................................................... 35

*Rowan v. Post Off. Dep't*,
    397 U.S. 728 (1970) ................................................................................................ 21

*S.C. Johnson & Son v. Clorox Co.*,
    241 F.3d 232 (2d Cir. 2001) .............................................................................. 33, 35

*Sanders v. Air Line Pilots Ass'n, Int'l*,
    473 F.2d 244 (2d Cir. 1972) ................................................................................... 34

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) ................................................................................................ 34

*SEC v. Musella*,
    578 F. Supp. 425 (S.D.N.Y. 1984) ........................................................................ 38

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ....................................................................................... 30, 31, 32

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) ................................................................................... 12

*Stern v. Marshall*,
    564 U.S. 462 (2011) ....................................................................................... 14, 15, 16

*Time Warner Cable Inc. v. FCC*,
    729 F.3d 137 (2d Cir. 2013) ................................................................................... 24

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*,
    453 U.S. 114 (1981)........................................................................ 18

*United States v. Buddhu*,
    2008 WL 2355930 (D. Conn. June 5, 2008)........................... 37

*United States v. Crispo*,
    306 F.3d 71 (2d Cir. 2002)........................................................ 23

*United States v. Grace*,
    461 U.S. 171 (1983)..................................................................... 23

*United States v. Hooker Chems. & Plastics Corp.*,
    749 F.2d 968 (2d Cir. 1984)...................................................... 16

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,
    266 F.3d 45 (2d Cir. 2001)................................................. 41, 42

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977).................................................................... 41

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981)............................................................. 36, 38

*Virginia v. Black*,
    538 U.S. 343 (2003).................................................................... 31

*Waldman v. Stone*,
    698 F.3d 910 (6th Cir. 2012) .................................................. 16

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)........................................................... passim

*We the Patriots USA v. Hochul*,
    17 F.4th 266 (2d Cir. 2021)...................................................... 37

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015)....................................................... 23, 24, 29

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) .............................................. 18

*Yonkers Racing Corp. v. City of Yonkers*,
    858 F.2d 855 (2d Cir. 1988)..................................................... 41

*Zeneca Inc. v. Eli Lilly & Co.*,
    1999 WL 509471 (S.D.N.Y. July 19, 1999) ........................ 38

## STATUTES

11 U.S.C. § 105(a) ........................................................... passim

11 U.S.C. § 1106(a)(3)............................................................ 40

28 U.S.C. § 157........................................................................ 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

28 U.S.C. § 157(b)(1) ................................................................................ 14

28 U.S.C. § 157(b)(2)(A) and (O) ............................................................ 14

28 U.S.C. § 1651(a) ................................................................ 4, 11, 16, 41

28 U.S.C.A. § 1334 ................................................................................... 12

## OTHER AUTHORITIES

*How Many NYC Blocks Are in a Mile?*, STREETEASY READS, Jan. 4, 2023 ................................ 28

## RULES

Fed. R. Bankr. P. 7001(7) ......................................................................... 39

Fed. R. Civ. P. 65 ..................................................................................... 42

Fed. R. Civ. P. 65(d) ................................................................................ 33

## PRELIMINARY STATEMENT[1]

The Bankruptcy Court's decision to enter the January 13, 2023 preliminary injunction (the "Injunction") was correct in every respect and should be affirmed.  The court acted decisively, and properly, to preserve the integrity of the bankruptcy process, and rightly ignored Kwok's specious free-speech claims.

This appeal is not about political speech.  It is about a deeply cynical and pretextual invocation of the First Amendment to provide cover for a harassment and intimidation campaign by Debtor-Appellant Ho Wan Kwok, an indicted self-proclaimed billionaire with countless slavishly devoted social-media and real-life followers.  When Kwok's bankruptcy case started going badly for him, Kwok sought to intimidate the bankruptcy trustee, his creditors, their lawyers, and their families to disrupt the very judicial proceeding he commenced.

The campaign began on November 20, 2022, nine months after Kwok commenced his chapter 11 case, but merely three days after negotiations to resolve Kwok's bankruptcy collapsed.  And while Kwok may have told his followers that they were fighting against Chinese Communist Party ("CCP") oppression, there were no demonstrations at the Chinese embassy or the United Nations.  Rather, the "protestors" trained their sights solely on the chapter 11 Trustee ("Trustee"), the Chairman of Pacific Alliance Group ("PAG")—an affiliate of Kwok's largest creditor, Pacific Alliance Asia Opportunity Fund ("PAX")—and their respective counsel, posting online the home and office addresses of these individuals and, especially, their family members.  Moreover, the attacks were intensely personal, claiming the Trustee, PAG's Chairman, and

---

[1] Appellant's July 26, 2023 appeal brief (ECF No. 43) is referred to herein as "Br."  Citations to (i) Appellant's Appendix appear as "A.__"; and (ii) Appellee's Supplemental Appendix appear as "SA. __".  Unless noted, all internal citations and quotations are omitted and any emphasis is added.

PAX's lawyers at O'Melveny & Myers LLP ("OMM") were CCP agents, anti-Semites, anti-Chinese racists, Nazis, and promoters of genocide, among other baseless accusations.  Kwok called for (and directly and indirectly funded) months-long, daily protests by his followers, who heeded that call in droves—picketing outside these individuals' private homes, distributing leaflets to neighbors describing them as racists and supporters of genocide, and displaying incendiary signs calling them "Chinese Communist Running Dogs."  The Trustee even received death threats and faced pressure to resign.

Kwok's campaign temporarily achieved his goal—not of educating the public about CCP oppression, but of creating, in the Trustee's words, a "damaging diversion" to the case, including the investigation into Kwok's assets.  PAX and the Trustee initiated this adversary proceeding and petitioned the Bankruptcy Court for relief, resulting in the Injunction, which enjoined certain aspects of Kwok's disruptive antics.  Finding that Kwok's conduct threatened to turn his chapter 11 case into "mob law," the court imposed narrowly tailored restrictions on Kwok's ability to foster protests directly in front of homes and workplace entrances, to dox individuals involved in his bankruptcy (and their relatives), and to interfere with the case.

Kwok's appeal claims the Injunction infringes his First Amendment rights.  But the First Amendment does not insulate a debtor's attempt to interfere with the orderly administration of a federal bankruptcy proceeding by threatening, harassing, doxing, and spreading misinformation about those involved.  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022).  The court below did not preclude Kwok from speaking, but instead issued a time, place, and manner injunction narrowly tailored to preclude Kwok's intimidation and protect the integrity of the bankruptcy proceedings.  Such an injunction would be appropriate even in the context of core protected speech on a matter of public concern.  The injunction is more than

justified here to impose tailored limits on (but not preclude) Kwok's efforts at intimidation in the guise of speech. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has *never* been … an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

Kwok's attempt to equate this case with those involving prior restraints on the media concerning matters of public concern (Br. 19) fails. Kwok is not a journalist, and the Injunction concerns a solely private dispute: Kwok's personal bankruptcy. Moreover, the Injunction does not preclude Kwok from speaking, which is what prior-restraint principles prevent—rather, the Injunction imposes time, place, and manner restrictions, which have always been allowed. Nor does Kwok's description of the Injunction as a "sweeping, content-based Injunction" hold up: again, the Injunction is a viewpoint-neutral time, place, and manner restriction that leaves open ample alternative means of expression. It easily passes muster under well-established First Amendment principles.

Kwok's other arguments likewise fail. The Injunction is sufficiently specific and reasonably clear, providing Kwok with notice of the conduct proscribed. And as explained below, the Bankruptcy Court plainly had jurisdiction to enter the Injunction, did not exceed its powers in doing so, considered evidence properly before it at a preliminary injunction hearing, and properly applied the preliminary injunction standard. For these reasons, this Court should affirm the Injunction.

## STATEMENT OF THE ISSUES

1) Whether the Bankruptcy Court correctly exercised subject matter jurisdiction (either "core" or "related to") over an adversary proceeding to enjoin the intimidation and harassment of the chapter 11 trustee, the debtor's largest creditor, and their respective counsel and relatives. Conclusion of law, reviewed *de novo*. *See In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir. 1999).

2) Whether the Injunction is viewpoint-neutral and narrowly tailored to serve the significant state interests of preserving quiet enjoyment of the home and the integrity of the judicial process while leaving open alternative avenues of communication and not burdening substantially more speech than is necessary to further the Injunction's goals.  Conclusion of law, reviewed de novo.  *See id.*

3) Whether the Injunction is viewpoint-neutral and narrowly tailored to serve the compelling state interests of preserving quiet enjoyment of the home and the integrity of the judicial process such that no less restrictive alternative would serve its purpose.  Conclusion of law, reviewed *de novo*.  *See id.*

4) Whether the Injunction, which specifically bars certain acts, at certain places, and at certain times, is unconstitutionally vague, ambiguous, or overbroad.  Conclusion of law, reviewed *de novo*.  *See id.*

5) Whether the Bankruptcy Court permissibly relied on hearsay evidence for the limited purpose of determining whether to issue a preliminary injunction.  Conclusion of law, reviewed *de novo*.  *See id.*

6) Whether it was a proper exercise of the Bankruptcy Court's powers under 11 U.S.C. § 105(a) or 28 U.S.C. § 1651(a) to enjoin the intimidation and harassment of the chapter 11 trustee, the debtor's largest creditor, and their respective counsel and relatives.  Conclusion of law, reviewed *de novo*.  *See id.*

7) Whether the Bankruptcy Court appropriately analyzed and applied the preliminary injunction standard under 11 U.S.C. § 105(a).  Mixed question of law and fact, reviewed *de novo*.  *See In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003).

## STATEMENT OF THE CASE

### A.  PAX's $116 Million Judgment Against Kwok.

In 2008, Kwok personally guaranteed a loan PAX made to a Kwok-owned entity.

(SA.0031-32).  Kwok failed to honor his guarantee.  (SA.0037).

PAX sued Kwok for breach of the personal guarantee in New York State Supreme Court.

(SA.0041).  On February 3, 2021, Justice Ostrager found Kwok liable for $116,402,019.57.

(SA.0054).  PAX then "undertook a year's long effort to enforce [the] judgment by first

identifying and then attempting to levy upon Kwok's assets in the United States."  (SA.0007).

Kwok frustrated PAX at every step: "Kwok, who is a self-declared multi-billionaire, had

secreted his assets in a maze of corporate entities and with family members." (*Id.*).  Kwok never paid the judgment.  (*Id.*).

## B.  The State Court Found Kwok in Contempt and Fined Him $134 Million.

Part of PAX's effort to enforce the judgment involved Kwok's super-yacht, the Lady May.  (SA.0010).  Despite Justice Ostrager having enjoined Kwok from "making or causing any sale, assignment, transfer or interferences with any property in which he has an interest," including the Lady May, Kwok directed the Lady May to leave that court's jurisdiction. (SA.0018, SA.0021, SA.0069).  PAX moved for contempt (SA.0072; SA.0083) and Justice Ostrager granted that motion.  He ordered Kwok to return the yacht to New York within 90 days or be fined $500,000 for every day thereafter the Lady May was not returned.  (SA.0025). The New York Appellate Division unanimously affirmed that order.

Kwok disregarded the return deadline and Justice Ostrager entered a contempt order imposing a $134 million fine (on top of the damages awarded to PAX) based on the "268 days" that "the Lady May ha[d] remained outside the jurisdiction of the Court." (SA.0016).  Kwok never paid the contempt fine.  Instead, on February 15, 2022, Kwok filed for bankruptcy in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"). (A.0166).

## C.  Bankruptcy Court Was Not the Refuge Kwok Expected.

On April 6, 2022, PAX moved to dismiss the bankruptcy case or, alternatively, to appoint a chapter 11 trustee (joining the U.S. Trustee's motion).  (SA.0135).  Rather than risk a trustee overseeing his case, Kwok consented to PAX's motion to dismiss.  (SA.0181).  But the Bankruptcy Court opted to grant the motion to appoint a trustee, finding that Kwok's bankruptcy

was "unusual, complicated, and often contentious," and appointing a trustee was in the best interest of creditors.  (SA.0185).

On July 8, 2022, over Kwok's objection, the Bankruptcy Court entered an order appointing Luc Despins as Chapter 11 Trustee (the "Trustee").  (SA.0204).  Kwok then moved unsuccessfully to disqualify Despins.  (A.0184, A.0209).

Since then, the Trustee has used his statutory powers to identify and marshal Kwok's assets.  This has included, *inter alia*, seeking Rule 2004 discovery into Kwok's legal and financial advisors, and entities and individuals affiliated with Kwok (SA.0229), and commencing adversary proceedings to obtain control over Kwok-controlled entities.  (SA.0247).  Kwok opposed these efforts every step of the way, leading to contempt motions and orders.  (SA.0231; SA.0312).

**D.  Settlement Discussions Broke Down, Leaving Kwok Desperate.**

During this time, parties also engaged in discussions aimed at resolving the bankruptcy.  (A.0429).  Kwok recognized that harassing his largest creditor's executives, and their relatives and counsel, was antithetical to reaching a settlement, and instructed his followers in a YouTube broadcast that ceasing the spread of PAX-related personal information "was a necessary condition for settlement and reconciliation."  (A.0430).  On October 30, 2022, the Trustee submitted a term sheet to Kwok concerning a global settlement, and negotiations continued.  (A.0431).

On November 17, 2022, settlement discussions came to a boiling point at a meeting between the Trustee, Kwok, and their respective counsel.  (A.0432).  During this meeting, the Trustee proposed that Kwok pay $250 million to resolve the chapter 11 case.  (A.0433).  Kwok's counsel falsely branded the demand "extortion," while recognizing that the money was to be paid

to the estate as part of a settlement, not to the Trustee personally.  (*Id.*).  This event became the launching pad for a vitriolic campaign by Kwok and his followers against the Trustee and PAX.

**E.  Kwok Orchestrated a Harassment Campaign to Intimidate the Trustee and PAX and Undermine the Bankruptcy.**

Recognizing that the Trustee could expose his previously concealed assets, Kwok utilized his vast social media following to intimidate, harass, dox, and incite "protests" against the Trustee and PAX in a transparent attempt to destabilize the bankruptcy.  For example, on November 15, 2022, two days *before* the contentious settlement meeting, the Kwok-affiliated Gettr page posted home addresses of the Trustee and his family members, and PAG's chairman and his family members, as well as the office addresses of the Trustee's counsel and PAX's counsel, calling for 90 days of protests at these locations.  (A.0431-32).

On November 20, 2022, three days after settlement discussions broke down, a Kwok-affiliated account posted the identities and workplaces of the Trustee's daughters, along with their photographs and a statement accusing their father of aiding and abetting the CCP.  (A.0435).

Also on November 20, 2022, Kwok's supporters began protesting directly outside (i) the Trustee's home, distributing leaflets to his neighbors describing the Trustee and his counsel as racist enablers of the CCP (A.0435), and (ii) OMM's New York office, holding placards bearing pictures of OMM attorneys with a hammer-and-sickle on their foreheads.  (A.0436).

On November 21, 2022, Kwok posted an online interview in which he acknowledged that the Trustee was issuing Rule 2004 subpoenas to Kwok's affiliates and advised his audience to avoid service.  (A.0435-36).  Kwok told viewers that, if they were "stupid" and received subpoenas, the Himalaya Global Alliance and the Rule of Law Foundation (both Kwok affiliates, *see* A.0421-22) would hire attorneys to contest the subpoenas.  (A.0435-36).  In this same

broadcast, Kwok threatened that the Trustee and his law firm (Paul Hastings LLP) would "suffer calamities" because of the Rule 2004 subpoenas.  (A.0436).

On November 22, PAX moved for an order enjoining Kwok from publishing personal information about certain parties and their families online, instructing Kwok to remove any such existing posts, granting a temporary restraining order ("TRO") in the event that the bankruptcy court ordered a hearing on the motion, and referring Kwok's conduct to the U.S. Attorneys' Office.  (A.0263).  That same day, the Trustee moved to intervene in support of the motion, (A.0297), and the court granted the TRO.  (A.0306).

Unsurprisingly, Kwok's harassment continued.  On November 25, 2022, the Trustee received a series of emails from an unknown email address with subject lines "I wish" and "I kill."  (A.0438).  On November 26, 2022, numerous Paul Hastings employees received emails from multiple senders stating that the New Federal State of China and "Chinese whistleblowers" called upon Paul Hastings employees to speak up against the Trustee and/or leave the firm, and including a web-post titled "DOJ Appointed Trustee Despins Blackmails $250 Million, Threatens to 'Tear Apart' Chinese Dissidents."  (A.0438-41).

Kwok's supporters regularly broadcasted from protests outside the residences and offices of Kwok's perceived adversaries.  For example:

- On November 24, 2022, the @MilesGuoLive Gettr account posted photographs of the ongoing protests outside the home of PAG's chairman's son and stated, "Comrades who have worked so hard to protest on the frontline, rain or shine, salute you!"  (A.0437).

- On December 4, 2022, a Kwok-affiliated Gettr profile posted a video of supporters placing a placard with a stylized image of PAX's counsel, Stuart Sarnoff, at the door of his home and sliding a letter under his door.  (A.0440).

- On or before December 5, 2022, Kwok's supporters rented a home in California directly across the street from a relative of PAG's chairman, and placed on it a billboard and signs targeting PAG's chairman.  (A.0440).

- On or before December 7, 2022, protests occurred at the Chapter 11 Trustee's daughter's and ex-wife's homes accusing the Chapter 11 Trustee of soliciting a bribe and seeking to destroy a Chinese dissident organization. (A.0441).

### H. The Bankruptcy Court Enjoined Kwok's Conduct to Protect the Quiet Enjoyment of Private Homes and Preserve the Integrity of the Bankruptcy.

Beginning December 5, 2022, the Bankruptcy Court held a four-day evidentiary hearing on Appellees' motion for a preliminary injunction, taking testimony from nine witnesses, and considering 100 exhibits, including the materials described above. On January 13, 2023, the Bankruptcy Court granted the motion, finding, *inter alia*, that:

- Absent Kwok's conduct, there was a likelihood of a successful reorganization. (A.0452). The court held that the Trustee's investigation was likely to bring substantial assets—"disclosed" and "contested"—into the estate. (A.0450). This finding was based, in part, on (i) Kwok's demonstrated "ab[ility] to marshal assets when he needs them" (A.0450); and (ii) Kwok's bankruptcy counsel's testimony "that there was meaningful progress made towards reaching a settlement with PAX." (A.0451).

- Kwok's conduct would irreparably harm the reorganization process because, among other things, it "embarrass[es], burden[s], delay[s] or otherwise impede[s] the reorganization proceedings." (A.0455). The Bankruptcy Court credited the Trustee's testimony that he (i) believed that the harassment campaign and resulting adversary proceeding were damaging diversions from his investigation into the assets of the Debtor that set the investigation back weeks (A.0445); (ii) encountered creditor hesitancy to participate in Kwok's case due to the social media and protest campaign, fearing such actions could turn Kwok's followers against them (A.0446); and (iii) spent hundreds of thousands of dollars to hire consultants to manage his firm's cyber security protection as a result of the online harassment. (A.0444).

- The balance of harms weighed in favor of granting the Injunction. (A.0468). The Bankruptcy Court identified "two established compelling state interests supporting" the Injunction—quiet enjoyment of private homes and the integrity of the judicial process. (A.0457; A.0460). And the court rejected Kwok's argument that his speech was due enhanced protection, concluding this case did not involve a "matter of public concern." (A.0463-64). The court also found that enjoining Kwok's conduct "vindicates the public's interest in the integrity of the bankruptcy process as well as court proceedings more generally." (A.0468).

The Injunction's two aims are (1) to protect the quiet enjoyment of private homes and (2) to impose various time, place, and manner restrictions on Kwok's social media and protest campaign, thus creating various limited restrictions on Kwok's ability to interfere with his bankruptcy.  Specifically, it restricts:

- Picketing, parading, or displaying or distributing harassing material (the "Subject Conduct") at any time before or about the homes or residences of the Trustee, PAX's or its affiliates' officers or employees, counsel to the Trustee or PAX or its affiliates (the "Protected Parties"), and any of their respective relatives; (A.0475)

- Engaging in the Subject Conduct, at any time, within 200 feet of the homes and residences of relatives of the Protected Parties; (A.0476)

- Engaging in the Subject Conduct between 3:00 p.m. and 10:00 a.m. within 200 feet of the home or residences of the Protected Parties, and any of their respective relatives; (A.0476)

- Engaging in the Subject Conduct, at any time, within 36 feet of any entrance to the offices of the Protected Parties, and any of their respective relatives; (A.0476)

- Engaging in the Subject Conduct, at any time, within 100 feet of the offices or workplaces of the Protected Parties' relatives; (A.0477)

- Engaging in the Subject Conduct between 8:00 a.m. and 10:00 a.m. and between 4:00 p.m. and 8:00 p.m. within 100 feet of the offices or workplaces, but not within 36 feet of an entrance to the offices or workplaces, of the Protected Parties and any of their relatives.  (A.0477).

The Injunction further prohibits Kwok from inciting the conduct described above and doxing the Protected Parties and their relatives, and directs Kwok to remove prior social-media posts that contain personal information concerning the Protected Parties or incites the acts proscribed. (A.0479).  In addition, the Injunction binds Kwok's officers, agents, servants, employees, attorneys, and "other persons who are in active concert or participation with [Kwok]." *Id.*

On January 25, 2023, Kwok filed a notice of appeal and moved for leave to appeal the Injunction.  (A.0001; A.0074).

## SUMMARY OF ARGUMENT

The Bankruptcy Court had subject matter jurisdiction over this adversary proceeding because it (i) seeks a preliminary injunction under Bankruptcy Code Section 105(a), and (ii) has no conceivable "existence outside of the bankruptcy." *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010). And the court had authority to hear this adversary proceeding and issue the Injunction because it is a "core" proceeding. *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 191 (2d Cir. 2003).

The Injunction—a viewpoint-neutral time, place, and manner restriction concerning a private matter—does not violate the First Amendment. The Injunction is valid under both intermediate and strict scrutiny because it is narrowly tailored to achieve the compelling state interests of protecting the quiet enjoyment of private homes and preserving the integrity of the judicial process.

The Injunction is not unconstitutionally vague, ambiguous, or overbroad because it bars specific acts, at specific places, and during specific times. These details adequately apprise Kwok and his followers of the conduct proscribed.

The Bankruptcy Court correctly considered hearsay evidence. Courts may rely on hearsay evidence for the limited purpose of determining whether to issue a preliminary injunction. And the Bankruptcy Court only considered hearsay evidence once it was satisfied that the evidence was relevant, authentic, and reliable.

The Injunction was a proper exercise of the Bankruptcy Court's powers under 11 U.S.C. § 105(a) and 28 U.S.C. § 1651(a) because it was "necessary" and "appropriate" to enjoin the Debtor and his followers from interfering with the bankruptcy process through harassment and intimidation.

The Bankruptcy Court correctly applied the standard for injunctive relief under 11 U.S.C.

§ 105(a) when it held that (1) there was a likelihood of successful reorganization; (2) there would be imminent irreparable harm to the estate in the absence of an injunction; (3) the balance of harms tips in favor of Appellees; and (4) the public interest weighs in favor of an injunction.

## **ARGUMENT**

## I.    **THE BANKRUPTCY COURT HAD SUBJECT MATTER JURISDICTION.**

### A.    **Federal Subject Matter Jurisdiction Exists under 18 U.S.C. 1334.**

Bankruptcy courts have jurisdiction over proceedings "arising under …, or arising in or related to cases under title 11." 28 U.S.C.A. § 1334. "Proceedings arising under the Bankruptcy Code are those that clearly invoke substantive rights created by federal bankruptcy law." *In re Robert Plan Corp.*, 777 F.3d 594, 596 (2d Cir. 2015). A court's "arising in" jurisdiction "covers claims that are not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy." *Baker*, 613 F.3d at 351. Cases that fall within either the "arising under" or "arising in" jurisdiction described above are referred to as "[c]ore proceedings." *Robert Plan Corp.*, 777 F.3d at 596. Non-core proceedings fall within a court's "related to" jurisdiction if their "outcome might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339–40 (2d Cir. 2018). "While 'related to' jurisdiction is not limitless, it is fairly capacious, and includes suits between third parties which have an effect on the bankruptcy estate." *Id.* at 340.

Federal jurisdiction exists here for at least two reasons: First, this adversary proceeding clearly arises under title 11, as it seeks a preliminary injunction under Section 105(a) of the Bankruptcy Code. (A.0279). Second, this action has no conceivable "existence outside of the bankruptcy," *Baker*, 613 F.3d at 351, as it (i) seeks to restrain a ***debtor*** and his acolytes from intimidating and threatening a ***chapter 11 trustee***, the debtor's largest creditor, and their counsel and relatives; and (ii) relates to failed plan-confirmation negotiations, Rule 2004 subpoenas, and

12

the submission of numerous claims against the estate (*see* pp. 4–10, *supra*)—none of which could possibly occur outside the confines of a bankruptcy.

Additionally, Kwok's conduct, if left unchecked, would "have a direct and substantial adverse effect" on confirming a plan and encouraging creditors to file claims. *Celotex Corp. v. Edwards*, 514 U.S. 300, 310 (1995).  For example, the Bankruptcy Court found that:

- "There have been discussions at Paul Hastings about having the Chapter 11 Trustee resign [and that the] Trustee has spent numerous hours arranging protection with the U.S. Marshals and providing incoming evidence to the U.S. Marshals."  (A.0377).

- "The Trustee is encountering creditor hesitancy to participate in the Debtor's case due to the social media and protest campaign, fearing such actions could turn against them."  (A.0378).

- "[T]he Debtor's conduct is having a chilling effect on potential witnesses and creditors in these cases."  (A.0386).

- In connection with granting the TRO, "continuing harassment may deter witnesses from assisting with the Trustee's investigation or deter creditors from filing claims." (A.0309–10).

Ignoring these findings, Kwok suggests that Appellees' claims are "too tenuous" to "conceivably" affect the estate based on the Trustee's statement (A.0624) that he would not be influenced or swayed in carrying out his duties.  (Br. 18).  But Kwok omits that the Trustee also testified that he was "***not*** saying … that [the harassment] is not affecting [his] ability to carry out [his] duties in any way."  (A.0624).  Kwok's conduct clearly impacts the bankruptcy estate.

### B.     The Bankruptcy Court Had the Authority to Hear the Adversary Proceeding and Issue the Injunction.

After determining that subject matter jurisdiction exists, the next question is whether the Bankruptcy Court had the authority to hear this adversary proceeding and issue the Injunction. Bankruptcy courts "may hear and determine … all core proceedings arising under title 11, or arising in a case under title 11" including "matters concerning the administration of the estate"

and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of

the debtor-creditor … relationship[.]"  28 U.S.C. §§ 157(b)(1), (b)(2)(A) and (O).  A proceeding

is "core" if it has "significant ramifications for the administration of the estate[.]"  *Cent. Vt. Pub.

Serv. Corp.*, 341 F.3d at 191.  *See also In re Kirwan Offs. S.a.r.l.*, 592 B.R. 489, 506 (S.D.N.Y.

2018), *aff'd sub nom. In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019) ("[M]atters

that are integral to the integrity of the bankruptcy process render the entire proceeding core –

even where [] non-core issues arise[.]").  This adversary proceeding, which concerns **the debtor's**

relentless attempts to undermine the administration of **his own** bankruptcy estate, is

unquestionably "core."  Appellees initiated this proceeding to seek relief from a campaign that

Kwok orchestrated to deter the Trustee and PAX—through intimidation, harassment, doxing, and

threats—from pursuing their rights and duties in the bankruptcy.  *See supra* at pp. 7–10.  The

proceeding thus "ha[s] significant ramifications for the administration of the estate," *Cent. Vt.

Pub. Serv. Corp.*, 341 F.3d at 191, and is "inextricably bound up" in core issues, *In re G.M.

Crocetti, Inc.*, 2008 WL 4601278, at *4 (S.D.N.Y. Oct. 15, 2008), concerning the "integrity of

the bankruptcy process."  *In re Kirwan Offs. S.a.r.l.*, 592 B.R. at 506.

The core/noncore distinction matters, chiefly, to guide whether a bankruptcy court may

issue a "final judgment."  *Stern v. Marshall*, 564 U.S. 462, 486 (2011) ("Congress permitted the

newly constituted bankruptcy courts to enter final judgments only in 'core' proceedings.").  But,

here, this is a distinction without a difference because "[a] bankruptcy court can issue a

preliminary injunction **even in a noncore, related matter** because the injunction is not a final

order."  *In re Wingspread Corp.*, 92 B.R. 87, 94 n.3 (Bankr. S.D.N.Y. 1988).  For all the reasons

discussed above (*see supra*, Section I.A), this matter is (at a minimum) "related" to the

bankruptcy proceedings.  *See Celotex*, 514 U.S. at 308-10 ("[T]he 'related to' language … must

be read to give … bankruptcy courts … jurisdiction over more than simple proceedings involving the property of the debtor or the estate," including where bankruptcy courts act to prevent "a direct and substantial adverse effect on [the] ability to undergo a successful reorganization."); *In re Purdue Pharms. L.P.*, 619 B.R. 38, 49 (S.D.N.Y. 2020) (finding "related to jurisdiction" to issue an injunction aimed at preventing "impact[]" to "the *res* of the bankruptcy proceeding").

The question of how far a bankruptcy court's authority extends is at the heart of *Stern*, which (i) addresses the allocation of power between Article III and Article I courts, and (ii) describes 28 U.S.C. § 157 as "allocat[ing] the authority to enter final judgment between the bankruptcy court and the district court."  564 U.S. at 480; *see also* 28 U.S.C. § 157 ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 … and may enter appropriate orders and judgments.").  But, as the Supreme Court noted, this allocation determination "does ***not*** implicate questions of subject matter jurisdiction." *Stern*, 564 U.S. at 480.  Cases in this Circuit are in accord.  *See, e.g.*, *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 464 (S.D.N.Y. 2011) ("identifying a claim as 'core' or 'non-core' under the bankruptcy law does not necessarily determine whether a bankruptcy court is constitutionally empowered to finally adjudicate the matter."); *In re Quigley Co.*, 676 F.3d 45, 52-53 (2d Cir. 2012) (analyzing separately the issues of (i) "judicial Power" to enter a final binding judgment and (ii) statutory jurisdiction).

Kwok argues that *Stern* forecloses state-law defamation claims here, because it limits a bankruptcy court's jurisdiction to hear only state-law claims involving "public rights."  (Br. 17).  This is wrong for several reasons.

15

*First*, the claims asserted in this adversary proceeding are not state-law defamation claims. Neither PAX's "limited" descriptions of Kwok's conduct as "defamatory" nor the Bankruptcy Court's repetition of that description in the now-dissolved TRO (Br. 17) "transform [the Complaint's] allegations" into personal injury claims. *Gorenflo v. Penske Logistics*, 592 F. Supp. 2d 300, 305 (N.D.N.Y. 2009). Kwok's attempt to rewrite the claim fails because it is axiomatic that "the plaintiff is master of his own complaint." *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 980 (2d Cir. 1984); *see also Waldman v. Stone*, 698 F.3d 910, 920 (6th Cir. 2012) (holding "claims [that] have state-law [] as an element, [may still] arise under the bankruptcy statute"). As the Bankruptcy Court recognized, the Complaint "does not assert a defamation cause of action, but rather asserts causes of action under 28 U.S.C. § 1651(a) and 11 U.S.C. § 105(a)." (A.0420; *see also* A.0259-61 (Compl.) (seeking relief under 28 U.S.C. § 1651(a) and 11 U.S.C. § 105(a)).[2]

*Second*, when *Stern* limited a bankruptcy court's ability to decide state-law claims, it did so for state-law **counterclaims** against **third parties**—not claims against the debtor. Tellingly, Kwok points to no case, and Appellees are aware of none, in which **the debtor** invoked *Stern* to foreclose a claim **against the debtor**. Indeed, the state-law defamation claims against the debtor in *Stern* **survived** because the third party "consented to the Bankruptcy Court's resolution of his defamation claim." 564 U.S. at 479. Here, because Kwok **chose** to file for bankruptcy, he chose to submit himself to the power of the Bankruptcy Court. Kwok's attempt to liken himself to *Stern*'s third-party defendant—who would not have reasonably expected to face state-law tort claims in bankruptcy court—is baseless.

---

[2] The Complaint's reference to criminal harassment statutes does not alter the analysis; while Kwok's conduct may *also* constitute a criminal violation, Appellees sought relief only under 11 U.S.C. § 105(a) and 28 U.S.C. § 1651(a) .

## II.      THE PRELIMINARY INJUNCTION COMPORTS WITH WELL-ESTABLISHED FIRST AMENDMENT PRINCIPLES.

Kwok's basic argument is that the Injunction violates the First Amendment because it impermissibly restricts "core political speech."  That argument is wrong twice over.  The Injunction does not restrict core political speech—it instead addresses primarily expressive conduct intended to intimidate and harass individuals central to Kwok's bankruptcy case and undermine that proceeding.  But even if Kwok were right, it would not matter, because the First Amendment permits "reasonable time, place, and manner regulations on speech," *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020), which are subject only to intermediate scrutiny unless they discriminate as to viewpoint.  The Injunction here is an ordinary time, place, and manner regulation that is narrowly tailored to prevent Kwok's most harassing intimidation tactics—it preserves the ability for Kwok (were he not incarcerated) and his followers to demonstrate at their preferred locations while attempting to ameliorate the most harassing nature of those demonstrations.  And because the Injunction does not evince government hostility to the demonstrators' message, it is viewpoint-neutral, *i.e.*, designed to address the impact of the expressive conduct on unwilling listeners in their homes and protect the bankruptcy process itself, not to stifle the expression of a particular viewpoint.  This neutral time, place, and manner restriction not only survives intermediate scrutiny, it also survives strict scrutiny because it is narrowly tailored to serve the compelling state interests of protecting quiet enjoyment of private homes and preserving the integrity of the judicial process.  Accordingly, this Court should affirm the Bankruptcy Court's entry of the Injunction.

### A.      The Injunction Is a Viewpoint-Neutral Time, Place, and Manner Restriction Concerning Speech About a Private Matter.

A regulation of speech is "viewpoint neutral[]" if it is not based on a "disagreement with the message presented."  *Longo v. U.S. Postal Serv.*, 953 F.2d 790, 796 (2d Cir.), *judgment*

*vacated on other grounds*, 506 U.S. 802 (1992) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 135 (1981)); *accord Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (distinguishing between "content" and "viewpoint" neutrality).  And a regulation maintains its viewpoint neutrality "even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.  Strict scrutiny does not apply to restrictions that are "agnostic" as to message, or that lack a "purpose or justification" aimed at regulating certain ideas.  *City of Austin*, 142 S. Ct. at 1471.

Here, the Injunction is a viewpoint-neutral time, place, and manner restriction to which intermediate scrutiny applies.  The Bankruptcy Court addressed the issue of viewpoint neutrality only in passing, stating that the Injunction was content-based because it "prohibits expression with particular valences" (A.0456)—presumably a reference to the restriction on "displaying or distributing harassing material"—and applied strict scrutiny accordingly (*see infra* at Section II.B).  But the remainder of the court's 61-page memorandum and the Injunction itself make clear that the restrictions on Kwok and his followers are actually viewpoint-neutral because they are not based on hostility to the message, but on the message's impact on the Protected Parties— in other words, the restrictions are "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293).  Indeed, the Injunction principally addresses expressive conduct—"protesting, picketing, [and] parading" (*e.g.*, A.0407)—at certain places, during certain times, and in certain manners, *without* "reference to the [message] of the regulated speech." *Ward*, 491 U.S. at 791.  Accordingly, the Injunction is "agnostic" as to viewpoint and thus "similar to ordinary time, place and manner restrictions" to which strict scrutiny does not apply.  *City of Austin*, 142 S. Ct. at 1473.  Indeed, if Kwok were

correct, a municipality's time, place, and manner restrictions on a Labor Day or Israel Independence Day parade would be subject to strict scrutiny (or prohibited entirely) because the municipality knows what messages those parades will convey.

The Injunction's prohibition on displaying or distributing certain harassing material during picketing (Br. 9-10, 20, 23) does not transform the Injunction into a viewpoint-based restriction premised on "*disagreement with the message* [Kwok] conveys." *Ward*, 491 U.S. at 791. In fact, the prohibition on displaying or distributing harassing materials effectively adds nothing to the Injunction because there would be no way to display/distribute *any* message at the subject locations without "protesting, picketing, [or] parading." (A.0475-78.) Thus, the Injunction does not require an enforcement authority to "examine the content of the message that is conveyed to determine whether a violation has occurred," because it "depends not on what they say, … but simply on where they say it." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014).

Indeed, the harassing-material reference merely reflects the realities of the situation the Bankruptcy Court was addressing, including the "voluminous" record of Kwok's efforts to harass and intimidate, seeking to undermine the bankruptcy by displaying signs and distributing handbills claiming that certain individuals were, *inter alia*, racists, anti-Semites, and CCP agents. Kwok's assertion that the Injunction is not viewpoint-neutral because "it does not enjoin complimentary speech" (Br. 21) is an absurd take on a serious situation, and inconsistent with Supreme Court jurisprudence regarding similar restraints. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 725 (2000) (finding that an ordinance restricting demonstrations outside abortion clinics would apply with equal force "whether [demonstrators] oppose or support the woman who has made an abortion decision").[3] Even in an alternate universe where Kwok's followers suddenly

---

[3] Simply identifying examples of unnecessarily prohibited activities is of "no constitutional significance" when those examples are "heavily outweighed" by the circumstances in which the Injunction has a

decided to show up at the Trustee's home with flowers and candy rather than doctored pictures

of him in Nazi regalia, the conduct would still be intimidating and harassing—especially given

the demonstrators' previous conduct.  As the Supreme Court has explained, "the evil of targeted

residential picketing, the very presence of an unwelcome visitor at the home, … is created by the

*medium of expression* itself."  *Frisby v. Schultz*, 487 U.S. 474, 487-88 (1988).[4]

Kwok attempts to liken the Injunction to prior restraints imposing gag orders on the

media (Br. 19-22), arguing that prior restraints are permissible "only in exceptional cases," citing

*CBS v. Davis*, 510 U.S. 1315, 1317 (1994).  But as the full sentence from *Davis* that Kwok cites

makes clear, "the prohibition against prior restraints *is by no means absolute*"; rather, it is "the

*gagging of publication* [that] has been considered acceptable only in 'exceptional cases.'"  *Id*.

The Injunction self-evidently does not involve a gag order prohibiting publication by the news

media.  And, as is the case with any legitimate time, place, and manner restriction, the Injunction

*permits* expression (just not directly in front of private homes and office entrances).  (*See*

A.0475-77).  The gag order analogy also fails because while news media reports, almost by

definition, address matters of public concern, the Injunction is focused on speech about a purely

private matter:  Kwok's dissatisfaction with the direction of his personal bankruptcy case.  The

Supreme Court has held, in other contexts, that there is no special protection under the First

Amendment for "speech solely in the individual interest of the speaker and [his] specific

---

"plainly legitimate sweep."  *Clift v. City of Burlington, Vt.*, 925 F. Supp. 2d 614, 641-42 (D. Vt. 2013)
(finding ordinance was not overbroad based on context of prohibitions and where imposing narrower
restriction might have risked viewpoint neutrality).

[4] Should the Court conclude that some portion of the Injunction is an impermissible viewpoint-based
restriction, we respectfully submit that only that portion should be stricken, leaving the remainder intact.
As the Supreme Court has recognized, "when confronting a constitutional flaw in a statute, [courts] try to
limit the solution to the problem."  *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328
(2006).  For that reason, courts "prefer ... to enjoin only the unconstitutional applications of a statute
while leaving other applications in force."  *Id.*

business audience." *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-62 (1985) ("[S]peech on matters of purely private concern is of less First Amendment concern.").

**B.**   **The State Has Compelling Interests in Protecting the Quiet Enjoyment of Private Homes and Preserving the Integrity of the Judicial Process.**

Because the Injunction is a viewpoint-neutral time, place, and manner restriction, it is subject to intermediate scrutiny, which requires that it be "narrowly tailored to serve a significant government interest." *City of Austin*, 142 S. Ct. at 1475.  The Injunction easily meets this test. But as the Bankruptcy Court correctly held (A.0456-63), even if the Injunction were subject to strict scrutiny, it would likewise pass muster, because it is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *accord Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).  The Bankruptcy Court identified two interests that the Injunction's various provisions serve: protecting the quiet enjoyment of private homes and preserving the judicial process's integrity.  Under well-established Supreme Court precedent, both are compelling state interests, and Kwok does not suggest otherwise.

With respect to the first state interest, it is uncontroversial that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is … of the highest order in a free and civilized society." *Frisby*, 487 U.S. at 484.  The Supreme Court has "often remarked on the unique nature of the home," describing it as "the last citadel of the tired, the weary, and the sick." *Id*.  Of particular relevance here, an "important aspect of residential privacy is protection of the unwilling listener," because, while "in many locations … individuals [may] simply [] avoid speech they do not want to hear, the home is different." *Id.*; *see also Rowan v. Post Off. Dep't*, 397 U.S. 728, 738 (1970) ("That we are often captives outside the sanctuary of the home and subject to objectionable speech … does not mean we must be captives everywhere.").  The home offers the "ability to avoid intrusions," which is "a special benefit of the privacy all citizens

enjoy within their own walls, which the State may legislate to protect." *Frisby*, 487 U.S. at 484-85 (upholding ordinance that enjoined picketing "before or about" a private residence).

Kwok's observation that *Frisby* involved a facial challenge and his attempt to distinguish the *Frisby* ordinance's terms from the Injunction (Br. 23-24) both miss the point.  The issue is whether the state has a "compelling" (*Reed*, 576 U.S. at 163) —or, if intermediate scrutiny applies, "significant" (*Ward*, 491 U.S. at 791)—interest in protecting the quiet enjoyment of the private residence and *Frisby* holds unequivocally that it does.  487 U.S. at 484.[5]

Kwok suggests that *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971), is the "most analogous" case.  (Br. 26).  But *Keefe* does not even address, much less refute, the state's compelling interest in protecting quiet enjoyment of the home.  That is because *Keefe* involved an injunction on distributing leaflets anywhere in an ***entire town***—conduct which the *Frisby* court properly deemed a "generally directed means of communication" where "the flow of information is not into households, but to the public"—whereas here, as in *Frisby*, "the picketing is narrowly directed *at* the household, not the public." *Frisby*, 487 U.S. at 486 (quoting *Keefe*, 402 U.S. at 420).  Thus, *Keefe* is factually inapposite.  Kwok attempts to erase this distinction by arguing that the Injunction is not limited to residences.  (Br. 27).  But that ignores that the Bankruptcy Court did not rely on the state's quiet-enjoyment interest to support non-residential restrictions.  (*See, e.g.*, A.0476-77 at (d)–(e)).

As for the other compelling state interest the court identified—preserving the judicial process's integrity—there is "*no question* that a State has a legitimate interest in protecting its

---

[5] Kwok also asserts that the Bankruptcy Court "made no findings" that Kwok's protesters disturbed the quiet enjoyment of the Protected Parties' homes, but even a cursory review of the Bankruptcy Court's factual findings shows otherwise.  *See, e.g.*, A.0368 (protests "directly in front of the Chapter 11 Trustee's home"); *id.* (protesters distributed leaflets to the Trustee's neighbors describing him as an enabler of the CCP and accusing him of racism); A.0376 (the Trustee was forced to "plan[] his schedule around avoiding the protesters").

judicial system from the pressures which picketing near a courthouse might create." *Cox v. Louisiana*, 379 U.S. 559, 562 (1965); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445–46 (2015) ("justice must satisfy the appearance of justice" because "[t]he judiciary's authority … depends in large measure on the public's willingness to respect and follow its decisions"); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009) (recognizing the "vital state interest" in safeguarding "public confidence in the fairness and integrity of the nation's … judges"). That is because "the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy," and thus "it is of the utmost importance that the administration of justice be absolutely fair and orderly." *Picard v. Magliano*, 42 F.4th 89, 103 (2d Cir. 2022) (quoting *Cox*, 379 U.S. at 562); *see also Williams-Yulee*, 575 U.S. at 445 (recognizing the "vital state interest in safeguarding" the "public confidence in the integrity of judges"); *United States v. Grace*, 461 U.S. 171, 183 (1983) (noting governmental interest in shielding judges from accusations of influence by picketers).[6]

Kwok points to nothing in *Cox* or *Picard* that would limit their reasoning to picketing near courthouses (Br. 25), which makes sense: a mob's ability to exert "influence or domination" (or the appearance thereof) over judicial proceedings is not limited to the courthouse steps, particularly in the era of social media. *Cox*, 379 U.S. at 562 (safeguards are necessary "at all stages" to exclude outside control); *see also Williams-Yulee*, 575 U.S. at 445. Moreover, harassing an officer of the court, the debtor's largest creditor, and their respective counsel and relatives directly outside private residences surely carries at least as great a coercive force—and

---

[6] Chapter 11 trustees are considered (i) "quasi-judicial officials" and are afforded heightened protections, such as qualified immunity for acts taken in the scope of their official duties, *In re Ctr. Teleproductions, Inc.*, 112 B.R. 567, 576 (Bankr. S.D.N.Y. 1990); and (ii) "court officers" for purposes of 18 U.S.C. § 1503, which makes it a crime to "corruptly … influence, intimidate, or impede any … officer in or of any court of the United States." *United States v. Crispo*, 306 F.3d 71, 78 (2d Cir. 2002). Against this backdrop, the Injunction's protection of the Trustee also contributes to preserving the judicial process's integrity.

is thus likely to threaten the "unhindered and untrammeled functioning of our courts"—as picketing near a public courthouse.  *Cox*, 379 U.S. at 562.  Kwok's attempt to distinguish *Cox* and *Picard* thus fails.

### C.    The Injunction Is Narrowly Tailored to Serve These Compelling Interests.

Intermediate scrutiny "is satisfied so long as the [Injunction] promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Ward*, 491 U.S. at 782–83.  In other words, narrow tailoring under intermediate scrutiny does not require the regulation of speech be the least restrictive means of advancing the state's interests.  *See Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 164 (2d Cir. 2013) ("To show that a regulation is narrowly tailored under intermediate scrutiny, the government need not demonstrate that the regulation is the least speech-restrictive means of advancing the Government's interests.").  That standard is easily satisfied here.  Strict scrutiny has a more demanding fit requirement—if that standard applies, the Injunction must be the "least restrictive means of achieving" the stated interests.  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021).  In other words, the Injunction "is narrowly tailored if it targets and eliminates no more than the exact source of the evil that it seeks to remedy."  *Frisby*, 487 U.S. at 485.  That test, too, is satisfied here.  The Bankruptcy Court determined that Kwok's conduct (i) "destroyed" the "quiet enjoyment of the home" by turning it "into a bunker where ingress and egress are subject to protest," and (ii) "threaten[ed] to transform the legal process into mob law[.]"  (A.0459-61).  Restricting Kwok from targeting the Protected Parties directly in front of their homes and offices and imposing buffers during certain times—while leaving ample alternative channels for protestors to express themselves—"is narrowly tailored to address th[ese] concern[s]."  *Williams-Yulee*, 575 U.S. at 454 (upholding speech-restrictive law under strict scrutiny).

On appeal, Kwok identifies five ways in which the Injunction allegedly is not narrowly

tailored; each argument fails.

### 1.   Breadth of Locations and Individuals.

Kwok claims that the Injunction covers too many places and people (Br. 29), but the Injunction applies to specified "residences and workplaces" precisely *because* Kwok directed his loyalists to disrupt those locations.  For instance, the Injunction covers the Trustee's residence because, as the record amply shows, large protests occurred "directly in front of the [] Trustee's home."  (A.0435).  Likewise, while Kwok laments the Injunction's coverage of Protected Parties' relatives' homes, it is necessary because Kwok's campaign *targeted* these sites; for example, protesters "swarmed [the Trustee's] ex-wife" outside her home (A.0441), and *rented a house* in California directly opposite a relative of PAG's chairman.  (A.0441).  And the Injunction covers certain office entrances (including "universities and schools," *see* A.0477) *because* Kwok targeted these sites in an effort to disrupt the bankruptcy case.  *See, e.g.*, A.0443-44 (describing "an instance where a protestor chased and screamed at [the Trustee's] colleagues on their way [] into Paul Hasting's office")).  Kwok thus complains of the Injunction's supposed overbreadth while ignoring the sprawling scope of his own disruption efforts.  *See, e.g.*, A.0371 (protests in Tokyo); A.0459 (protests in Connecticut, New York, Massachusetts, and California).  Kwok asks rhetorically "[w]hat possible rationale exists for restricting speech concerning every O'Melveny employee, let alone their relatives and ex-spouses" (Br. 29), but the answer is obvious:  there would be no reason for Kwok's followers to target those individuals other than to interfere with the bankruptcy case.  Given Kwok's far-reaching efforts, the Injunction targets "no more than the exact source of the evil that it seeks to remedy."  *Frisby*, 487 U.S. at 485.

### 2.   Buffer Zones.

Kwok challenges the Injunction's buffer zones (Br. 29-32), but in doing so he ignores the facts and mischaracterizes the law.  Kwok correctly acknowledges that the Supreme Court in

*Frisby* upheld a ban on picketing "before or about" a private residence, just as the Injunction does. *Id.* at 30; *see Frisby*, 487 U.S. at 477. Kwok nonetheless asserts that—unlike the *Frisby* ordinance—the Injunction's 200-foot buffer precludes "alternative channels." (Br. 30). Not so. The 200-foot buffer is a limited time, place, and manner restriction that applies only during certain hours of the day when the Protected Parties are "likely to be resting at home and traveling to and from work or school."[7] (A.0459). Indeed, the Bankruptcy Court expressly noted what the Injunction does *not* do: "ban 'general marching through residential neighborhoods, or even walking a route in front of an entire block of houses.'" A.0459 (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 755 (1994)). Nor does the Injunction proscribe going "door-to-door," as Kwok suggests (Br. 30), because the Injunction applies only to certain residences. Thus, the Injunction plainly permits "alternative channels" of expression, as in *Frisby*. 487 U.S. at 484.

Kwok also suggests that the 200-foot buffer is improper because in *Madsen* the Court struck down a 300-foot buffer. (Br. 31). But this mischaracterizes *Madsen*, which simply held that the record in that case did not support a 300-foot buffer (based on the neighborhood's size and configuration), while also noting that "it appears that a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired results." *Madsen*, 512 U.S. at 775. Here, the Bankruptcy Court examined the record and concluded that a 200-foot buffer "provide[s] enough room for cars to safely drive into and out of a neighborhood," and enough "room as a noise buffer for most unamplified noises." (A.0459

---

[7] Although the 200-foot buffer applies at all times to the private homes of *relatives* (A.0476), Kwok appears not to challenge this restriction, and rightly so. As the Bankruptcy Court correctly observed, "protests at the homes of uninvolved relatives only serve to intimidate the Plaintiffs and may be completely banned under *Cox*." (A.0462); *see Cox*, 379 U.S. at 562 ("A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence.").

n.12).  Kwok's claim that *Madsen* is "controlling authority for vacating the Injunction" is baseless.

Kwok further argues that the Bankruptcy Court's reliance on *Madsen* was misplaced because the *Madsen* injunction came after a state court found that protesters continued to impede access to a clinic following enactment of a less restrictive injunction.  (Br. 30).  But nothing in *Madsen* suggests that an injunction is justified only after a less restrictive injunction fails to remedy the evil targeted.  *See Madsen*, 512 U.S. at 770 (describing the initial injunction's failure as something to "bear in mind").  Such a rule would negate the very purpose of injunctions: "to eliminate the unlawful conduct targeted."  *Id*. at 776.  Failing on the first try is not a prerequisite.

Kwok separately challenges the 36-foot buffer that applies at all times to the entrances of Protected Parties' workplaces, falsely claiming that the Bankruptcy Court held that *Madsen* condoned a 36-foot buffer "in all circumstances."  (Br. 30).  The Bankruptcy Court imposed this buffer because the record established that Kwok's conduct risked the legal process "being dominated or appearing to be dominated by 'mob law.'"  (A.0054 (quoting *Cox*, 379 U.S. at 562)).  *Madsen* simply provided a reference point.  And Kwok's protestation that *Madsen* struck a similar 36-foot buffer surrounding *other areas* is irrelevant because that part of the buffer applied to "*private property* to the north and west of the clinic"—not public workplace entrances.  *See Madsen*, 512 U.S. at 771.  The Injunction's 36-foot buffer around public workplace entrances is precisely the type of buffer the *Madsen* court condoned.  *See id*. at 770 ("On balance, we hold that the 36-foot buffer zone around the clinic *entrances and driveway* burdens no more speech than necessary to accomplish the governmental interest at stake.").[8]

---

[8] Kwok's reliance on *McCullen v. Coakley* (Br. 31) is likewise misplaced.  There, the Court held that a 35-foot buffer was not narrowly tailored because the record reflected that "Petitioners [were] *not protestors*," but rather sidewalk counselors who sought to "inform women of various alternatives" to abortion "through personal, caring, consensual conversations," which the buffer-zone precluded.

Finally, Kwok suggests that the 100-foot buffer around workplace entrances is improper because *Madsen* only upheld a 36-foot buffer and *Cox* is "inapposite to non-courthouse workplaces." (Br. 31–32). Kwok again misreads the case law. Just as *Madsen* did not hold that a 36-foot buffer is always permissible, it did not hold that 36 feet is the maximum permissible buffer. It all depends on the facts of the case. Here, for example, the Bankruptcy Court determined that a round-the-clock ban on picketing within 100 feet of the Protected Parties' relatives' offices and workplaces was appropriate given that "such picketing of uninvolved relatives only serves to intimidate the [Appellees] and may be completely banned under *Cox*." (A.0462). And, as discussed above (at pp. 22–24), Kwok's attempt to limit *Cox*'s reach to courthouse picketing finds no support in the decision itself. Kwok also claims without explanation or support that the 100-foot buffer around New York offices will require picketers to stand "blocks away, effectively suppressing protests" (Br. 32)—but the average length of a New York City block is far greater than 100 feet.[9] The 100-foot workplace buffer is narrowly tailored.

### 3. Time Restrictions.

Kwok's sole attack on the Injunction's time restrictions is that "there was no evidence of noise issues" here. (Br. 32). But Kwok ignores the Bankruptcy Court's commonsense "concern about noise at night" caused by protesting in front of residences in Connecticut, New York, Massachusetts, and California—each of which have nighttime noise ordinances. (A.0459 n.13).

---

573 U.S. 464, 489 (2014). Here, Kwok's loyalists were "protestors" seeking to intimidate those involved in Kwok's bankruptcy. *See, e.g.*, A.0462 (concluding that protests in question "only serve[d] to intimidate the Plaintiffs"). Thus, the tailoring concerns in *McCullen* are not present here.

[9] *See How Many NYC Blocks Are in a Mile?*, STREETEASY READS, Jan. 4, 2023, https://streeteasy.com/blog/how-many-nyc-blocks-are-in-one-mile/#:~:text=The%20average%20length%20of%20a,Not%20so%20reliable (north-south blocks are approximately 264 feet and east-west blocks are roughly 750 feet).

And the time restrictions on demonstrations at offices were narrowly tailored not to address noise, but to ameliorate the harassment and intimidation of bankruptcy participants during the "likely hours of ingress and egress to [their] workplaces." (A.0462). Kwok does not challenge this justification.

### 4.    Content Prohibited.

Kwok claims that the Injunction is not narrowly tailored because its references to "harassing material" are not content-neutral. (Br. 33-34). But as explained above (at Section II.A), the issue is not whether the Injunction mentions the affected speech's content (*i.e.*, the specifics of what is said), but whether the restrictions are based on hostility to the message expressed—if not, then the restrictions are permissibly viewpoint-neutral. *See Ward*, 491 U.S. at 791. Moreover, "[t]he First Amendment requires that [the Injunction] be narrowly tailored, not that it be perfectly tailored." *Williams-Yulee*, 575 U.S. at 454 (2015). The Injunction's restrictions on harassing material are narrowly tailored to the harm to be avoided. Restricting Kwok at certain times and places from fomenting anger among his followers via (false) allegations designed to call into question the legitimacy of a judicial proceeding—*e.g.*, that the Trustee, PAX, and their counsel are CCP agents prosecuting Kwok's bankruptcy because of anti-Chinese racism and to extort Kwok—is narrowly tailored to address the Bankruptcy Court's concerns about "transforming the legal process into mob law" (A.0459-61). *See Williams-Yulee*, 575 U.S. at 454 ("The impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary."); *Hodge v. Talkin*, 799 F.3d 1145, 1150 (D.C. Cir. 2015) (states have "considerable latitude" to use "speech-restrictive measures" to preserve the integrity of judicial proceedings).

### 5.    Breadth of Activities.

Finally, Kwok challenges the "breadth of activities" the Injunction covers (Br. 34), but

again ignores that the Injunction leaves ample alternative channels for expression.  Kwok claims

without analysis that the Injunction prohibits "neighborhood parading," but the Bankruptcy

Court expressly *declined* to enjoin "marching through residential neighborhoods."  (A.0459).

Nor does the Injunction prohibit "door-to-door proselytizing" or "distributing materials," as

Kwok claims.  (Br. 34).  Rather, it merely forbids the "focused picketing" that was at issue in

*Frisby*, and imposes certain time, place, and manner restrictions—*e.g.*, a 200-foot buffer zone

around *certain* residences at night and during typical commute times.  487 U.S. at 483–84.

Kwok also claims that the Bankruptcy Court failed to justify its time, place, and manner

restrictions as to workplaces (Br. 34), but the court expressly stated that its concerns about "mob

law" apply to workplaces, finding that a 100-foot buffer during "likely hours of ingress and

egress" would help avoid "close encounters between protestors and workers."  (A.0462).

Kwok's "breadth of activities" argument is thus unavailing.

>    **D.**    **The Injunction Does Not Restrict Speech of Public Concern.**

The Bankruptcy Court concluded that the Injunction is narrowly tailored to serve

compelling state interests, but it also recognized that strict scrutiny[10] did not necessarily apply

because the Injunction concerns only a matter of private concern and thus warrants less First

Amendment protection.  (A.0464-67).  While speech "on public issues occupies the highest rung

of the hierarchy of First Amendment values, and is entitled to special protection," protections are

"less rigorous" where "matters of purely private significance are at issue."  *Snyder v. Phelps*, 562

U.S. 443, 452 (2011).  Speech relates to public concerns "when it can be fairly considered as

relating to any matter of political, social, or other concern to the community, or when it is a

subject of legitimate news interest; that is, a subject of general interest and of value and concern

---

[10] As discussed *supra* (Section II.A), intermediate—not strict—scrutiny applies here, because the
Injunction is a viewpoint-neutral time, place, and manner restriction.

to the public." *Id*. at 453.  To determine whether speech is of public concern, courts examine the "content, form, and context of that speech, as revealed by the whole record."  *Id*.

Here, the Bankruptcy Court properly concluded that Kwok's conduct is not a matter of public concern but instead concerns only his "Chapter 11 bankruptcy."  (A.0465).  The "content" of Kwok's campaign "plainly relates to" private issues: accusing the Trustee, PAX, and their counsel of being CCP agents, anti-Semites, fostering and financing genocide in Xinjiang, and seeking to destroy Kwok's so-called Whistleblower Movement.  (A.0442).  Far from being "matters of public import," this "content" reflects the ugly levels to which Kwok is willing to stoop to gain leverage in a private dispute.  *Snyder*, 562 U.S. at 454.  The "form" of Kwok's conduct also confirms the private nature of this case: protests targeted at *private* homes and workplaces solely of parties involved in Kwok's bankruptcy (and their relatives).  And much of Kwok's campaign consists of speech entitled to no First Amendment protection, such as true threats and defamation.  *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 359 (2003) (true threats not protected); *Beauharnais v. Illinois*, 343 U.S. 250 (1952) (defamation not protected).

Finally, the "context" is most telling: Kwok orchestrated this campaign only after the collapse of settlement discussions aimed at resolving a bankruptcy proceeding that was trending badly for him, leaving him facing extensive discovery into his maze of hidden assets.  That Kwok never resorted to such tactics during the preceding five years—when PAX litigated and won its breach-of-contract claim against Kwok in state court—confirms that the enjoined conduct concerns only a *private* dispute, Kwok's "Chapter 11 bankruptcy."  (A.0465).

The supposed issues of public concern Kwok identifies (Br. 35-36) are each a pretext— mere "sheep's clothing" for Kwok's attempt to intimidate the bankruptcy participants.  For example, Kwok claims the demonstrators were expressing their "support for the [Chinese]

dissident movement and 'New Federal State of China,' and condemnation of CCP oppression," and "CCP oppression [and] regime change in China," but fails to explain how those issues are addressed by demonstrators holding signs and distributing fliers depicting the Trustee with a hammer-and-sickle emblazoned on his forehead at the Trustee's suburban home (much less his relatives' residences). The so-called issue of "improper connections between U.S. law firms and the CCP" is likewise contrived. Leaving aside that there are numerous law firms, investment funds, and other business that have offices or do business in China—none of which have drawn the wrath of Kwok and his supporters[11]—Kwok fails to explain how this is "of value and concern to the public." *Snyder*, 562 U.S. at 453. The attacks specifically targeting the Trustee—baseless allegations of criminal activity, anti-Semitism, racism, and (especially) unfairness toward Kwok—are also more obviously directed to issues of private rather than public concern. Why does the general public care about a disgruntled debtor's fact-free assertions of misconduct by a chapter 11 trustee? Kwok does not say. But the Bankruptcy Court's "concern" that Kwok's speech on these issues was "***contrived*** to insulate speech on a private matter" (A.0465) is spot on. At bottom, Kwok's speech is "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *R.A.V. v. St. Paul*, 505 U.S. 377, 383 (1992). It thus "does not implicate the same constitutional concerns as limiting speech on matters of public interest," and is "of less First Amendment concern." *Snyder*, 562 U.S. at 452; *Dun & Bradstreet*, 472 U.S. at 758–59.

## III.    THE INJUNCTION IS NOT VAGUE, AMBIGUOUS, OR OVERLY BROAD.

Under F.R.C.P. 65, injunctions "shall be specific in terms," and "shall describe in

---

[11] As another court recently observed, "numerous other law firms represent Chinese clients in litigation in the United States and have … offices in China. The protests [preceding the Injunction] singled out [PAX's counsel] … after they had assisted a client in litigation against Kwok." *Gong v. Sarnoff*, 2023 WL 5372473, at *14 (S.D.N.Y. Aug. 22, 2023).

reasonable detail … the acts or acts sought to be restrained." *S.C. Johnson & Son. v. Clorox Co.*, 241 F.3d 232, 241 (2d Cir. 2001) (quoting F.R.C.P. 65(d)).  An injunction "must be more specific than a simple command" to "obey the law"—it must "apprise those within its scope of the conduct that is being proscribed." *Clorox*, 241 F.3d at 240 (citing *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989)).  In assessing injunctions under this rule, courts routinely consider the order's "context"—including related findings of fact and conclusions of law—to determine whether an injunction reasonably put those impacted on notice of the conduct proscribed.  *See, e.g.*, *Clorox*, 241 F.3d at 241 (holding that injunction was "sufficiently clear" "when read in the context of" the court's related opinions); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 809 (2d Cir. 1981) (injunction satisfied Rule 65(d) "because the record of the proceedings relating to the proposed injunction amply demonstrate[d]" defendant's grasp of what conduct the injunction enjoined).

Here, the Injunction and 61-page supporting memorandum clearly satisfy Rule 65.  The Injunction bars Kwok from specific acts ("protesting, picketing, parading, or displaying or distributing harassing material") at specific places (*e.g.*, "the lobby of and on the streets and sidewalks bordering and surrounding Paul Hastings' office at 200 Park Avenue in New York") (A.0479) and during specific times (*e.g.*, between 8:00 a.m. and 10:00 a.m. within one hundred feet).  (A.0069).  Moreover, the Injunction bars Kwok from "publishing online the home addresses and other personal information" of Appellees, their counsel, and their relatives, and "interfering" with his bankruptcy by threatening or encouraging others to threaten the safety of Appellees.  (A.0478).  Far from mere "obey the law" commands, these are specific restrictions that explicitly "apprise" Kwok of the "conduct" "proscribed," *Terry*, 886 F.2d at 1352, and plainly put this Court on notice of "what it is reviewing."  *Clorox*, 241 F.3d at 241.  The

authority Kwok cites (Br. 39-40) is inapposite for precisely this reason.[12]

Kwok's vagueness arguments are hollow.  For example, Kwok challenges the use of the words "harassing" and "disparaging" (Br. 38), but ignores that the Injunction specifically defines "harassing material" as including depictions of Appellees, their counsel, and their relatives as CCP agents, anti-Semites, racists, and supporters of genocide.  (A.0478).  Kwok likewise ignores that the Injunction's sole reference to "similarly disparaging allegations" is tied to, and limited by, the "harassing material" definition that immediately precedes it.  (*Id.*)  Kwok's assertion that the Injunction is confusing because it prohibits "disparaging," but not "defamatory," speech (Br. 38-39) is disingenuous; the Injunction's use of "disparaging" is not license for Kwok to defame and, thus, creates no confusion as to what is prohibited.  And Kwok's suggestion that he cannot "discern" what epithets would be similarly disparaging to "Communists, agents of the [CCP], extortionists, anti-Semites, racists, [or] supporters of genocide" (*id.*) is pure sophistry.

Kwok also claims vagueness in the Injunction's prohibition on "'interfering' with the bankruptcy proceeding," claiming that any act with which the Trustee disagrees (including this appeal) could be characterized as "interference."  (Br. 40).  But, of course, that's not what the Injunction says—it prohibits interfering with the "integrity" of the bankruptcy.  That limitation defines the Injunction's scope—as does the immediately following language specifying that interference, in this context, includes threatening or encouraging others to threaten Appellees' safety (and that of their counsel and relatives).  (A.0479).  Kwok is surely aware that this appeal

---

[12] *See, e.g.*, *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (order instructed defendants "not to enforce the present Wisconsin [statutory] scheme" concerning involuntary confinement under Wisconsin State Mental Health Act); *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 429 (2d Cir. 1993) (order prohibiting use of "Maintenance Software" failed to define term); *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (order barred use of unspecified "trade secrets"); *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 247 (2d Cir. 1972) (proposed injunction enjoining breach of "duty of fair representation … necessarily would contain only an abstract conclusion of law, not an operative command capable of enforcement").

(while lacking merit) doesn't interfere with the bankruptcy case's integrity.

Kwok's argument also ignores the *61-page* memorandum accompanying the Injunction that details the numerous ways in which Kwok has interfered with this bankruptcy.  *See, e.g.*, A.0435-36 (describing how Kwok advised followers to avoid service of subpoenas and threatened that the Trustee and his firm would "suffer calamities" because of subpoenas issued). To the extent there is any vagueness in the Injunction (and there is not), the memorandum's extensive findings of fact and conclusions of law make the Injunction's restrictions more than "sufficiently clear."  *See Clorox*, 241 F.3d at 241.  That distinguishes this case from Kwok's authority (Br. 41) involving an injunction *without* related findings of fact.  *See Int'l Longshoreman's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 70, 74 (1967) (reversing affirmation of decree enforcing an arbitration award, which involved a distinct "set of facts," and was thus nothing more than "an abstract conclusion of law"); *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir. 1997) (remanding where "there [was] a complete dearth of findings of fact and conclusions of law to support [the] injunction,"); *In re LightSquared, Inc.*, 539 B.R. 232, 243 (S.D.N.Y. 2015) (vacating injunction because "the Bankruptcy Court did not make specific findings of fact with regard to the conduct" enjoined).

Finally, Kwok's assertion that the Injunction is vague and overbroad because it fails to identify whom it protects (Br. 39, 42) is a red herring.  The Injunction's unmistakable purpose is to prohibit Kwok's and his followers' efforts to intimidate and harass *bankruptcy participants*. It is not a trap to ensnare demonstrators who, while otherwise complying with the Injunction, unwittingly cross paths with relatives or co-workers of bankruptcy participants.  Kwok's supposed concern about marching in the (non-political) Macy's Thanksgiving Day Parade demonstrates his argument's *reductio ad absurdum* nature.

## IV.    THE BANKRUPTCY COURT PERMISSIBLY RELIED ON AUTHENTICATED HEARSAY EVIDENCE.

The Bankruptcy Court did not err in considering hearsay evidence during the hearing.

The Supreme Court has held that "a preliminary injunction is customarily granted on the basis of

procedures that are less formal and evidence that is less complete than in a trial on the merits."

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The Second Circuit extended this

principle, joining "six of our sister circuits [that] have permitted district courts to rely on hearsay

evidence for the limited purpose of determining whether to award a preliminary injunction."

*Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases).  The Second

Circuit explained that it is appropriate to consider hearsay evidence in determining whether to

grant preliminary injunctive relief because:

> The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage.  To hold otherwise would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief.

*Id.*

Kwok claims that the Bankruptcy Court misconstrued *Mullins* because it supposedly held

that "it could consider all proffered hearsay in deciding whether to grant a preliminary

injunction" (Br. 44), but this misstates the court's analysis.  The court first observed that "every

one of these posts [proffered by Appellees] has been authenticated for purposes of admissibility,"

because the parties "went through that" entire procedure "this morning."  (A.0509).  The court

then explained that having "already established authenticity[,] the issue is, is whether or not

I will fully admit it and then give it weight."  (A.0510).  Thus, the court did not consider any

hearsay without appropriate initial gatekeeping as to relevance, authenticity, or reliability.

Kwok next claims (Br. 44) that admissible hearsay can only come in the form of

testimony or a sworn affidavit, citing *United States v. Buddhu*, 2008 WL 2355930 (D. Conn.

36

June 5, 2008), and *We the Patriots USA v. Hochul*, 17 F.4th 266 (2d Cir. 2021).  But neither case

supports the notion that otherwise authenticated, reliable hearsay may not be considered by

courts on motions for preliminary injunctions.  Indeed, *Hochul* belies this proposition: "[C]ourts

may consider hearsay evidence ***such as*** affidavits when determining whether to grant a

preliminary injunction."  17 F.4th at 276 n.3.  Likewise, *Buddhu* held: "In considering a motion

for a preliminary injunction, the Court ***may*** rely on affidavits, depositions, and sworn testimony,

***even when they include hearsay*.**  2008 WL 2355930, at *1 n.2.  And as the Second Circuit has

explained elsewhere, "[e]xcluding documents exclusively because they are hearsay in a

preliminary injunction hearing is [] at odds with our precedent.  This is true regardless of

whether testimony has been taken or discovery completed."  *New York v. Griepp*, 991 F.3d 81,

97 (2d Cir. 2021).

    *Griepp* is instructive.  There, the Second Circuit held that "the district court correctly

admitted [hearsay evidence], but [] erred in categorically giving [it] no weight."  *Id.*  The court

recognized that while "a trier of fact has considerable discretion in weighing the evidence before

it," it may not "categorically" give "no weight" to hearsay evidence.  *Id.*  Doing so, the Second

Circuit held, "***functionally contravenes the principle … that the admissibility of hearsay …***

***goes to weight, not preclusion, at the preliminary injunction stage*.**"  Kwok's argument that

non-sworn hearsay evidence is categorically inadmissible thus contradicts clear Circuit

precedent.

    Kwok also unsuccessfully tries to distinguish hearsay "consist[ing] of social media posts

and internet videos" from "sworn testimony, subject to cross-examination," claiming that the

former is "inherently unreliable."  (Br. 45).  *First*, Kwok ignores that the evidence was

authenticated by an expert witness subject to cross-examination (A.0426).  *See SEC v. Musella*,

578 F. Supp. 425, 427-28 (S.D.N.Y. 1984) (examining "particular exhibits in question," deeming that "each is in some sense inherently trustworthy," and concluding that "their reliability is such as to warrant their full consideration."); *Zeneca Inc. v. Eli Lilly & Co.*, 1999 WL 509471, at *2 (S.D.N.Y. July 19, 1999) (admitting hearsay evidence after "carefully consider[ing] the reliability of all the disputed evidence").

*Second*, Kwok's argument would render the Supreme Court's holding in *Camenisch* entirely meaningless—preliminary injunction hearings are typically held on an emergency basis without the same time to prepare as for a trial, and thus evidence need not be supported by sworn testimony from a witness subject to cross-examination. *See Camenisch*, 451 U.S. at 395.  Indeed, as the Bankruptcy Court observed, citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988), "the urgency of obtaining a preliminary injunction [necessitates a prompt determination and] makes it difficult to obtain affidavits from persons who would be competent to [] testify at trial."  (A.0509).

Finally, Kwok complains that the Bankruptcy Court "admitted PAX's hearsay evidence wholesale, regardless of reliability, [but] did not apply that approach to hearsay offered by Kwok" and "reflexively sustain[ed] [PAX's] objections."  (Br. 45 n.29).  It is unclear what Kwok is suggesting here but, regardless, his disappointment with certain rulings does not change the black-letter law cited above.  Moreover, each of the rulings he cites to either involved foundation or speculation objections (A.0536; A.0550; A.0675), or ultimately did not affect Kwok's ability to elicit accurate testimony (A.0561).  The Court appropriately admitted and relied on PAX's hearsay evidence in granting the Injunction.

**V.      THE INJUNCTION IS A PROPER EXERCISE OF THE BANKRUPTCY COURT'S POWERS.**

11 U.S.C. § 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  It is axiomatic, therefore, that bankruptcy courts have the power to issue injunctive relief when necessary or appropriate.  Section 105(a) permits any "party in interest" to move the court for relief.  Where the relief sought is a preliminary injunction, the vehicle for obtaining that relief is, as here, an adversary proceeding.  *See* Bankruptcy Rule of Procedure 7001(7) ("a proceeding to obtain an injunction or other equitable relief" is an adversary proceeding).

Bankruptcy courts have consistently acted under Section 105(a) to enjoin intimidating and harassing behavior akin to the conduct at issue here.  *See, e.g.*, *Patriot Grp. v. Fustolo (In re Fustolo)*, 2015 WL 411760, at *1 (Bankr. D. Mass. Jan. 30, 2015) (enjoining under Section 105(a) "various cyber and video attacks, including posting false material on consumer complaint boards and creating a fraudulent website and blog containing postings with false statements," which were "intended to cause [a creditor] to abandon" certain positions in the bankruptcy); *In re Robinson*, 368 B.R. 805, 810 (Bankr. E.D. Ark. 2007) ("enjoining and restraining" under Section 105(a) debtor "and any persons acting for or at his behest from engaging in or taking any actions to interfere in any way with the administration of [the] bankruptc[y] or the sale of assets of the bankruptcy estates by the Trustee, ***including but not limited to any actions to coerce, intimidate, harass, hinder or threaten the Trustee, any creditors, attorneys or parties in interest*** in [these bankruptcies] until their completion and closure").  For all the reasons discussed above (*see supra* at pp. 7–10), this case is squarely in line with *Fustolo* and *Robinson*.

Kwok's glib assertion that the cases relied on by the Bankruptcy Court "do not support using Section 105(a) to enjoin alleged defamation and harassment" (Br. 47) mischaracterizes the

Injunction.  The Injunction is aimed squarely at conduct that would interfere with the bankruptcy and prevent the Trustee from carrying out his responsibilities under 11 U.S.C. § 1106(a)(3).[13]  To the extent Kwok suggests that Section 105(a) applies only to third-party conduct, and not the debtor's own conduct, there is no support for that proposition.

Kwok's Section 105(a) case law is entirely inapposite.  In *In re Dairy Mart Convenience Stores, Inc.*, the movant sought equitable relief under Section 105(a) as a purely prophylactic measure aimed at quelling "concern[]" that the debtor would not live up to certain pre-petition, court-ordered obligations that would have had no impact on the administration of the estate.  351 F.3d 86, 89 (2d Cir. 2003).  Thus, the bankruptcy court's invocation of Section 105(a) in *In re Dairy Mart* was an impermissible and purely speculative "roving commission to do equity"— unlike here, where the Bankruptcy Court sought to ensure the proper administration of the estate by addressing ***existing*** harmful conduct that threatened to interfere with the estate and the Trustee's statutory responsibilities—an effort squarely "within the confines of the Bankruptcy Code."  *Id.* at 92.[14]

Kwok's reliance on *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988), fares no better, because that opinion says nothing about the limits of Section 105(a).  In *Norwest*, the Supreme Court considered whether a bankruptcy proceeding's status as "proceeding[] in 'equity' … prevents [undersecured creditors] from …  voting in the class of unsecured creditors," and whether allowing them to do so would amount to a "'fair and equitable' reorganization plan in the best interests of all creditors and debtors."  *Id.* at 206.  Kwok cherry-picks language from the

---

[13] "A trustee shall … investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business … and any other matter relevant to the case or to the formulation of a plan[.]"  11 U.S.C. § 1106(a)(3).

[14] Notably, the *Dairy Mart* court did not reject the Section 105(a) application merely because it sought relief against the debtor and not a third party.

decision about the bankruptcy court's powers to do equity *in general* and tries to pass it off as the Supreme Court's view of the limitations of Section 105(a).

Kwok also argues that the Bankruptcy Court improperly relied on the All Writs Act, 28 U.S.C. § 1651(a), because it is a "non-bankruptcy statute" that does not create jurisdiction.  (Br. 48.)  That misses the point.  The Bankruptcy Court did not rely on Section 1651(a) as a jurisdictional grant; rather, it relied on the All Writs Act as it was intended to be used:  to issue an injunction that was "needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction."  *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985); *see also Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 863 (2d Cir. 1988) (All Writs Act authorizes federal courts to enjoin persons "in a position to frustrate the implementation of a court order or the proper administration of justice, [including] those who have not taken any affirmative action to hinder justice"); *Nguyen Huu To v. Rubin*, 99 F.3d 400, 1995 WL 723130, at *2 (2d Cir. 1995) (affirming injunction under All Writs Act where continued litigation "would seriously impair the federal court's flexibility and authority to decide a case").

Kwok's assertion that the Section 1651(a) cases cited by the Bankruptcy Court are inapposite (Br. 48-49) is simply wrong.  Both cases provide relevant guidance to the applicability of Section 1651(a).  *See United States v. N.Y. Tel. Co*., 434 U.S. 159, 174 (1977) (All Writs Act "extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice"); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 266 F.3d 45, 50–51 (2d Cir. 2001) (affirming injunction under All Writs Act because it grants "authority to enjoin and bind non-parties to an

action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction").

To the extent Kwok suggests *Teamsters* holds that Section 1651(a) cannot be applied to expressive conduct (Br. 49), he is again mistaken. Certainly, the case draws no such bright line; it merely held that "factors" like "risk [of] interference with appellants' First Amendment right of petition" would be *considered* in deciding whether an All Writs Act injunction is "necessary or appropriate" to protect a federal court's jurisdiction. 266 F.3d at 51. And other courts have enjoined doxing and harassing conduct under the All Writs Act in similar circumstances. *See, e.g.*, *In re Stabile*, 436 F. Supp. 2d 406, 418 (E.D.N.Y. 2006) ("[T]he All Writs Act is a proper basis and appropriate remedy to address complaints of harassment made by a court-appointed monitor when the relief sought includes an injunction or restraining order."); *Houghtaling v. Eaton*, 559 F. Supp. 3d 164, 172 (W.D.N.Y. 2021) (holding injunction proper under All Writs Act to enjoin filings that "serve to harass defense counsel and/or raise frivolous issues"); Consent Order of Preliminary Injunction and Other Ancillary Relief at 2–3, *Century Indem. Co. v. Kosnoff (In re Boy Scouts of Am.)*, Case No. 20-10343, Adv. P. No. 22-50071 (Bankr. D. Del. Jan. 24, 2022), ECF No. 13 (approving consent order enjoining defendant from publishing home addresses and personally identifying information of parties, and requiring defendant to withdraw existing social media posts containing such information).

## VI.   THE BANKRUPTCY COURT APPROPRIATELY ANALYZED AND APPLIED THE PRELIMINARY INJUNCTION STANDARD.

The Bankruptcy Court appropriately analyzed and applied the preliminary injunction standard under Section 105(a). As the court explained, and contrary to Kwok's unsupported assertion, the appropriate standard for injunctive relief under Section 105(a) for bankruptcy cases is not F.R.C.P. 65 but, rather, the "traditional preliminary injunction standard as modified to fit

the bankruptcy context." (A.0448). Injunctive relief under Section 105(a) is appropriate if (1) there is a likelihood of successful reorganization; (2) there is imminent irreparable harm to the estate in the absence of an injunction; (3) the balance of harms tips in favor of the moving party; and (4) the public interest weighs in favor of an injunction. *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007).

### A.     The Bankruptcy Court Appropriately Applied the Likelihood of Success Standard.

Kwok criticizes the Bankruptcy Court for not addressing the likelihood of success of Appellees' nonexistent defamation claim. (Br. 49). But that is not the proper standard under Section 105(a). Instead, the Bankruptcy Court appropriately assessed whether there was a "*reasonable* likelihood of a successful reorganization," unless "the acts sought to be enjoined *cause* it to fail." *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 589-90 (emphasis in original); *see also In re Calpine*, 365 B.R. at 410 (finding "there is a strong likelihood that the Debtors can successfully reorganize").

Kwok seizes on the phrase from *Lyondell* (quoted by the Bankruptcy Court) "unless … the acts sought to be enjoined *cause* it to fail" and argues that "likelihood of a successful reorganization" requires a showing that the enjoined acts would otherwise prevent a successful reorganization. (Br. 49-50). That is a misreading of *Lyondell*. After analyzing the bankruptcy proceedings to date, the court in *Lyondell* stated: "Here I can say with great comfort, and find, that the Debtors are proceeding on track, and there is no reason to believe or suspect that their reorganization will fail—unless, of course, the acts sought to be enjoined cause it to fail." 402 B.R. at 590. There was no analysis attached to that sentence's final clause; it created no hurdle. Other courts' analysis of the "likelihood of a successful reorganization" requirement bear this out. *See In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997); *In re Monroe Well*

*Serv. Inc.*, 67 B.R. 746, 755 (Bankr. E.D. Pa. 1986).  Here, Kwok offers no reason to disturb the Bankruptcy Court's conclusion that there will be "a successful result for the Debtor's Chapter 11 case."  (A.0451).

>    **B.      The Bankruptcy Court Correctly Found Irreparable Harm.**

Kwok argues that a showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction."  (Br. 50.)  But, as Kwok's own case law recognizes, Second Circuit courts consistently hold "that … irreparable injury, need not be shown in a proceeding for an injunction under § 105(a)."  *In re Peterson*, 2018 WL 1172447, at *2 (Bankr. D. Conn. Mar. 2, 2018) (cited Br. 50); *see also In re Lyondell*, 402 B.R. at 588 n.37 (collecting cases); *id*. at 590 ("Courts in the Second Circuit have recognized a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process[.]").  Instead, to demonstrate "irreparable harm" under Section 105(a), Appellees were only required to show "that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization proceedings."  *Id.*  Under that standard, the Bankruptcy Court correctly found that there would be irreparable harm should Kwok's enjoined conduct continue, because it (i) risks terminating the Trustee's Court-ordered investigation, (ii) undermines the Trustee's investigation by intimidating potential witnesses and creditors, and (iii) may cause the Trustee's resignation.  (*See* pp. 9–10, *supra*).

Kwok's assertion that there is no irreparable harm here ignores the applicable standard. For example, Kwok asserts that the Court has failed to identify irreparable harm to PAX (Br. 52). But the issue is irreparable harm to "the reorganization proceedings," not any particular creditor. And Kwok does not dispute that the irreparable harm the Bankruptcy Court identified would, in fact, "burden, delay or otherwise impede the reorganization proceedings."  He simply tries to

recharacterize the harm as "inconveniences and distractions" in order to shoehorn this case into the inapposite precedent he cites for denying an injunction.  (Br. 51-52).  Kwok fails to grapple with the Bankruptcy Court's conclusion—after presiding over a four-day hearing and reviewing a voluminous record—that the demonstrations were (i) causing significant unnecessary delay that is "likely to lead to the dissipation of assets and reduced recoveries to creditors, which in bankruptcy … may be considered irreparable harm," (ii) undermining the Trustee's investigation by chilling the investigation and intimidating creditors who may come forward, and (iii) creating the risk that the Trustee would resign under circumstances that would "unlikely [] lead to the appointment of a replacement Chapter 11 trustee" and thus "thwart the Court's previous decision that a Chapter 11 trustee should be appointed[.]"  (A.0454).

Moreover, Kwok has essentially admitted by his own conduct that the demonstrations would "embarrass, burden, delay or otherwise impede the reorganization proceedings."  As the Bankruptcy Court noted, on October 21, 2022, when it appeared that a settlement favorable to Kwok was imminent, he "called for the members of his movements – the NFSC and the Whistleblower Movement – as well as his personal followers, to cease doxing PAX to allow for peace and settlement between the Debtor and PAX."  (A.0454).

### C.    The Bankruptcy Court Correctly Found That the Balance of Harms Favors Injunctive Relief.

In balancing the harms to the bankruptcy proceeding with the harms to Kwok's First Amendment rights, the Bankruptcy Court appropriately analyzed the Injunction's provisions under applicable First Amendment precedent.  As discussed, *supra* Section II, the Injunction satisfies both intermediate ***and*** strict scrutiny.  Kwok's assertion that he would be irreparably injured by losing his First Amendment freedoms (Br. 53) presumes, incorrectly, that the Injunction violates the First Amendment.  Since it does not, Kwok's purported concerns do not

outweigh the harm his and his followers' conduct would cause the other bankruptcy participants.

> **D.    The Bankruptcy Court Correctly Found That the Public Interest Weighs in Favor of the Injunction.**

Kwok also argues that the public interest weighs against the Injunction.  (Br. 55).  His argument fails for two reasons:  *First*, it is circular because, again, Kwok presumes that the Injunction is an improper prior restraint.  While "securing First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), the Injunction does not violate the First Amendment because it is narrowly tailored to achieve compelling state interests.  The Bankruptcy Court correctly concluded that the reasonable restraints on Kwok's speech are justified by both the public interest in "preserving the sanctity and privacy of the home and the rule of law" and the public interest in the integrity of the bankruptcy process and court proceedings.  (A.0468).

*Second*, in likening his speech to the "impartial distribution of news and ideas" protected by the First Amendment and suggesting the Injunction "deprive[s] our free society of the stimulating benefit of varied ideas because their purveyors fear physical or economic retribution solely because of what they choose to think and publish," Kwok misses the mark.  (Br. 55, citing *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 150-151 (1967)).  Unlike *Curtis*, this case is not a libel action brought against a magazine publisher.  This is a bankruptcy proceeding at risk of being improperly derailed by targeted harassment and intimidation campaigns against the Trustee investigating the debtor's estate, the debtor's largest creditor, their counsel, and their uninvolved relatives.  Doxing, harassing, and threatening individuals for the sake of interfering with justice is not speech that lies at the First Amendment's core.  Moreover, unlike in *Curtis*, the individuals fearing "physical or economic retribution" are not Kwok and his supporters, but the Appellees who are entitled to a peaceful and functional bankruptcy process.

## CONCLUSION

For all of the foregoing reasons, this Court should affirm the Injunction.

Dated: September 25, 2023            Respectfully submitted,
Hartford, Connecticut

**LUC A. DESPINS,**                   **Pacific Alliance Asia Opportunity Fund L.P.**
**CHAPTER 11 TRUSTEE**

By: /s/ _Douglas S. Skalka_           By: _/s/ Patrick M. Birney_
Douglas S. Skalka (ct00616)        Patrick M. Birney (CT No. 19875)
Patrick R. Linsey (ct29437)         Annecca H. Smith (CT No. 31148)
NEUBERT, PEPE & MONTEITH, P.C.   ROBINSON & COLE LLP
195 Church Street, 13th Floor       280 Trumbull Street
New Haven, Connecticut 06510      Hartford, CT 06103
(203) 781-2847                    Telephone: (860) 275-8275
dskalka@npmlaw.com           Facsimile: (860) 275-8299
plinsey@npmlaw.com           E-mail: pbirney@rc.com
                              asmith@rc.com

-and-                               -and-

Nicholas A. Bassett (_pro hac vice_     Peter Friedman (_pro hac vice_ pending)
forthcoming)                 Stuart M. Sarnoff (_pro hac vice_ pending)
PAUL HASTINGS LLP         Daniel L. Cantor (_pro hac vice_ pending)
2050 M Street NW            pfriedman@omm.com
Washington, D.C., 20036       ssarnoff@omm.com
(202) 551-1902                 dcantor@omm.com
nicholasbassett@paulhastings.com    O'MELVENY & MYERS LLP
                              Seven Times Square
-and-                               New York, NY 10036
                              Telephone: (212) 326-2000
Avram E. Luft (_pro hac vice_ forthcoming)   Facsimile: (212) 326-2061
Douglass Barron ((_pro hac vice_ forthcoming)
PAUL HASTINGS LLP         _Attorneys for Pacific Alliance Asia_
200 Park Avenue            _Opportunity Fund L.P._
New York, New York 10166
(212) 318-6079
aviluft@paulhastings.com
douglassbarron@paulhastings.com

_Counsel for the Chapter 11 Trustee_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2023, a copy of the foregoing was filed electronically through the Court's CM/ECF System.  Notice of this filing will be sent by e-mail to all parties receiving notice by operation of the court's electronic filing system.  Parties in interest may access this filing through the Court's CM/ECF System.

/s/ *Patrick M. Birney*
Patrick M. Birney

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned certifies that the above brief complies with the applicable type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i) as modified by this Court's September 19, 2023 order (ECF No. 50) because, excluding the parts of the memorandum exempted by Federal Rule of Bankruptcy Procedure 8015(g), this brief contains 14,971 words.

Date: September 25, 2023

*/s/ Patrick M. Birney*
Patrick M. Birney (CT No. 19875)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Telephone: (860) 275-8275
Facsimile: (860) 275-8299
E-mail: pbirney@rc.com

*Counsel to Pacific Alliance Asia
Opportunity Fund L.P.*