**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

------------------------------------------

IN RE: KWOK,
    *Debtors*

------------------------------------------

HO WAN KWOK,
    *Debtor-Appellant*,

      v.

PACIFIC ALLIANCE ASIA
OPPORTUNITY FUND, and LUC A.
DESPINS,
    *Appellees*.

------------------------------------------

BANKR. NO. 22-50073 (JAM)
    *Chapter 11*

ADV. PRO. NO. 22-5032

CIVIL NO. 3:23-CV-102 (KAD)

SEPTEMBER 30, 2024

**MEMORANDUM OF DECISION**

Kari A. Dooley, United States District Judge:

Pending before the Court is Ho Wan Kwok's (the "Debtor" or "Appellant") appeal of the Bankruptcy Court's preliminary injunction order (the "PI") against him and those within his control prohibiting the intimidation and harassment of, principally, the Chapter 11 Trustee, Luc A. Despins (the "Trustee"), and Appellant's largest creditor, Pacific Alliance Asia Opportunity Fund ("PAX") (collectively, the "Appellees").[1]  *See In re Kwok*, No. 22-ap-5032 (JAM) (Bankr. D. Conn. Jan. 13, 2023), ECF No. 134 (hereinafter, the "PI Order").  For the reasons set forth below, the preliminary injunction order of the Bankruptcy Court is AFFIRMED.

**Background**

The Bankruptcy Court's Memorandum of Decision Granting in Part the Motion for Preliminary Injunction (hereinafter, the "PI Memorandum") contains a comprehensive explanation of the facts and procedural history relevant to the instant appeal.  The Court assumes the parties'

---

[1]  As discussed *infra.*, the PI Order also protected PAX's affiliates and their officers or employees, counsel to the Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses).  *See* PI Order.

familiarity with the underlying facts and procedural history, as well as the PI Memorandum, and recites herein only those necessary to the Court's decision.

Facts[2]

On July 8, 2022, a Gettr social media account controlled by the Debtor[3] posted a statement from the Debtor that "the entire process of changing the trustee and my personal bankruptcy case is among the greatest treasures of our New Federal State of China and is of immense significance." PI Memorandum at ¶ 27.  The Debtor believes that the Trustee should be removed from his case for an alleged conflict of interest.  *Id.*  On July 13, 2022, the Debtor posted a statement on Gettr that he and undisclosed other parties would do their best to investigate the Trustee's past work as a bankruptcy trustee and as a lawyer working on IPOs.  *Id.* at ¶ 28.  On July 19, 2022, the Debtor posted another statement on Gettr about the Trustee, stating "[p]lease spread the words about the revelations of the [Chinese Communist Party] military intelligence and the truths about the trustee of my bankruptcy case. All the U.S. DOJ officials and lawyers from various law firms who want to deport me and harm me will be sent to prison. I have the most unique voice in the world because almost every part of my body that can voice has been tortured by the CCP."  *Id.* at ¶ 29.

After the Bankruptcy Court granted PAX's Motion for Appointment of Chapter 11 Trustee on June 15, 2022, PAX and the Debtor engaged in settlement discussions on diverse dates between July 2022 and September 2022.  *Id.* at ¶ 30.  As part of those settlement discussions, PAX

---

[2]  Insofar as Appellant does not challenge the Bankruptcy Court's factual findings, the Court does not revisit the findings. Accordingly, the Court refers the parties to the PI Memorandum for a detailed account of, *inter alia*, the "Entities Related to the Debtor," the "Parties Related to the Debtor," and the "Social Media Accounts Related to the Debtor."  *See* No. 22-ap-5032, ECF No. 134.  The Court has also removed some internal citations to the record for ease of reading.

[3]  As detailed in the PI Memorandum, the Debtor frequently utilized various accounts on the social media platform Gettr to communicate with his wide audience of supporters, including @Miles, @MilesGuo, and @MilesGuoLive. *See* PI Memorandum, ECF No. 133 at ¶¶ 16–26.  The Bankruptcy Court found—and the parties do not contest—that the Debtor controls the aforementioned Gettr accounts.

demanded that the Debtor stop the doxing of PAG's[4] executives and their families.  *Id.* at ¶ 31.  On October 21, 2022, the Debtor made a statement posted on the New Federal State of China ("NFSC") YouTube channel asking the audience, which included "fellow fighters," "friends of the [NFSC]," and his personal supporters, to stop spreading the personal information of PAG's executives and their families and counsel.  *Id.*  The Debtor stated that he recognized this was a necessary condition for settlement and reconciliation, and acknowledged that numerous parties he had accused of supporting the CCP may one day become friends of the NFSC.  *Id.*

Notwithstanding, on November 15, 2022, a Gettr account affiliated with the Debtor, @NFSCSpeaks, posted personal home addresses of the Trustee, the Trustee's family members, the chairman of PAG, family members of the chairman of PAG, and the law offices of the Trustee and PAX's counsel.  *Id.* at ¶ 34.  The post called for a 90-day protest at these locations.  *Id.*  The post also contained photographs of some of the individuals living at the home addresses listed in the post.  *Id.*

On November 16, 2022, counsel for the Debtor transmitted to the Trustee a letter summarizing the proposed terms for a global settlement that were acceptable to the Debtor.  *Id.* at ¶ 35.  Counsel for the Debtor wanted to settle the case before the settlement fell apart on account of things "heating up," including, *inter alia*, the social media campaign.  *See id.*  On November 17, 2022, a settlement meeting took place at the New York City office of Brown Rudnick.  *Id.* at ¶ 36.  The Debtor, his attorneys, and his translator were present.  *Id.*  The Trustee and his attorney were also present at the meeting.  *Id.*  Prior to the meeting, the parties attending entered into a nondisclosure agreement.  *Id.*  During the meeting, the Trustee asked for $250 million to resolve the Debtor's Chapter 11 case, a demand that counsel for the Debtor found outrageous and

---

[4] PAG is the managing partner of PAX. *See* PI Memorandum at 18 n.8.

extortionate. *Id.* at ¶ 37.  The Debtor believed he was close to reaching a settlement with PAX, but that the Trustee's $250 million demand destroyed the deal. *Id.*

On November 19, 2022, the Debtor recorded a video which was posted on a Gettr account affiliated with the Debtor, @chinatruth2022, on November 20, 2022. *Id.* at ¶ 39.  In the video, the Debtor represents that he "personally, strongly oppose[s]" the protests "in front of PAX office building and other places." *Id.*  The video makes no mention of protests in front of the homes of the Trustee and his family, the offices of Paul Hastings, or the homes of the PAG chairman and his family. *Id.*  The video also advises viewers "if you really want to protest . . . be sure to consult a lawyer first, within the perimeter of the law, act within the perimeter of the law, and be sure to observe your state ordinances and local police . . . I strongly oppose and absolutely do not support such protests." *Id.*

On November 20, 2022, the @NFSCSpeaks Gettr account posted a statement identifying the Trustee's daughters and stating that their father is aiding and abetting the CCP. *Id.* at ¶ 41. The post also contained photographs of the Trustee and his daughters, and identified where they work. *Id.*  The Debtor reposted this post on his own Gettr page. *Id.*

On November 20, 2022, protests occurred directly in front of the Trustee's home. *Id.* at ¶ 42.  The protesters held signs which were primarily targeted directly at the Trustee. *Id.*  The next day, protesters at the Trustee's home distributed leaflets to neighbors describing the Trustee and his counsel as enablers of the CCP and accusing the Trustee of racism. *Id.* at ¶ 43.

On or before November 20, 2022, subpoenas pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure were issued to at least one of the Debtor's associates. *See id.* at ¶ 40. The Rule 2004 subpoenas led in part to additional protests at the offices of PAX's counsel in Washington D.C. *Id.*  On November 21, 2022, the Debtor participated in an internet broadcast

acknowledging the Rule 2004 subpoenas, and advised the audience that they should avoid receipt of the subpoenas and, if they are "stupid" and receive the subpoenas, entities affiliated with the Debtor would hire attorneys to help them contest the subpoenas.  *Id.* at ¶ 44.  In that same broadcast, the Debtor stated that the Trustee and his counsel would suffer "calamities" because of the Rule 2004 subpoenas: "[t]o deal with this rogue, we have our rogue's ways. In a few days you will see what would happen to him. Calamities, I can tell you guys. They will suffer calamities!" *Id.* at ¶ 45.

On November 22, 2022, GNews, an entity founded by the Debtor, conducted an internet broadcast from the protests outside of the O'Melveny & Myers New York City office, stating that it was the third day of such protests.  *Id.* at ¶ 47.  The protesters held placards with stylized, inflammatory depictions of O'Melveny & Myers attorneys, as well as the Trustee.  *Id.*  On November 23, 2022, the @NFSCSpeaks Gettr account posted a video of protests that occurred immediately in front of the home of a family member of PAG's chairman.  *Id.* at ¶ 48.  Protesters displayed signs with photographs of PAG's chairman with the word "SPY" and "CCP" prominently displayed.  *Id.*  On November 24, 2022, a video was posted on YouTube, in which the Debtor personally called for "Comrades" to "persevere with the 90-day protest," cited the Rule 2004 subpoenas as a reason for the protests, and stated that the Trustee's behavior was mafia-like and worse than that of the CCP.  *Id.* at ¶ 49.  On November 24, 2022, the @MilesGuoLive Gettr account posted photographs of the protests occurring at the home of PAG's chairman's son with supportive emojis and stated, "Comrades who have worked so hard to protest on the frontline, rain or shine, salute you!"  *Id.* at ¶ 50.  The placards seen in the photograph are largely targeted at PAG's chairman.  *Id.*

On November 25, 2022, the @NFSCSpeaks Gettr account posted a video timestamped November 23, 2022, depicting protesters picketing and parading through the private lobby of the building which houses the Paul Hastings office in New York City.  *Id.* at ¶ 52.  The protesters carried placards displaying inflammatory, edited photographs of the Trustee, the Trustee's counsel, and PAX's counsel.  *Id.*  A large banner with the NFSC emblem was carried by the protesters.  *Id.*  At the protest, Beile Li, an associate of the Debtor, stated: "To everyone at Paul Hastings . . . Millions of People that have been persecuted by the CCP with curse you, will curse your family, curse every single person in your life because there is blood on your hands" and "the people of the [NFSC], 500 million of us . . . we stand against Paul Hastings, and we stand against O'Melveny.  There is no going back, there is no recourse.  You have committed a crime, and now you're going to suffer the consequences of your actions."  *Id.*

On November 25, 2022, the @Miles Gettr account posted an NFSCSpeaks broadcast of protesters picketing in front of the Trustee's home, standing behind an NFSC banner and displaying accusatory signs.  *Id.* at ¶ 53.  That same day, the @Miles Gettr account posted images of protests also occurring at the home of a relative of PAG's chairman, in which protesters are depicted in front of the home carrying signs with photographs of a targeted party and displaying NFSC flags.  *Id.* at ¶ 54.  Also on November 25, 2022, the @NFSCSpeaks Gettr account posted a video depicting protesters outside Paul Hastings's Tokyo office holding pickets directed at the Trustee.  *Id.* at ¶ 56.

On November 25, 2022, the Trustee received a series of emails at his work email from the same unknown email address with the subject lines "I wish" and "i kill."  *Id.* at ¶ 55.  The "I wish" email had the body text "hhhhhhhhhhahahahaha."  *Id.*  The "i kill" email had no body text.  *Id.*  The Trustee believed these emails to be a threat.  *Id.*  The next day, an unknown caller left a threatening

voicemail on the Trustee's work telephone number stating "Luc, you are CCP's running dog. You need to go to Hell. You just did something so ridiculous and your end is so close. F-U-C-K." *Id.* at ¶ 61. Also on November 26, 2022, numerous Paul Hastings employees received emails from multiple senders stating that the NFSC and "Chinese whistleblowers" called upon Paul Hastings employees to speak up against the Trustee and/or leave the law firm. *Id.* at ¶ 60.

On November 26, 2022, the @Miles Gettr account again posted an NFSCSpeaks internet broadcast depicting protesters picketing in front of the Trustee's home, standing behind an NFSC banner and displaying accusatory signs. *Id.* at ¶ 57. On November 26, 2022, the @NFSCSpeaks Gettr account posted a link to an article in support of a comment that stated "$250 Million Dollar EXTORTION OF THE CENTURY" and "DOJ Appointed Trustee Despins Blackmails $250 Million, Threatens to 'Tear Apart' Chinese Dissidents." *Id.* at ¶ 58. The post included an inflammatory photograph of the Trustee's face. *Id.* On November 30, 2022, the @MilesGuoLive Gettr account posted the same text with a stylized image of the Trustee. *Id.* The "$250 Million Dollar Extortion of the Century" article fueled additional individuals to protest and/or organize protests. *Id.* at ¶ 59. The Debtor, or someone under his control or direction, breached the NDA about the November 17, 2022 meeting for the purpose of creating the article. *Id.* at ¶ 74. On November 28, 2022, the @Miles Gettr account posted a broadcast depicting protests occurring in front of the O'Melveny & Myers offices in Washington, D.C. and New York. *Id.* at ¶ 63. Protesters carried signs targeting PAG's chairman. *Id.* Protests targeting the Trustee also occurred at Grand Central Station in New York City on November 29, 2022. *Id.* at ¶ 64. On December 3, 2022, the @Miles Gettr account posted a video depicting protesters picketing in front of PAX's counsel's apartment building in New York City. *Id.* at ¶ 65. Also on December 3, 2022, a video

was posted on Gettr depicting protesters placing a placard including a stylized image of PAX's counsel at the door of his home, and sliding a letter under his door. *Id.* at ¶ 66.

On or before December 5, 2022, the protestors rented a home in California directly across from the home of a relative of PAG's chairman and placed on it a billboard and signs targeting PAG's chairman. *Id.* at ¶ 67.

On or before December 7, 2022, protests accusing the Trustee of soliciting a bribe and seeking to destroy a Chinese dissident organization occurred at the Trustee's daughter's and ex-wife's homes. *Id.* at ¶ 69. The protestors swarmed his ex-wife. *Id.* As a result, the Trustee hired a bodyguard for his daughter. *Id.*

On or before December 7, 2022, protests accusing the Trustee of being an antisemite and profiting from antisemitism accompanied with images of the Trustee as a Nazi officer occurred at Grand Central Station in New York City, which is adjacent to the Paul Hastings office. *Id.* at ¶ 70. That morning, the Trustee had also encountered protestors at his home when leaving for work at about 8:15am or 8:20am. *Id.* at ¶ 71. It was a peaceful encounter, but the protestors were trying to take photos of him. *Id.*

The Debtor supports, encourages, and is the leader of a social media and protest campaign targeting Appellees, their counsel, and their relatives, at their personal homes and workplaces. *Id.* at ¶ 77. The social media campaign and protests are tied to Appellees' involvement in the Chapter 11 cases, including appointment of the Trustee, which resulted in a divestiture of the Debtor's control over his Chapter 11 case, discovery efforts of the Trustee and his efforts to discover and recover estate assets, and the efforts of PAX to satisfy its claim which was reduced to judgment before the Debtor filed his Chapter 11 case. *Id.* The social media and protest campaign accuses Appellees and their counsel of, *inter alia*, being members or agents of the CCP, supporting and

financing genocide in Xinjiang, seeking to destroy the NFSC, anti-Chinese racism, and antisemitism. *Id.* The Debtor supports the protest campaign and has offered legal support to those individuals and entities served with Rule 2004 subpoenas, considering the protestors to be his comrades. *Id.*

Due to the protest campaign, the Trustee had to plan his schedule around avoiding the protestors, and spent numerous hours arranging protection with the U.S. Marshals and providing incoming evidence to them. *Id.* at ¶¶ 85, 91. The Trustee was also concerned that the Debtor's inflammatory rhetoric and his supporters' response thereto was escalating, and was directed not only to the Trustee, but also to others who have no involvement in these cases. *Id.* at ¶ 87. For example, the Trustee recalled a protestor chasing and screaming at Paul Hastings colleagues on their way up the escalator into the firm's New York City office. *Id.* Relatedly, partners at Paul Hastings expressed concerns as to how long the social media and protest campaign would last, and how much it would impact the firm, and have further discussed the Trustee's potential resignation. *Id.* at ¶ 89. Additionally, counsel for the Trustee became nervous about coming to work through the gauntlet of protestors. *Id.* at ¶ 90. Resulting hybrid work has slowed down the Trustee's investigation into the Debtor's estate. *Id.*

The Trustee believed the instant adversary proceeding was a damaging diversion from his investigation into the Debtor's assets—for both him and the Bankruptcy Court. *Id.* at ¶ 94. The process of attempting to recover estate assets has been delayed, and the Trustee could not hire professionals to assist with the investigation without those assets. *Id.* Moreover, the Trustee's investigation has relied on unpaid informants who also became very concerned by the social media and protest campaign, fearing it could turn against them. *Id.* at ¶ 95. Likewise, the Trustee has

also encountered hesitancy from creditors to participate in the Debtor's case due to the social media and protest campaign. *Id.* at ¶ 96.

<u>Procedural History</u>

On November 22, 2022, PAX, the Debtor's largest creditor, filed a complaint and an application for a temporary restraining order ("TRO") and a preliminary injunction against the Debtor. *See* No. 22-ap-5032, ECF No. 3. PAX alleged that the Debtor had orchestrated a campaign of harassment and intimidation directed at PAX, its officers, and their families as a means of disrupting the bankruptcy proceedings. PAX sought to enjoin the Debtor and others from posting false and harassing materials about—as well as the personal information of—the Trustee, PAX, and their officers, employees, and relatives, and encouraging or funding protests that were occurring at their homes and offices. *Id.* PAX also requested that the Debtor be ordered to remove social media posts that disclosed personal information of the Trustee, PAX, and their officers, employees, and relatives, or otherwise encouraged protests at their homes and offices. *Id.* The Trustee filed a motion to intervene as a plaintiff that same day, which was subsequently granted. *See* No. 22-ap-5032, ECF Nos. 9, 25.

The Bankruptcy Court held an expedited hearing on the TRO application on November 23, 2022. *See id.* at ECF No. 18. PAX proffered evidence in the form of social media posts, screenshots, and information that the Debtor had been "defaming, harassing, and encouraging and organizing protests against individuals involved in the [Debtor's] Chapter 11 case, including PAX, family members of PAX's chairman, PAX's counsel, the Chapter 11 Trustee, family members of the Chapter 11 Trustee, and the Chapter 11 Trustee's counsel." No. 22-ap-5032, ECF No. 26 at 2–3. Accordingly, the Bankruptcy Court entered a TRO pursuant to Federal Rule of Civil Procedure 65 and 11 U.S.C. § 105(a), finding that imminent, irreparable harm to the bankruptcy

estate and process was likely absent a TRO, and the need to protect against such harm outweighed any restraint on the Debtor's speech. *Id.* at 4–5. The TRO enjoined the Debtor and his "officers, agents, servants, employees, and attorneys and other persons who are in active concert of participation with" him from: (1) posting false and harassing material about or personal information of the Trustee, PAX or PAG's officers or employees, counsel to the trustee or PAX, and their respective relatives and encouraging, inciting, suggesting, or funding protests at their homes or offices; and (2) interfering with the integrity of the bankruptcy proceedings (such as by threatening the safety of the Trustee, PAX, PAG, and their officers, employees, counsel, and relatives,); and further (3) ordered the Debtor to remove social media posts that contained false or harassing material about or the personal information of the aforementioned persons or encouraging similar conduct towards those persons. *Id.* at 6. The Bankruptcy Court scheduled a hearing on PAX's motion for a preliminary injunction for December 2, 2022. *Id.*

On December 5, 2022, the Bankruptcy Court began what would be a four-day evidentiary hearing on PAX's motion for a preliminary injunction. Following the evidentiary hearing, on January 11, 2023, the Bankruptcy Court issued the PI, enjoining the Debtor from the already restrained behavior and dissolving the TRO. No. 22-ap-5032, ECF No. 134. Specifically, the PI Order provides:

> (a) With respect to individual homes and residences of the Plaintiffs and their relatives, the Court issues a "before or about" injunction that applies *at all times* to preserve the quiet enjoyment of the home, *see Frisby v. Schultz*, 487 U.S. 474 (1988), enjoining the Debtor from protesting, picketing, parading, or displaying or distributing harassing

material[5], at any time, before or about the homes or residences of the Chapter 11 Trustee, PAX's or its affiliates' officers or employees, counsel to the Chapter 11 Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses);

(b) With respect to individual homes and residences of *relatives*, the Court issues an injunction that applies *at all times* to preserve the rule of law, *see Cox v. State of Louisiana*, 379 U.S. 559 (1965), enjoining the Debtor from protesting, picketing, parading, or displaying or distributing harassing material, at any time, within two hundred feet (200 ft.) of the homes of relatives (including former spouses) of the Chapter 11 Trustee, PAX or its affiliates, PAX's or its affiliates' officers or employees, and counsel to the Chapter 11 Trustee or PAX;

(c) With respect to individual homes and residences of the Plaintiffs and their relatives, the Court issues a *time, place, and manner restriction* injunction to preserve the quiet enjoyment of the home, *see Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994); *Frisby v. Schultz*, 487 U.S. 474 (1988), enjoining the Debtor from protesting, picketing, parading, or displaying or distributing harassing material, between 3:00 p.m. (15:00) and 10:00 a.m. (10:00) applicable local time within two-hundred feet (200 ft) of the homes or residences, but not before or about the homes or residences (wherein subparagraph (a), *supra*, controls), of the Chapter 11 Trustee, PAX's or its affiliates' officers or employees, counsel to the Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses);

(d) With respect to the offices or workspaces of the Plaintiffs and their relatives, the Court issues an injunction that applies *at all times* to preserve the rule of law, *see Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994); *Cox v. State of Louisiana*, 379 U.S. 559 (1965), enjoining the Debtor from protesting, picketing, parading, or displaying or distributing harassing material, at any time, within thirty-six feet (36 ft.) of any entrance to the offices or workplaces (which may include universities and schools) of the Chapter 11 Trustee, PAX or its affiliates,

---

[5]  The Bankruptcy Court subsequently instructed that: "'harassing material' shall include (but not be limited to) material that depicts, describes, or accuses the Chapter 11 Trustee, PAX or its affiliates, PAX's or its affiliates' officers or employees, counsel to the Chapter 11 Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses) as Communists, agents of the Chinese Communist Party, extortionists, anti-Semites, racists, supporters of genocide, or otherwise makes similarly disparaging allegations regarding such parties' actions or beliefs. For the avoidance of doubt, counsel for the Chapter 11 Trustee and PAX include, without limitation, Paul Hastings LLP, O'Melveny & Myers LLP, Robinson & Cole LLP, and Neubert, Pepe & Monteith, P.C., and each of the lawyers and employees of the foregoing law firms (the lawyers of each such law firm include without limitation those lawyers listed on each law firm's website). For the further avoidance of doubt, protesting, picketing, parading, or displaying or distributing harassing material are prohibited, within the above specified parameters, by this Order include, without limitation, (i) in the lobby of and on the streets and sidewalks bordering and surrounding Paul Hastings' office at 200 Park Avenue in New York City; (ii) in the lobbies of and on the streets and sidewalks bordering and surrounding O'Melveny & Myers' offices at 7 Times Square, New York City and 1625 Eye Street, NW Washington, DC; and (iii) on the property of and on the streets and sidewalks bordering and surrounding the homes and residences of all the individuals referenced in the subparagraph (a) of this paragraph." No. 22-5032, ECF No. 134, at 5–6.

PAX's or its affiliates' officers or employees, and counsel to the Chapter 11 Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses);

(e) With respect to the offices or workplaces of the *relatives*, the Court issues an injunction that applies *at all times* to preserve the rule of law, *see Cox v. State of Louisiana*, 379 U.S. 559 (1965); *Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022), enjoining the Debtor from protesting, picketing, parading, or displaying or distributing harassing material, at any time, within one hundred feet (100 ft.) of the offices or workplaces (which may include universities and schools) of relatives (including former spouses) of the Chapter 11 Trustee, PAX or its affiliates, PAX's or its affiliates' officers or employees, and counsel to the Chapter 11 Trustee or PAX;

(f) With respect to the offices and workplaces of the Plaintiffs and their relatives, the Court issues a *time, manner, and place restriction* injunction to preserve the rule of law, *see Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994); *Cox v. State of Louisiana*, 379 U.S. 559 (1965); enjoining the Debtor from protesting, picketing, parading, or displaying or distributing harassing material, between 8:00 a.m. (8:00) and 10:00 a.m. (10:00) and between 4:00 p.m. (16:00) and 8:00 p.m. (20:00) applicable local time within one hundred feet (100 ft.) of the offices or workplaces (which may include universities and schools), but not within thirty-six feet (36 ft.) of an entrance to the offices or workplaces (wherein subparagraph (d), *supra*, controls), of the Chapter 11 Trustee, PAX or its affiliates, PAX's or its affiliates' officers or employees, counsel to the Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses);

(g) With respect to doxing the Plaintiffs and their relatives, the Court issues an injunction to preserve the quiet enjoyment of the home, *see Frisby v. Schultz*, 487 U.S. 474 (1988), enjoining the Debtor from publishing online the home addresses and other personal information (including, with respect to relatives, relatives' employers) of the Chapter 11 Trustee, PAX's or its affiliates' officers or employees, counsel to the Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses); and

(h) With respect to incitement, the Court issues an injunction in support of the preceding injunctions, *see Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994); *Frisby v. Schultz*, 487 U.S. 474 (1988); *Cox v. State of Louisiana*, 379 U.S. 559 (1965), enjoining the Debtor from encouraging, inciting, suggesting, or directly or indirectly funding any activity enjoined by subparagraphs (a)–(g) of this paragraph via any form of communication including, without limitation, social media.

No. 22-5032, ECF No. 134, at 2–5.

The Bankruptcy Court further ordered, *inter alia*, that:

2.  The Debtor is further preliminarily enjoined from interfering in any way with the integrity of his Chapter 11 case, the Chapter 11 case of Genever Holdings, LLC, and the Chapter 11 case of Genever Holdings Corporation, which have been jointly administered in this Court, including taking any act to, and/or directing or encouraging others to take any act that, threatens, or encourages others to threaten the safety of Chapter 11 Trustee, PAX's or its affiliates' officers or employees, counsel to the Chapter 11 Trustee or PAX, and any of their respective relatives (including former spouses);

3.  The Debtor is directed to take down all existing social media posts on accounts he uses or controls, including, without limitation, the Gettr accounts with the (former) handles @Miles, @MilesGuo, and @MilesGuoLive, that (a) contains the home addresses and other personal information (including, with respect to relatives, relatives' employers) of the Chapter 11 Trustee, PAX's or its affiliates' officers or employees, counsel to the Chapter 11 Trustee or PAX or its affiliates, and any of their respective relatives (including former spouses); and/or (b) encourage, incite, or suggest any activity enjoined by paragraphs 1 and/or 2 of this Order;

4.  The terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and

5.  In accordance with Fed. R. Civ. P. 65(d)(2), the Debtor, his officers, his agents, his servants, his employees, his attorneys, and other persons who are in active concert or participation with the Debtor, his officers, his agents, his servants, his employees, and his attorneys are bound by this Order upon receiving actual notice by personal service or otherwise. For the reasons stated above, the Court has found that (a) the individuals Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Roy Guo, Jiao Bing Shang, Shan Mu, Yaqin Li, Ziheng Cheng, and Elliot Dordick and (b) the entities New Federal State of China; Himalaya Global Alliance and other Himalaya entities, such as Himalaya Exchange, Himalaya Farms, and Himalaya New World, Inc.; the Rule of Law Foundation; and G-Series entities, including, without limitation, GTV and G-News, as well as any persons or entities acting at their direction or on their behalf are the Debtor's officers, agents, servants, employees, attorneys, and/or other persons who are in active concert or participation with the Debtor, his officers, his agents, his servants, his employees, and his attorneys.

No. 22-5032, ECF No. 134, at 6–7.

On January 26, 2023, the Debtor filed the instant appeal of the PI order.  ECF No 2.

**Standard of Review**

Districts courts have jurisdiction to hear appeals from "final judgments, orders, and decrees . . . [and] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges." 28 U.S.C. § 158(a). "The decision as to whether to grant leave to appeal an interlocutory order of a bankruptcy court is committed to the discretion of the district court." *Osuji v. U.S. Bank, N.A.*, 285 F. Supp. 3d 554, 557 (E.D.N.Y. 2018) (citing *In re Kassover*, 343 F.3d 91, 94 (2d Cir. 2003). On April 12, 2023, this Court granted leave for Debtor to appeal because the "preliminary injunction order involves a controlling question of law, to which there is substantial ground for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the adversary proceeding." *See* ECF No. 27.

On appeal, the district court will "review Bankruptcy Courts' conclusions of law *de novo*, and their findings of fact for clear error." *Mercury Capital Corp. v. Milford Connecticut Associates, L.P.*, 354 B.R. 1, 6–7 (D. Conn. 2006) (citing Fed. R. Bankr. P. 8013).

**Discussion**

Subject Matter Jurisdiction

Appellant first contends that the Bankruptcy Court lacked subject matter jurisdiction to enter the PI. Appellant Br. at 15–19. Specifically, Appellant argues that this matter does not arise in or relate to Title 11 or concern administration of the bankruptcy estate, and further purports that Appellees' state law claims of defamation and criminal violations do not arise under or in Title 11. *Id.* Appellees respond that this adversary proceeding arises under Title 11 because it seeks a preliminary injunction pursuant to § 105(a) of the Bankruptcy Code and because this action has no conceivable existence outside the bankruptcy proceedings insofar as it sought to restrain the debtor from intimidating the Trustee and the debtor's largest creditor and otherwise sought to

enjoin conduct that contributed to the breakdown of settlement negotiations.  Appellee Br. at 12–16.  Additionally, Appellees argue that Appellant's conduct unquestionably impacted the administration of the bankruptcy estate.  *Id.* at 14.

Section 1334(b) of Title 28, United States Code confers three types of jurisdiction over bankruptcy proceedings: (1) "arising under" jurisdiction; (2) "arising in" jurisdiction; and (3) "related to" jurisdiction.  Core proceedings are those that fall within the bankruptcy court's "arising in" and "arising under" jurisdiction; non-core proceedings are those that fall within the bankruptcy court's "related to" jurisdiction.  28 U.S.C. § 157; *Stern v. Marshall*, 564 U.S. 462 (2011).

"Jurisdiction under 28 U.S.C. § 1334(b)'s 'related to' prong rests where the proceeding's outcome 'could conceivably have any effect on the estate being administered in bankruptcy.'"  *In re Indicon*, 499 B.R. 395, 401 (D. Conn. 2013); *see also In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have any 'conceivable effect' on the bankruptcy estate. If that question is answered affirmatively, the litigation falls within the 'related to' jurisdiction of the bankruptcy court.").  "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected to the bankruptcy estate."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 340 (2d Cir. 2018) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).  "While 'related to' jurisdiction is not 'limitless,' . . . it is fairly capacious, and includes 'suits between third parties which have an effect on the bankruptcy estate.'"  *Id.* (internal citations omitted).

Section 105(a) of Title 11, United States Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]."  The Second Circuit has observed that the "equitable power conferred on the bankruptcy court by

section 105(a) is the power to exercise equity in carrying out the provisions of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing. This language 'suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective.'" *New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quoting 2 *Collier on Bankruptcy* ¶ 105.01[1] (15th ed. 2003)).

Appellant argues that *Stern* demonstrates that the Bankruptcy Court lacked jurisdiction over this matter because Appellees' claims sound in state law. The Court disagrees. As noted by another district court in this Circuit, *Stern* "lends clear support for the conclusion that a non-core matter that arises in connection with a core proceeding renders that matter core, for purposes of determining a bankruptcy court's subject matter jurisdiction, as long as the non-core matter is sufficiently related to the core proceeding." *In re Kirwan Offices S.a.r.l.*, 592 B.R. 489, 506 (S.D.N.Y. 2018). And the "Second Circuit has repeatedly held that, where confronted with matters that qualify as core and non-core, matters that are integral to the integrity of the bankruptcy process render the entire proceeding core—even where the non-core issues are under another jurisdiction's laws and related to prepetition events." *Id.* (collecting cases).

This is not a close question. The Bankruptcy Court had jurisdiction to enter the PI because it is, at the very least, "related to" the administration of the bankruptcy estate.[6] Appellant's conduct began shortly after a contentious and pivotal negotiation with his largest creditor which has undisputedly not yet been resolved (and may well have been inhibited by the protest campaign). Moreover, as a consequence of the protest campaign, the Trustee encountered hesitancy from creditors to participate in the proceeding, and even considered resigning. *See* PI Memorandum at

---

[6] The Bankruptcy Court concluded that the matter was a "statutorily core proceeding," a conclusion which finds support in the cases cited above. PI Memorandum at 7.

¶¶ 89, 96.  Accordingly, at a minimum, the Bankruptcy Court had "related to" jurisdiction to adjudicate the request for a preliminary injunction, because the failure to do otherwise might have "a direct and substantial adverse effect on [the] ability to undergo a successful reorganization." *See Celotex*, 514 U.S. at 308–10.

<u>Application of the Preliminary Injunction Standard</u>

The Bankruptcy Court has authority to issue a preliminary injunction under both Section 105(a) of the Bankruptcy Code and Rule 65 of the Federal Rules of Civil Procedure, as made applicable to adversary proceedings under Bankruptcy Rule 7065.  *See In re Soundview Elite Ltd.*, 543 B.R. 78, 115 (Bankr. S.D.N.Y. 2016) (issuing preliminary injunction "under each of [Rule 65 and Section 105(a)], each of which provides separate authority for such measures"); *In re Peterson*, No. 10-23429 (AMN), 2018 WL 1172447, at *2 (Bankr. D. Conn. Mar. 2, 2018) ("The traditional standards for issuance of an injunction pursuant to Fed. R. Civ. P. 65 are made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7065.").  Insofar as Appellees' motion for a preliminary injunction sought relief pursuant to Section 105(a), the Bankruptcy Court applied the Section 105(a) standard, and found that Appellees had met the requirements for the issuance of the PI.  *See* PI Memorandum at 34, *et seq*; *see also In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 622, 650 (Bankr. S.D.N.Y. 2023) ("Whether a Court applies the traditional [Rule 65] requirements in a given case depends in large part on the arguments made by the litigants").

While the Second Circuit has not established the requisite standard for issuing a preliminary injunction under Section 105(a), the Bankruptcy Court accurately observed that courts in this Circuit routinely apply an approach that employs the "traditional preliminary injunction standard as modified to fit the bankruptcy context," such that Section 105(a) injunctive relief may enter if: (1) there is a likelihood of successful reorganization; (2) there is an imminent irreparable

harm to the estate in the absence of an injunction; (3) the balance of harms tips in favor of the moving party; and (4) the public interest weighs in favor of an injunction. *See, e.g.*, *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007); *In re Lyondell Chem. Co.*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009).

Because the Second Circuit has not established a standard for injunctive relief pursuant to Section 105(a), Appellant argues that the Bankruptcy Court was required to evaluate the PI under the standards applicable to Rule 65 motions.[7] Appellant Br. at 49.  Alternatively, Appellant argues that, even applying the Section 105(a) standard, the Bankruptcy Court erred in its evaluation. *Id.* Specifically, Appellant contends that: (a) the protest campaign did not cause a failed reorganization; (b) Appellees' purported irreparable harm is legally insufficient and refuted by the record; (c) Appellant's First Amendment freedoms outweigh the "inconvenience and cost to [the Trustee] and unpleasant statements and depictions"; and (d) "[t]he public interest weighs heavily against silencing [Appellant] and his supporters." *Id.* at 49–55.

Appellees disagree, and argue that Appellant misapplies the "likelihood of success" prong under Section 105(a) and ignores the applicable "irreparable harm" analysis.  Appellee Br. at 43–

---

[7] The motion for preliminary injunction explicitly invoked both Section 105(a) and Rule 65, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure. *See* No. 23-ap-5032, ECF No. 3.  While the Bankruptcy Court evaluated—and granted—the motion for preliminary injunction consistent with Section 105(a), the Court finds that even if it had assessed the motion under the traditional Rule 65 standard, the result is the same. *See In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. at 650 ("there should hardly ever be a situation where an injunction is warranted under one authority but not the other.").  The competing standards are largely identical: they both require a showing that irreparable harm was likely absent the injunction, as well as an analysis of the balance of harms to each party and the public interest in issuing the injunction.  Where they differ is in the "likelihood of success" analysis.  Indeed, a party seeking a preliminary injunction pursuant to Rule 65 must demonstrate "a likelihood of success on the *merits*." *In re Homaidan*, 650 B.R. 372, 406 (Bankr. E.D.N.Y. 2022) (emphasis added).  By comparison, Section 105(a) requires an evaluation as to whether there is a likelihood of *successful reorganization*. *In re Calpine Corp.*, 365 B.R. at 409 (emphasis added).  Appellant argues that, under Rule 65, the Bankruptcy Court should have evaluated the likelihood of success on Appellees' underlying defamation claim, upon which "Appellees could not hope to succeed." Appellant Br. at 49.  But neither the Appellees' underlying Complaint, nor their motion for a preliminary injunction, advance a defamation claim.  Thus, were a court to employ the Rule 65 standard here, it would evaluate the likelihood of success on the request for a preliminary injunction.  As set forth herein, the PI satisfies strict scrutiny, and is not otherwise vague, ambiguous, or overbroad.  Thus, the Court concludes that Appellants have demonstrated a likelihood of success and, for the reasons articulated herein, have also satisfied the remaining prongs of the traditional Rule 65 standard for preliminary injunctions.

45.  Appellees argue that their harms are not outweighed by any harm to Appellant's free speech rights because the PI does not violate the First Amendment.  *Id.* at 46.  Appellees further urge that the public interest weighs decidedly in Appellees' favor.  *Id.* at 45–46.  The Court agrees with Appellees, and concludes that the Bankruptcy Court properly applied and analyzed the Section 105(a) factors in issuing the PI.

To establish "likelihood of success" in this context, there must be a "*reasonable* likelihood of a successful reorganization."  *In re Lyondell*, 402 B.R. at 589 (citing *Hawaii Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06-CV-5358 (PKC), 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006)).  As observed by the Bankruptcy Court, the Trustee's investigation appears likely to "liquidate and recover enough assets to fund a confirmable Chapter 11 plan," which the Bankruptcy Court would consider a success.  *See* PI Memorandum at 38–39.  The Appellant does not challenge this assessment, and instead insists that the enjoined conduct would not "cause" a failed reorganization.  Appellant Br. at 49–50.  But this argument misreads *In re Lyondell*, which does not require a showing that the enjoined conduct would otherwise prevent a successful reorganization.  *See* 402 B.R. at 590 (merely acknowledging that "there is no reason to believe or suspect that [the] reorganization will fail—unless, of course, the acts sought to be enjoined *cause* it to fail") (emphasis in original).

Next, the Court concludes that the Bankruptcy Court correctly found "irreparable harm" if the PI was not issued.  When evaluating a preliminary injunction under Section 105(a)'s framework, courts in this Circuit "have determined that irreparable harm need not be shown . . . in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process."  *In re Soundview*, 543 B.R. at 119–20.  "Thus, where the movant shows that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization

proceedings or if the stay is necessary to preserve or protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue injunctive relief." *In re Lyondell*, 402 B.R. at 590 (internal quotation marks omitted).   Here, the Court is persuaded that the protest campaign threatened the reorganization process and the bankruptcy proceedings.   Due to the protest campaign, the Trustee encountered hesitancy from creditors and unpaid informants to participate in the bankruptcy proceeding, and even considered resigning as the Trustee.  *See* PI Memorandum at ¶¶ 89, 96.  The Bankruptcy Court concluded—and this Court accepts—that were the Trustee to resign, it is unlikely that a replacement trustee would be appointed under these circumstances, and that even if a replacement was appointed, they would "have to start over again."  *Id.* at 42. Moreover, the Trustee testified that the process of attempting to recover the estate's assets was delayed by the protest campaign, and that the Trustee cannot hire professionals to assist with the investigation without those assets.  *Id.* at ¶ 94.  Absent the PI, the Court assumes that the called for "90 day" protest campaign would have continued—and possibly intensified—thereby delaying the Trustee's investigation and asset recovery efforts, and undeniably threatening the reorganization process.  *See In re Soundview*, 543 B.R. at 119–20.   Indeed, many of the protests portended additional, escalating obstruction of the Trustee and PAX's efforts.  Finally, the Court observes that the harmful impact of the protest campaign and the motivation behind it were made manifest when the Appellant asked his supporters—just as the parties were nearing a settlement—to cease doxing PAX.  PI Memorandum at ¶ 31.

Likewise, the balance of hardships tips in Appellees' favor.  Appellant urges that he is irreparably harmed by the loss of his First Amendment freedoms under the PI.  But, as discussed *infra.*, the PI does not violate Appellant's First Amendment rights.  Accordingly, absent any such concerns, any inconvenience or constitutionally permissible restriction on Appellant's speech does

not outweigh the significant and demonstrable harm that the protest campaign had—and would surely continue to have—on the bankruptcy participants (*e.g.*, the Trustee, PAX, their respective counsel, etc.) and the proceeding itself.

Lastly, the Court agrees with the Bankruptcy Court's assessment that the PI "vindicates the public's interest in the integrity of the bankruptcy process," and further "serves the public's interest in preserving the sanctity and privacy of the home." PI Memorandum at 56. Indeed, as set forth herein, the Court finds both the quiet enjoyment of the home and the integrity of the bankruptcy proceedings to be compelling state interests which defeat Appellant's First Amendment claims. To be sure, Appellant's protest campaign had already delayed and/or otherwise obstructed the efficient administration of the underlying bankruptcy proceeding, and would no doubt have continued to do so. Further, the PI's prohibition on protesting, picketing, parading, or displaying or distributing harassing material before or about the homes of the protected parties plainly serves the public's interest in avoiding the home becoming "a bunker where ingress and egress are subject to protest." *See id.* at 47. Accordingly, the public interest weighs in favor of the PI.

<u>First Amendment</u>

As discussed, Appellant challenges the PI as violative of the First Amendment to the United States Constitution. Appellant makes two principal arguments: (1) that the PI is an impermissible prior restraint; and (2) that the scope of the PI is not sufficiently narrowly tailored to survive strict scrutiny review. *See* Appellant Br. at 19–33. In response, Appellees argue that the PI is, in fact, a viewpoint-neutral time, place, and manner restriction subject to—and withstanding—immediate scrutiny, and that it also survives strict scrutiny because it is narrowly tailored to serve multiple

compelling state interests. Appellee Br. at 17–32. The Court concludes that the PI must withstand strict scrutiny and that it does so.[8]

In evaluating a prior restraint on speech, the Court has an "obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Metropolitan Opera Ass'n v. Local 100, Hotel Employees & Restaurant Employees*, 239 F.3d 172, 176 (2d Cir. 2001). A prior restraint on expression has a "'heavy presumption' against its constitutional validity," *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971), and is "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Indeed, "when a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases." *Metropolitan Opera Ass'n*, 239 F.3d at 176.

Content-based policies must satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). As such, preliminary injunctions are "presumptively unconstitutional and may be justified only if the [Plaintiffs] prove[] that they are narrowly tailored to serve compelling state interests[]." *Id.*

Here, the PI prohibits Appellant, and those within his control, from: (1) posting false and harassing material about or personal information of the Trustee, PAX or PAG's officers or

---

[8] The Court rejects Appellees' argument that the PI is a viewpoint-neutral time, place, and manner restriction subject to immediate scrutiny. Although the PI certainly addresses types of expressive conduct—such as protesting, picketing, and parading—at certain places and towards certain persons, it is abundantly clear that the thrust of the injunction is to prevent the dissemination of "harassing material." Under the PI, the Debtor is enjoined "from protesting picketing, parading, or displaying or distributing harassing material." No. 22-ap-5032, ECF No. 134 at 3. "Content-based regulations 'target speech based on its communicative content.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Reed*, 576 U.S. at 163. The Court concludes that the PI's time, place, and manner restrictions cannot be read without the prohibition against the "harassing material" identified—and precisely defined—by the injunction, thus rendering strict scrutiny analysis appropriate.

employees, counsel to the Trustee or PAX, and their respective relatives and encouraging, inciting, suggesting, or funding protests at their homes and offices; and (2) interfering with the integrity of the bankruptcy proceedings by protesting with harassing materials at their homes, offices, and workplaces.  PI Order at 2–6.  The PI further orders Appellant to remove social media posts that contained false or harassing material about or the personal information of the aforementioned persons or encouraging similar conduct towards those persons.  *See id.* at 6–7.  Importantly, the PI defines "harassing material" as including, but not limited to, material that depicts the protected parties as "Communists, agents of the Chinese Communist Party, extortionists, anti-Semites, racists, supporters of genocide, or otherwise makes similarly disparaging allegations regarding such parties' actions or beliefs."  *See id.* at 5–6.

Recognizing that the PI is a content-based prior restraint subject to strict scrutiny, for the reasons that follow, the Court concludes that the PI is sufficiently narrowly tailored to serve two compelling state interests.

### Compelling State Interests

The PI serves two compelling state interests: (1) the state interest in protecting the "well-being, tranquility, and privacy of the home," *see, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988); and (2) the state interest in protecting the integrity of the bankruptcy proceedings.  *See, e.g.*, *Cox v. Louisiana*, 379 U.S. 559 (1965); *Picard v. Magliano*, 42 F.4th 89, 103 (2d Cir. 2022).

It is beyond dispute that a compelling state interest exists in protecting the well-being, tranquility, and privacy of the home.  "Even protected speech is not equally permissible in all places and at all times."  *Frisby*, 487 U.S. at 479 (1988).  "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society," and First Amendment restrictions can bow to residential privacy because it

protects "the unwilling listener." *Id.* at 484.  Indeed, as the Supreme Court recognized, the home is different because it is a place for people to retreat and avoid speech that they do not want to hear. *Id.* at 484–85.

Here, as in *Frisby*, the PI does not prohibit general marching through a residential neighborhood, "or walking a route in front of an entire block of houses."  487 U.S. at 483.  Rather, the PI prohibits picketing that takes place "solely in front of a particular residence." *Id.*  In support of the PI, the Bankruptcy Court specifically observed that protests occurred directly in front of the Trustee's house, that protesters distributed leaflets to the Trustee's neighbors, that the Trustee revised his schedule to avoid the protestors, and that the home addresses of the Trustee, PAX, PAG, their counsel, and their relatives were posted online. *See* PI Memorandum at ¶¶ 42–43, 48, 53-54, 57, 66, 69, 71.  This conduct more neatly aligns with the facts of *Frisby*, in which the Supreme Court upheld a ban on picketing intended to "intrude upon the targeted resident, and to do so in an especially offensive way," "even if some such picketers have a broader communicative purpose, [because] their activity nonetheless inherently and offensively intrudes on residential privacy." *Id.* at 486.  Accordingly, the Court concludes that the Bankruptcy Court properly concluded that the protest campaign implicated the compelling state interest in the well-being, tranquility, and privacy of the home.

Likewise, there is a compelling state interest in protecting the integrity of the underlying bankruptcy proceeding.  The vital and dynamic role of the bankruptcy process is well-settled and continually reinforced by both the courts and Congress alike. *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (Observing the bankruptcy courts' "fundamental nature" as courts of equity); *United States v. Berg*, 250 F.3d 139, 143 (2d Cir. 2001) (Recognizing the importance of protecting the integrity

of the bankruptcy system) (citing *United States v. Messner*, 107 F.3d 1448, 1457 (10th Cir. 1997));

*see also Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2098 (2024) (Kavanaugh, J.,

dissenting) (acknowledging the "flexibility and common sense of the bankruptcy system at work,"

as well as "Chapter 11's ever-elusive goal of ensuring fair and equitable recovery to creditors");

*Celotex*, 514 U.S. at 308 (bankruptcy courts enjoy "comprehensive jurisdiction," "so that they

might deal efficiently and expeditiously with all matters connected with the bankruptcy estate");

11 U.S.C. § 105 (affording bankruptcy courts the power to issue any orders "necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]").

Similarly, "[t]here can be no question that a State has a legitimate interest in protecting its

judicial system from the pressures which picketing near a courthouse might create." *Cox*, 379 U.S.

at 462; *Picard*, 42 F.4th at 103 (same); *see also United States v. Trump*, 88 F.4th 990, 1003 (D.C.

Cir. 2023) ("[E]ven protected speech may, and sometimes must, be regulated when necessary to

protect a compelling governmental interest, including the fair administration of a criminal trial.")

(citing *Cox*). Courts have an obligation to ensure that speech does not "divert the trial from the

'very purpose' of a court system,'" which is "'to adjudicate controversies, both criminal and civil,

in the calmness and solemnity of the courtroom according to legal procedures.'" *Trump*, 88 F.4th

at 1004 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 350–51 (1966)). "Due process demands that

'the conclusions to be reached in a case will be induced only by evidence and argument in open

court, and not by any outside influence, whether of private talk or public print," and this duty

extends to protecting "court personnel from both the reality and the appearance of undue outside

pressure." *Id.* Accordingly, "a State may adopt safeguards necessary and appropriate to assure

that the administration of justice at all stages is free from outside control and influence." *Picard*,

42 F.4th at 103 (citing *Cox*, 379 U.S. at 562)).  Each of these pronouncements are equally applicable to the important work of the bankruptcy courts.

So although *Cox* and *Trump* involved criminal prosecutions and protests occurring outside the courthouse itself, the Court finds that the compelling state interest in protecting the integrity of the bankruptcy proceedings is equally persuasive under these circumstances.  *See In re Flint Water Cases*, No. 16-CV-10444 (JEL), 2024 WL 2139318, at **19–20 (E.D. Mich. May 13, 2024) (acknowledging the reasoning in *United States v. Trump* as persuasive in assessing whether an order limiting speech would be appropriate where conduct in the litigation included a "public relations campaign [involving] the intimidation and harassment [of] opposing counsel").

The Trustee—an officer of the Court—testified that discussions were held at his law firm as to whether the Trustee should resign in light of the protest campaign.  *See* PI Memorandum at ¶ 89.  The Bankruptcy Court found that were the Trustee to resign, it is unlikely that a replacement trustee would be appointed under these circumstances, and that even if a replacement was appointed, they would "have to start over again."  *Id.* at 42.  The Trustee further testified that he spent hours arranging protection with the U.S. Marshals and providing evidence to the U.S. Marshals.  *Id.* at ¶ 91.  Moreover, and critically, due to the social media and protest campaign, the Trustee encountered hesitation and concern from both putative creditors and unpaid informants in participating in the bankruptcy proceeding.  *Id.* at ¶¶ 95–96.  This underscores the chilling effect that the protest campaign has had on potential witnesses and creditors.  Indeed, a particular focus of the protest campaign was the Debtor's largest creditor, PAX, as well as lawyers for the Trustee and PAX.  *See id.* at ¶¶ 40, 47, 52, 54, 56, 63, 65–66, 70.  Insofar as essential figures in the underlying bankruptcy proceeding—including the Trustee himself—have been repeatedly targeted

by the protest campaign, it follows that the integrity of the bankruptcy proceeding may be compromised if not afforded adequate protection.

In this vein, Appellant's reliance on *Keefe* is misplaced. 402 U.S. 415. There, the Supreme Court struck down an injunction prohibiting the distribution of leaflets in Westchester, Illinois which targeted the perceived improper practices of a local real estate broker. *See id.* In the Court's view, *Keefe* is factually inapposite. In *Keefe*, a civil rights organization was broadly enjoined from distributing "leaflets or *literature of any kind*, and from picketing, *anywhere in the City of Westchester, Illinois*." *Id.* at 417 (emphasis added). The Supreme Court struck down the injunction, emphasizing, *inter alia*, that the individual seeking the injunction was "not attempting to stop the flow of information into his own household, but to the public" at large. *Id.* at 420. By contrast, the PI issued by the Bankruptcy Court is far more targeted. It applies to specific locations (*e.g.*, private households), as opposed to an entire city, and is confined to a particularized type of expressive communication, to wit, harassing materials. As such, the PI does not prohibit criticism of the Trustee generally, nor does it enjoin protesting, picketing, parading, or displaying or distributing harassing material beyond certain specific geographic locations. Appellant also relies on the protest campaign as being a matter of public concern. But this argument misses the point. Even if the campaign against the Trustee and others implicated a public concern, unlike *Keefe*, the PI was purposefully crafted to stop the flow of information, not to the concerned public, but into the subject households. *See* 402 U.S. at 420; *cf. Frisby*, 487 U.S. at 486 (prohibiting picketing that was narrowly directed at the household, not the public).

*Narrowly Tailored*

Given these compelling state interests, the Court must next evaluate whether the PI is narrowly tailored to protect those interests, *i.e.*, that it employs the "least restrictive means of achieving" its stated purpose. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

Here, the PI imposes various geographic and time restrictions, including: (1) a prohibition at all times against protesting "before or about" the homes or residences of the protected parties and their relatives; (2) a prohibition at all times against protesting within 200 feet of the homes of the relatives of the protected parties; (3) a prohibition from 3:00pm to 10:00am against protesting within 200 feet of the homes of the protected parties; (4) a prohibition at all times against protesting within 36 feet of any entrances to the offices or workplaces of the protected parties; (5) a prohibition at all times against protesting within 100 feet of the offices and workplaces (including schools or universities) of the relatives of the protected parties; and (6) a prohibition from 8:00am to 10:00am and 4:00pm and 8:00pm against protesting within 100 feet of the offices and workplaces of the protected parties. PI Order at ¶ 1(a)–(f). The PI also prohibits publishing the home addresses and/or other personal information of the protected parties online, and encouraging or inciting the activity enjoined by the PI. *Id.* at ¶ 1(g)–(h).

Appellant argues that the PI is not adequately narrowly tailored because of the "breadth of locations and people protected; arbitrary buffer zones; arbitrary time restrictions; and breadth of activities prohibited." Appellant Br. at 28–34. Appellant urges that the PI does not define many of the aforementioned locations, thereby protecting potentially thousands of unidentified homes, offices, and campuses given the global reach of the law firms involved in the underlying bankruptcy proceeding. *Id.* at 29. Appellant also contends that the PI's "buffer zones" (*e.g.*, 100 feet from workplaces, 36 feet from workplace entrances, and 200 feet from homes) were arbitrarily

selected, and insists that for offices in New York City, a 100-foot buffer would effectively suppress the protests entirely.  *Id.* at 29–32.  Appellant further argues that the time restrictions were arbitrarily selected without evidence in the record suggesting noise issues, that the PI's content restrictions are too strict on protestors' speech, and that the prohibition against protesting, picketing, parading, and displaying or distributing harassing material provides no alternatives for free speech. *Id.* at 32–35.

Appellees disagree, and argue that restricting Appellant and his associates from targeting the protected parties directly in front of their homes and offices and imposing certain time and location buffers—while leaving ample alternative channels for the protestors to express themselves—is narrowly tailored to address the compelling state interests identified herein. Appellee Br. at 24.  Specifically, Appellees insist that the: (a) breadth of locations, individuals, and activities covered by the PI; (b) precise time restrictions and buffer zones set forth in the PI; and (c) content prohibited by the PI are each narrowly tailored to either the quiet enjoyment of the home and/or the integrity of the bankruptcy proceedings.  *Id.* at 24 –30.

On balance, the Court agrees with Appellees and, upon review of the Bankruptcy Court's extensive factual findings supporting the PI, concludes that the PI is narrowly tailored to achieve its identified goals.

<u>Breadth of Locations and "Buffer Zones"</u>

First, regarding the locations covered by the PI, the Second Circuit has observed that "a statute that imposes a geographic restriction on protests directed at cases being tried in . . . courthouses, while not restricting demonstrations on other subjects in the same area, is indeed narrowly tailored because the compelling interest that justifies the restriction is triggered by the content of the speech.  As with the prohibition on electioneering near polling places, the

compelling justification does not warrant limiting all speech near courthouses or restricting the particular type of speech at issue in all public fora, but it does arguably justify limiting particular forms of speech in the particular location." *See Picard*, 42 F.4th at 105–106; *see also Cox*, 379 U.S. at 562.  Here, the Court finds—with the benefit of a highly detailed factual record—that the PI similarly, and justifiably, limits a particular type of speech in particular locations as a means of advancing the compelling state interests discussed above.  *See Picard*, 42 F.4th at 106.

Likewise, the Bankruptcy Court's corresponding "buffer zones" do not run afoul of the First Amendment.  In *Madsen v. Women's Health Ctr., Inc.*, the Supreme Court determined, *inter alia*, that: (a) a 300-foot "buffer zone" around the subject residences would be impermissibly equivalent to a complete ban on "'[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses'"; and (b) a 36-foot "buffer zone" around the entrance to the subject business (an abortion clinic) was appropriate.  *See* 512 U.S. 753, 775 (1994)).  The 200-foot and 36-foot "buffer zones" imposed by the PI are entirely consistent with the Supreme Court's analysis in *Madsen*.[9]  *See id.*  Additionally, the PI's 100-foot "buffer zones"— which apply to both the protected parties' workplaces during likely hours of ingress and egress, as well as the offices and workplaces of the protected parties' *relatives* at all times—are also permissible.  The ingress/egress "buffer zone" at workplaces is tailored to "avoid close encounters between protestors and workers that might undermine the integrity of the bankruptcy proceeding." PI Memorandum at 50.  As the Bankruptcy Court found, in the absence of any injunction, such encounters did, in fact, occur.  *See, e.g.*, *id.* at ¶ 87 (Trustee recalled a protestor chasing and screaming at Paul Hastings colleagues on their way up the escalator into the firm's New York City

---

[9]  While Appellant contends that the 200-foot "buffer zone" is arbitrary, the Court notes that to the contrary, the Bankruptcy Court explained its decision with a precise finding that "200 feet should provide enough room for cars to safely drive into and out of a neighborhood," and "should also provide ample room as a noise buffer."  *See* 512 U.S. at 775; PI Memorandum at 47 n.12.

office).  Moreover, the Supreme Court has suggested that even a complete ban on protesting at the offices of *relatives* would have been permissible insofar as protesting "uninvolved relatives only serves to intimidate."  *See id.* at 50 (citing *Cox*, 379 U.S. at 562).

In sum, the PI's geographic restrictions and corresponding "buffer zones" were prompted by protests involving harassing and threatening material directed at the homes, offices, and workplaces of the Trustee, PAX, their counsel, and their relatives.  The Bankruptcy Court set forth a detailed rationale for these restrictions, which makes manifest the Bankruptcy Court's effort to craft the "least restrictive means" necessary to protect the compelling state interests discussed above.  *See, e.g.*, PI Memorandum at 47 n.12 ("200 feet should provide enough room for cars to safely drive into and out of a neighborhood."); 50 at n.15 ("The Court chooses 100 feet because it concludes most pedestrian traffic – from parked cars, transit stops, and homes – destined for the offices should occur within this distance from the offices.").  While these restrictions may pose some logistical challenges in places like New York City, the Court cannot conclude on this record that the PI unconstitutionally burdens the protestor's free speech rights, or that a less restrictive alternative was available to the one crafted by the Bankruptcy Court.

<u>Time Restrictions</u>

The Court next concludes that the time restrictions imposed by the PI at both the protected parties' residences and their workplaces are sufficiently narrowly tailored.  *See Madsen*, 512 U.S. at 755 (acknowledging that a court may impose a reasonable limitation on the time and duration of protests).  Regarding the protected parties' residences, the time restrictions are imposed to protect the quiet enjoyment of the home, and are narrowly tailored to that end insofar as they reflect the hours in which the protected parties "are likely to be resting at home and traveling to and from work or school."  *See* PI Memorandum at 47.  Indeed, the Trustee testified that he encountered

protestors at his home attempting to photograph him when leaving for work at about 8:15am or 8:20am, and the Court agrees that the quiet enjoyment of the home is "destroyed when the home is turned into a bunker where ingress and egress are subject to protest." *See id.* The Court further agrees that nighttime noise from the protests is a threat to the protected parties' quiet enjoyment of the home. Indeed, as noted by the Bankruptcy Court, all of the relevant towns and cities targeted by the protest campaign have nighttime noise ordinances. *See id.* The PI's resulting nighttime restrictions are the least restrictive means of subduing the threat to the protected parties' quiet enjoyment of the home.

As to the workplace specific time restrictions—which the Appellant does not appear to challenge—the Court nonetheless finds that they were specifically imposed to avoid close encounters between protestors and workers that might threaten the integrity of the bankruptcy proceeding, and to that end, are permissibly limited only to likely hours of ingress and egress.

<u>Breadth of Individuals</u>

As to the breadth of individuals covered by the PI, the Court first observes that the PI protects particular parties *to the bankruptcy proceeding*, as well as their counsel and families, *i.e.*, individuals who have been directly targeted by the protest campaign. *See Picard*, 42 F.4th at 105–106. Moreover, as described *infra*, the Court is persuaded that the PI permissibly describes the context in which it was issued, and the vast scope of the protest campaign itself. In short, there is little or no risk that the protesters will misapprehend the identities of the protected individuals.

<u>Breadth of Prohibited Content and Activities</u>

Appellant insists that by prohibiting the dissemination of "harassing material," the PI regulates content. The Court agrees but concludes that the PI's restriction on "harassing material" is narrowly tailored to achieve the compelling state interest in upholding the integrity of the

bankruptcy proceedings and the quiet enjoyment of the protected parties' homes.  Indeed, "harassing material" is precisely defined to include "material that depicts, describes, or accuses the [protected parties] as Communists, agents of the Chinese Communist Party, extortionists, anti-Semites, racists, supporters of genocide, or otherwise makes similarly disparaging allegations regarding such parties' actions or beliefs."  *See* PI Order at 5.  These materials, particularly when directed at the Trustee and the Debtor's largest creditor, are unquestionably designed to intimidate participants in the bankruptcy proceeding, undermine the legitimacy of the bankruptcy proceeding, and hinder the work of the Trustee.  The prohibition against such harassing material is therefore narrowly tailored to address the Bankruptcy Court's concerns about transform[ing] the legal process into "'mob law.'"  *See* PI Memorandum at 49.

Appellant further argues that the PI's prohibition impermissibly offers no alternatives.  *See* Appellant Br. at 34.  Appellant is incorrect.  The PI prohibits protesting, picketing, parading, or displaying or distributing harassing material in certain locations during certain times, and within certain "buffer zones."  It does not restrict the aforementioned activities beyond those parameters, and indeed, declines to enjoin "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses."  *Madsen*, 512 U.S. 753, 775.  Accordingly, the PI leaves ample alternative channels for expression.

Scope of the Injunction

Appellant next challenges the PI as vague, ambiguous, and overly broad.  Specifically, Appellant argues that the PI: (a) fails to adequately define key terms such as "disparaged," "harassing," "action or beliefs," and "interfering"; (b) is overly broad in who it purports to protect and the sort of conduct it restrains; and (c) accordingly, fails to put this Court on notice of what it is reviewing.  Appellant Br. at 38–43.  By contrast, Appellee contends that the PI is neither vague,

ambiguous, nor overbroad, because it bars specific acts at specific places during specific times, and otherwise explicitly apprises Appellant of the conduct it prohibits. Appellee Br. at 32–35. The Court agrees with Appellee and concludes that the PI, which was carefully crafted following a four-day evidentiary hearing, is sufficiently clear to give explicit notice of precisely what conduct is prohibited and to whom it applies.

"Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Indeed, Rule 65 of the Federal Rules of Civil Procedure—which was "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders"—contemplates that preliminary injunctions "shall be specific in terms" and "shall describe in reasonable detail . . . the act or acts sought to be restrained." *See* Fed. R. Civ. P. 65; *Schmidt*, 414 U.S. at 476. In short, "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Ass'n*, 473 F.2d 244, 247 (2d Cir. 1972). Vague, ambiguous, or overly broad orders "will not withstand appellate scrutiny." *Diapulse Corp. v. Carba*, 626 F.2d 1108, 1111 (2d Cir. 1980).

As to the PI's purported vagueness, the Court is not persuaded that the terms "disparaging," "harassing," "actions and beliefs," and "interfering" as set forth in the PI are "subjective, general terms susceptible to interpretation." *See* Appellant Br. at 38–39. First, the PI specifically sets forth a detailed definition of "harassing material," and the term "similarly disparaging" is plainly limited by that definition. PI Order at 5. In turn, "actions or beliefs" is appropriately limited by both "similarly disparaging," as well as the foregoing definition of "harassing material." *Id.* Put simply, the forbidden acts are clear. *Sanders*, 473 F.2d at 247. Second, contrary to Appellant's contentions, the term "interfering" is not impermissibly vague because it is limited first by the term

"integrity," and then by the ensuing language specifying that "interfering" includes "taking any act to, and/or directing or encouraging others to take any act that, threatens, or encourages others to threaten the safety of [the protected parties]." *See* PI Order at ¶ 2.  Generally, the Court observes that the PI followed an extensive, four-day evidentiary hearing, as well as the Bankruptcy Court's resulting 61-page supporting memorandum, which sets out the bases for the PI in great detail. Accordingly, the Court concludes that the meaning of "interfering," in addition to the "harassing material" meant to be enjoined by the PI, is abundantly clear to Appellant and all those subject to the terms of the PI.

Next, the Court finds that the PI is not impermissibly overbroad.  In crafting the PI, the Bankruptcy Court considered—and set out comprehensively—the extensive and intricate factual background relevant to Appellees' motion.  The Bankruptcy Court described in detail: (a) the various entities, persons, and social media accounts related to Appellant; (b) the social media and protest campaign itself, and the timeline of those events; (c) Appellant's involvement with the social media and protest campaign, including the numerous related statements made and/or reposted by Appellant online; and (d) the effects of the social media campaign and protest campaign on the Trustee's bankruptcy investigation.  *See generally* PI Memorandum.

Additionally, while portions of the PI may appear to be drafted broadly, the Court finds that the broad language employed by the PI reflects the context in which it was issued, and is proportionate to the vast scope of the protest campaign itself.  *See S.C. Johnson & Son v. Clorox Co.*, 241 F.3d 232, 241 (2d Cir. 2001) (acknowledging that a reviewing court may consider the context in which a preliminary injunction was issued to determine whether it is sufficiently specific).  Indeed, the protest campaign was not confined to a precise geographic location or narrow type of expressive communication.  Rather, the protest campaign was widespread, and was

carried out online, at private residences across the country, and at workplaces and offices across the world. Moreover, the PI's definition of "harassing material" is likewise appropriately comprehensive because the extent of the harassment associated with the protest campaign was itself varied, far-reaching, and evolving (*e.g.*, protesting, picketing, parading, and displaying or distributing harassing material, revealing sensitive personal information, sending threatening emails and voicemails, chasing and screaming at employees of the Trustee's law firm as they entered the office, etc.). As such, the Court concludes that the PI is appropriate in scope, and is "hardly so broad as to be considered a mere obey-the-law order of the sort that [] has [been] condemned in the past." *S.C. Johnson & Son, Inc.*, 241 F.3d at 241 (citing *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 748 (2d Cir. 1994)). Accordingly, the Court concludes that the PI is not unconstitutionally vague, ambiguous, or overbroad.

Hearsay Evidence

Appellant argues that most of the Bankruptcy Court's fact finding was impermissibly based on inadmissible hearsay, namely, unsworn "social media posts and internet videos." [10] Appellant Br. at 43–46. In response, Appellee asserts that the Bankruptcy Court was permitted to rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction.

---

[10] As a preliminary matter, it is not apparent that much of the social media evidence relied upon was, in fact, hearsay, that is, offered for the truth of the assertions made. This evidence established the fact that the statements were made, and was not offered as evidence that the statements were true. For example, the Bankruptcy Court was not called upon to decide whether the Trustee was an agent of the CCP as averred in some of the postings. The harassing statements themselves or the call to action on social media are the operative facts proven by the social media evidence and to this extent they are not hearsay. Indeed, they were offered not for their truth but for their effect on the listener, *i.e.*, fear, intimidation and the like.

Appellee Br. at 36–38.  The Court agrees with Appellees, and finds that the Bankruptcy Court appropriately considered the hearsay evidence in determining whether to grant the PI.[11]

It is well-established that hearsay evidence may be considered in determining whether to grant a preliminary injunction because "[t]he admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage."  *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").

Appellant contends that this rule applies only to certain hearsay evidence, *e.g.*, depositions, affidavits, other sworn testimony, and "inherently trustworthy" evidence.  Appellant Br. at 44–45. *See e.g.*, *We the Patriots USA v. Hochul*, 17 F.4th 266, 276 n.3 (2d Cir. 2021) ("[C]ourts may consider hearsay evidence such as affidavits when determining whether to grant a preliminary injunction."); *United States v. Buddhu*, No. 08-CV-74, 2008 WL 2355930, at *1 n. 2 (D. Conn. June 5, 2008) ("In considering a motion for a preliminary injunction, the Court may rely on affidavits, depositions, and sworn testimony, even when they include hearsay.") (citations omitted).  However, at the evidentiary hearing, every social media post introduced into evidence was "authenticated for purposes of admissibility."  Appellant Br. App'x (ECF No. 44) at A.0509; *see SEC v. Musella*, 578 F.Supp. 425, 427–28 (S.D.N.Y.1984) (a court need not discount hearsay evidence presented in an application for a preliminary injunction if such evidence is found to be

---

[11]  Appellant does not appear to fundamentally challenge the Bankruptcy Court's fact finding as a whole, which, consequently, this Court has accepted as well-supported in the record.  Rather, Appellant merely insists that "[t]he evidentiary record is fatally flawed."  Appellant Br. at 14.  In support of this contention, Appellant identifies only a few specific facts upon which the Bankruptcy Court improperly relied on hearsay evidence, none of which appear to be of great significance.  *See, e.g.*, Appellant Br. at 45 (citing Bankruptcy Court's determinations that: (1) Elliot Dordick is a GETTR employee; and (2) Appellant referred to Beile Li as a "a great wise, beautiful sister").  Otherwise, Appellant appears to generally contest the Bankruptcy Court's reliance on unsworn "social media posts and internet videos."  *Id.*  Accordingly, it is unclear what relief is being sought by Appellant in this regard.  Nevertheless, the Court assumes that Appellant seeks to strike down the entire PI on these grounds.

"inherently trustworthy").  As such, the purportedly impermissible hearsay (if hearsay at all) relied on by the Bankruptcy Court in granting the PI was sufficiently reliable and "inherently trustworthy," and therefore appropriately considered in the Bankruptcy Court's fact finding, particularly given the urgency and haste inherent in any request for a preliminary injunction.  *See Mullins*, 626 F.3d at 52 (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction . . . makes it difficult to obtain affidavits from persons who would be competent to testify at trial.").

**Conclusion**

For all of the foregoing reasons, the Court AFFIRMS the order of the Bankruptcy Court granting Appellees' motion for a preliminary injunction.  The Clerk of the Court is directed to enter judgment in favor of Appellees and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September 2024.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE